UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LOUISIANA MUNICIPAL POLICE EMPLOYEES'
RETIREMENT SYSTEM, Derivatively on Behalf
of Itself, and All Others Similarly Situated,

                                  Plaintiff,

                vs.

DAN R. HESSE, JOSEPH J. EUTENEUR,
ROBERT H. BRUST, PAUL N. SALEH,
JAMES H. HANCE, JR., ROBERT R. BENNETT,
GORDON M. BETHUNE, LARRY C. GLASSCOCK,
V. JANET HILL, FRANK IANNA,
SVEN-CHRISTER NILSSON,
WILLIAM R. NUTI, and RODNEY O'NEAL,

                                  Defendants,

                –and–

SPRINT NEXTEL CORP.,

                                  Nominal Defendant.

Civ. No. 12-4017(ALC)(JCF)

**NOTICE OF REMOVAL**

---

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 and Local Civil Rule 81.1, defendants Dan R. Hesse, Joseph J. Euteneur, Robert H. Brust, Paul N. Saleh, James H. Hance, Jr., Robert R. Bennett, Gordon M. Bethune, Larry C. Glasscock, V. Janet Hill, Frank Ianna, Sven-Christer Nilsson, William R. Nuti, and Rodney O'Neal (the "Individual Defendants"), and nominal defendant Sprint Nextel Corp. ("Sprint Nextel" and, together with the Individual Defendants, the "Defendants"), by and through their respective undersigned counsel, remove to this Court the action captioned above and described in paragraph 1 below.  In support of removal, Defendants state as follows:

**INTRODUCTION**

1.      The removed action is a purported shareholder derivative action filed on or about April 30, 2012, in the Supreme Court of the State of New York, New York County, and captioned *Louisiana Municipal Police Employees' Retirement System v. Hesse, et al.*, Index No. 651436/2012 (the "State Court Action").

2.      No defendant has been properly served with process in the State Court Action nor has any purported proof of service been filed by the plaintiff.[1]   Accordingly, this Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b).

3.      All Defendants join in this Notice of Removal, and thereby consent to removal.

4.      Pursuant to 28 U.S.C. § 1446(a), copies of all process, pleadings, and orders known to have been filed in the State Court Action are attached hereto as *Exhibit 1*.

5.      Venue in the Southern District of New York, Manhattan Division, is proper under 28 U.S.C. § 1441(a) because the Supreme Court of the State of New York, New York County, is located within this district and division.

---

[1]   Before the Individual Defendants retained separate counsel in the State Court Action, the undersigned counsel for Sprint Nextel agreed to accept service on behalf of all Defendants, but expressly did not waive formal service of process on behalf of any of those Defendants. A copy of the complaint was thereafter sent to counsel for Sprint Nextel by e-mail, but, to date, service has not been attempted, let alone effected.  Delivery of a copy of a complaint by e-mail does not constitute valid service under New York law.  *See* N.Y. C.P.L.R. § 308; *Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*, Civ. No. 02-6438, 2002 WL 31509881, at *3 (S.D.N.Y. Nov. 6, 2002) (counsel's agreement to accept service on behalf of individual defendants was not a waiver of those defendants' rights to formal service of process; subsequent delivery of courtesy copy by e-mail was not proper service and did not trigger defendants' time to remove under 28 U.S.C. § 1446).

6.      Pursuant to 28 U.S.C. § 1446(d), copies of this Notice of Removal are being served on plaintiff and filed with the Clerk of the Supreme Court of the State of New York, New York County.

7.      Defendants do not waive, and expressly reserve, any and all available defenses, including without limitation any defense of lack of proper service and/or lack of personal jurisdiction.

## THIS COURT HAS SUBJECT MATTER JURISDICTION

8.      This Court has subject matter jurisdiction over this civil action under 28 U.S.C. § 1332 because (A) there is complete diversity among the parties; and (B) the amount in controversy exceeds $75,000.

### A.      There Is Complete Diversity Among the Parties

9.      Upon information and belief, plaintiff Louisiana Municipal Police Employees' Retirement System (the "Plaintiff") is an institution providing retirement and other benefits to municipal police personnel throughout the State of Louisiana.   Accordingly, Plaintiff is an instrumentality of the State of Louisiana and a citizen thereof.  None of Defendants is a citizen of Louisiana.

10.     Defendant Dan R. Hesse is a resident and domiciliary of Missouri.  Accordingly, Mr. Hesse is, for the purposes of diversity jurisdiction, a citizen of Missouri and not a citizen of Louisiana.   *See Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 42 (2d Cir. 2000) ("An individual's citizenship, within the meaning of the diversity statute, is determined by his domicile.   Domicile is the place where a person has his true fixed home and principal establishment, and to which, whenever he is absent, he has the intention of returning.").

11.     Defendant Joseph J. Euteneur is a resident and domiciliary of Colorado. Accordingly, Mr. Euteneur is, for the purposes of diversity jurisdiction, a citizen of Colorado and not a citizen of Louisiana.

12.     Defendant Robert H. Brust is a resident and domiciliary of Massachusetts. Accordingly, Mr. Brust is, for the purposes of diversity jurisdiction, a citizen of Massachusetts and not a citizen of Louisiana.

13.     Defendant Paul N. Saleh is a resident and domiciliary of Virginia.  Accordingly, Mr. Saleh is, for the purposes of diversity jurisdiction, a citizen of Virginia and not a citizen of Louisiana.

14.     Defendant James H. Hance, Jr. is a resident and domiciliary of Florida. Accordingly, Mr. Hance is, for the purposes of diversity jurisdiction, a citizen of Florida and not a citizen of Louisiana.

15.     Defendant Robert R. Bennett is a resident and domiciliary of Colorado. Accordingly, Mr. Bennett is, for the purposes of diversity jurisdiction, a citizen of Colorado and not a citizen of Louisiana.

16.     Defendant Gordon M. Bethune is a resident and domiciliary of Texas. Accordingly, Mr. Bethune is, for the purposes of diversity jurisdiction, a citizen of Texas and not a citizen of Louisiana.

17.     Defendant Larry C. Glasscock is a resident and domiciliary of Indiana. Accordingly, Mr. Glasscock is, for the purposes of diversity jurisdiction, a citizen of Indiana and not a citizen of Louisiana.

18.     Defendant V. Janet Hill is a resident and domiciliary of Virginia.  Accordingly, Ms. Hill is, for the purposes of diversity jurisdiction, a citizen of Virginia and not a citizen of Louisiana.

19.     Defendant Frank Ianna is a resident and domiciliary of New Jersey.  Accordingly, Mr. Ianna is, for the purposes of diversity jurisdiction, a citizen of New Jersey and not a citizen of Louisiana.

20.     Defendant Sven-Christer Nilsson is a resident and domiciliary of Sweden. Accordingly, Mr. Nilsson is, for the purposes of diversity jurisdiction, a citizen of Sweden and not a citizen of Louisiana.

21.     Defendant Rodney O'Neal is a resident and domiciliary of Michigan. Accordingly, Mr. O'Neal is, for the purposes of diversity jurisdiction, a citizen of Michigan and not a citizen of Louisiana.

22.     Defendant William R. Nuti is a resident and domiciliary of New York. Accordingly, Mr. Nuti is, for the purposes of diversity jurisdiction, a citizen of New York and not a citizen of Louisiana.[2]

---

[2]  The so-called "forum defendant rule" of Section 1441(b)(2) does not preclude removal in this case because Mr. Nuti (like all the other Defendants) has not been properly served.  *See* 28 U.S.C. § 1441(b)(2) ("A civil action otherwise removable solely on the basis of the jurisdiction under section 1332(a) of this title may not be removed if any of the parties in interest *properly joined and served as defendants* is a citizen of the State in which such action is brought.") (emphasis added); *Stop & Shop Supermarket Co. v. Goldsmith*, Civ. No. 10-3052 (KMK), 2011 WL 1236121, at *2 (S.D.N.Y. Mar. 31, 2011) ("[T]he rule of unanimity and the forum-defendant rule apply only to parties properly served."); *In re Fosamax Prods. Liab. Litig.*, MDL No. 1789 (JFK), 2008 WL 2940560, at *2 (S.D.N.Y. July 29, 2008) (concluding that § 1441(b) "allow[s] removal where an in-state defendant has not been served by the time the removal petition is filed"); *Deveer v. Govt. Employees Ins. Co.*, Civ. No. 07-4437 (JS), 2008 WL 4443260, at *4 (E.D.N.Y. Sept. 26, 2008) ("[R]emoval of a diversity case is permissible where an in-state defendant has not been served by the time

(Cont'd on following page)

23.    Nominal defendant Sprint Nextel is a Kansas corporation with its principal place of business in Kansas.  (Compl. ¶ 13.)  Accordingly, Sprint Nextel is, for the purposes of diversity jurisdiction, a citizen of Kansas and not a citizen of Louisiana.  *See Wachovia Bank v. Schmidt*, 546 U.S. 303, 318 (2006) ("[A] corporation's citizenship derives, for diversity jurisdiction purposes, from its State of incorporation and principal place of business.").

**B.      The Amount in Controversy Exceeds $75,000**

24.    Plaintiff seeks, *inter alia*, a damages award from each of the Individual Defendants in the amount of "more than $300 million," "plus annual interest of 14.5%, and a penalty of double the amount of fraudulent underpayments or up to 30% of other underpayments."  (Compl. ¶ 3 & *ad damnum* clause.)  Accordingly, the amount in controversy requirement of 28 U.S.C. § 1332 is satisfied.

## CONCLUSION

For the foregoing reasons, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 and Local Civil Rule 81.1, this Court has jurisdiction over the State Court Action, which is properly removed from the Supreme Court of the State of New York, New York County, to the United States District Court for the Southern District of New York.

---

(Cont'd from preceding page)

the removal petition is filed.") (quotation marks omitted); *Stan Winston Creatures, Inc. v. Toys "R" Us, Inc.*, 314 F. Supp. 2d 177, 180 (S.D.N.Y. 2003) ("[T]he language of § 1441(b) makes plain that its prohibition on removal applies only where a defendant who has been 'properly joined *and served*' is a resident of the forum state.") (emphasis in original).

Dated: May 21, 2012
New York, New York

CHADBOURNE & PARKE LLP

By _____

Thomas J. McCormack
Marc D. Ashley
Robert Kirby
30 Rockefeller Plaza
New York, New York  10112
Tel.:  (212) 408-5100
Fax:  (212) 541-5369

*Attorneys for the Individual Defendants*

PILLSBURY WINTHROP
SHAW PITTMAN LLP

By _____

E. Leo Milonas
David G. Keyko
1540 Broadway
New York, New York  10036
Tel.:  (212) 858-1615
Fax:  (212) 858-1500

*Of Counsel:*

Dane H. Butswinkas
David S. Blatt
Kenneth J. Brown
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, District of Columbia  20005
Tel.:  (202) 434-5000
Fax:  (202) 434-5029

*Attorneys for Nominal Defendant*
*Sprint Nextel Corp.*

# EXHIBIT 1

FILED: NEW YORK COUNTY CLERK 04/30/2012
INDEX NO. 651436/2012
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 04/30/2012

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

----------------------------------------------------------------X

LOUISIANA MUNICIPAL POLICE EMPLOYEES'
RETIREMENT SYSTEM, Derivatively on Behalf
of Itself, and All Others Similarly Situated,

                       Plaintiff,

        vs.

DAN R. HESSE, JOSEPH J. EUTENEUR,
ROBERT H. BRUST, PAUL N. SALEH,
JAMES H. HANCE, JR., ROBERT R.
BENNETT, GORDON M. BETHUNE,
LARRY C. GLASSCOCK, V. JANET HILL,
FRANK IANNA, SVEN-CHRISTER
NILSSON, WILLIAM R. NUTI,
and RODNEY O'NEAL,

                  Defendants,

      -and-

SPRINT NEXTEL CORP.

               Nominal Defendant.

----------------------------------------------------------------X

Index No.:
Date Purchased:
**SUMMONS**

Plaintiffs designates:

New York County as the
Place of trial

The basis of venue is
Defendant's place of business
Sprint Nextel Corp. Address:

403 Avenue Of The Americas, New
York, NY 10014

TO THE ABOVE NAMED DEFENDANTS:

     **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a

copy of your answer, or, if the complaint is not served with this summons, to serve a notice of

appearance, on the plaintiffs' attorney(s) within twenty days after the service of this summons,

exclusive of the day of service (or within thirty days after the service is complete if this summons is

not personally delivered to you within the State of New York); and in case of your failure to appear

or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: New York, New York
       April 30, 2012

ROY JACOBS & ASSOCIATES

By: _____
       Roy L. Jacobs, Esq.

60 East 42nd St. 46th Floor
New York, NY 10165
212-867-1156
212-504-8343 (Fax)
rjacobs@jacobsclasslaw.com

*Attorneys for the Plaintiff*

**DEFENDANTS' ADDRESSES:**

**SPRINT NEXTEL CORP.**
403 Avenue Of The Americas
New York, NY 10014

The following Individual Defendants
May be found at:

6200 Sprint Parkway
Overland Park, KS 66251

**DAN R. HESSE**

**JOSEPH J. EUTENEUR**

**ROBERT H. BRUST**

**PAUL N. SALEH**

**JAMES H. HANCE, JR.**

**ROBERT R. BENNETT,**

2

GORDON M. BETHUNE

LARRY C. GLASSCOCK

V. JANET HILL
FRANK IANNA

SVEN-CHRISTER NILSSON

WILLIAM R. NUTI

RODNEY O'NEAL,

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| **LOUISIANA MUNICIPAL POLICE EMPLOYEES' RETIREMENT SYSTEM,** Derivatively on Behalf of Itself, and All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>              vs.<br><br>**DAN R. HESSE, JOSEPH J. EUTENEUR, ROBERT H. BRUST, PAUL N. SALEH, JAMES H. HANCE, JR., ROBERT R. BENNETT, GORDON M. BETHUNE, LARRY C. GLASSCOCK, V. JANET HILL, FRANK IANNA, SVEN-CHRISTER NILSSON, WILLIAM R. NUTI, and RODNEY O'NEAL,**<br><br>                              Defendants,<br><br>              -and-<br><br>**SPRINT NEXTEL CORP.**<br><br>                              Nominal Defendant. | Index No.<br><br>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT |

Plaintiff, LOUISIANA MUNICIPAL POLICE EMPLOYEES' RETIREMENT SYSTEM, ("Plaintiff") through its attorneys, alleges, after due investigation, on actual knowledge as to its own acts and on information and belief as to all other allegations as follows:

## INTRODUCTION

1.      This is a shareholder derivative action brought by Plaintiff on behalf of nominal defendant Sprint Nextel Corp. ("Sprint Nextel" or the "Company") against the Company's Board of Directors and certain executive officers of the Company for breach of their fiduciary duties of good faith and fair dealing owed to the Company and its shareholders.

1

2.        On April 19, 2012, New York Attorney General Eric T. Schneiderman, filed a Superseding Complaint (the "New York Complaint") against Sprint Nextel and three other related entities in the Supreme Court of the State of New York, County of New York, captioned *People of the State of New York, et al. v. Sprint Nextel Corp., et al.*, Index No. 103917-2011 (the "New York Action").  The New York Action was originally filed on March 31, 2011 as a *qui tam* action brought by Empire State Ventures, LLC.  The New York Attorney General then investigated the matter and decided to take over the action.

3.        The New York Complaint is as detailed as it is damning.  For example, the New York Complaint – which is being filed herewith as Exhibit A and is incorporated by reference herein – illustrates a ***seven year ongoing*** campaign by Defendants to deliberately and knowingly under-collect and underpay millions of dollars in New York state and local taxes on flat-rate access charges for wireless calling plans.  The New York Complaint alleges violations of several New York laws, including:   (i) the New York False Claims Act – State Financial Law §§189(1)(g) and (1)(c); (ii) Persistent Fraud or Illegality – Executive Law §63(12); and (iii) Violation of Article 28 of the Tax Law.  The New York Complaint alleges that Sprint Nextel under-collected and underpaid more than $100 million in taxes and is liable for up to three times this amount (or more than $300 million), plus annual interest of 14.5%, and a penalty of double the amount of fraudulent underpayments or up to 30% of other underpayments.   The understatement of tax liability will also impact the Company's stated revenue and earnings per share figures, which could necessitate a restatement of the Company's financial statements during for the period of the illegal scheme and certainly invite additional scrutiny by the Securities and Exchange Commission.

2

4.       Since 2002, New York Tax Law has required mobile phone companies to collect from its customers and to remit to the taxing authorities at issue sales taxes on the full amount of their monthly access charges for their calling plans.  For example, when a customer pays Sprint Nextel a fixed monthly charge of $39.99 for 450 minutes of mobile calling time, the law requires the Company to collect such sales tax from the customer and pay such sales taxes on the entire $39.99 over to the taxing authority.  However, beginning in 2005, Sprint Nextel illegally failed to collect such taxes from its customers and to pay over to New York state and local sales tax authorities the appropriate sales taxes.  Rather, the Company arbitrarily excluded a set portion of its revenue from these fixed monthly charges.  To carry out this fraudulent practice, Sprint Nextel repeatedly and knowingly submitted false records and statements to New York State tax authorities.  The Company knowingly concealed this practice from taxing authorities, its competitors (including, but not necessary limited to, Verizon, AT&T, T-Mobile, and MetroPCS), and its customers.

5.       This illegal tax evasion scheme was done for a single purpose – to gain a competitive advantage over Sprint Nextel's competitors – not by cutting prices or offering better services – but by failing to collect and pay sales taxes its competitors properly collected and paid.  Indeed, Sprint Nextel investigated numerous different approaches to unbundling certain of its services in an attempt to lower its tax rate (called "component taxation").  The first option, which the Company called "conservative," examined the savings of unbundling internet charges from combined internet/voice plans.  It was Sprint Nextel's understanding that many of its competitors were using this approach of component taxation.  However, according to one Sprint Nextel employee, "the project was scrapped because there wasn't enough bang for the buck."

More specifically, the Company determined that this "conservative" approach would reduce its sales taxes by only *$623,000 per month*.

6.      Another option, which the Company viewed as aggressive and risky, involved unbundling "interstate usage" from within its fixed monthly charge wireless services. But, because the fixed monthly charge is not divisible based on customer usage, unbundling in this way required the Company to come up with an arbitrary method of allocating the charge into subparts. Despite the impropriety and arbitrariness of these divisions, the Company decided to adopt the aggressive approach to unbundling that included breaking out a portion of its fixed monthly charge for wireless voice services and treating that part of the charge as if it were interstate usage billable on a per-minute basis, which is not subject to taxation under certain circumstances. Using this aggressive approach, the Company was able to save an additional *$4.6 million per month*.

7.      The tax scheme adopted by Sprint Nextel was approved at the highest levels of the corporation. Responsibility for implementing the unbundling plan fell to Sprint Nextel's business unit called the "State and Local Tax Group". This group was headed by an Assistant Vice President who reported to the Company's Vice President of Tax who, in turn, reported directly to the Company's Chief Financial Officer. Moreover, according to the New York Complaint: "*Sprint continues to not collect and pay New York state and local taxes on the full amount of its receipts from its fixed monthly charges for wireless voice services, despite being specifically informed of the illegality of this practice by a field-auditor of the New York Tax Department in 2009, and then, in 2011, by a senior enforcement official of the New York Tax Department.*" [1] Thus, by no later than 2009, the Sprint Board would have known of the tax issues, given what is understood to be the operation of on-going reporting channels within the

---

[1] Unless otherwise noted, emphasis has been added throughout.

Company , but took no action to investigate the wrongdoing or to cease the unlawful conduct. Even now when the conduct has had widespread publicity, the Spring Board has failed to act.

8.     The Individual Defendants have breached their fiduciary duties to the Company by failing to properly collect and pay over the taxes beginning no later than 2005. Despite direct and actual knowledge of this tax dodging scheme, the Individual Defendants are continuing their efforts to evade the taxes owed to the State of New York and are turning a blind eye to the ongoing illicit conduct. As a result, the Individual Defendants have subjected the Company to hundreds of millions of dollars of liability and other consequences harmful to the Company, including potential exposure to liability for false and misleading financial statements.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action pursuant to Section 7 of Article VI of the New York State Constitution.

10.     This Court has personal jurisdiction over the Defendants pursuant to C.P.L.R. §§ 301 and 302. Specifically, the Individual Defendants have effected and continue to effect a tortuous scheme from without the State which has material effect within the State. The Company actively does business within New York and is deemed present in New York.

11.     Venue is proper in this Court pursuant to C.P.L.R. § 503.

## PARTIES

12.     Plaintiff is a current shareholder of Sprint Nextel and has been a shareholder of the Company during the relevant time.

13.     Nominal Defendant Sprint Nextel Corp. is a Kansas Corporation with its principal place of business in Overland Park, Kansas. The Company's common stock trades on the New York Stock Exchange under the ticker symbol "S". The Company offers a comprehensive range

5

of wireless and wireline communications services to consumers, businesses and government users. The Company served more than 56 million customers at the end of the first quarter of 2012, including approximately 1.82 million wireless customers in New York State. Sprint Nextel has annual revenues of approximately $33 billion per year.

14.     Defendant Dan Hesse ("Hesse") was appointed as the Company's Chief Executive Officer, President and a member of the Board of Directors on or about December 17, 2007. In addition, Hesse is Chairman of Sprint Nextel's Executive Committee. He served as Chairman, President and Chief Executive Officer of Embarq Corporation from May 2006 to December 2007 and as President of the company's local telecommunications business from June 2005 to May 2006. Hesse also served as Chairman, President and Chief Executive Officer of Terabeam Corporation, a Seattle-based communications company, from March 2000 to June 2004 and President and Chief Executive Officer of AT&T Wireless Services, a division of AT&T, from 1997 to 2000.

15.     Defendant Joseph J. Euteneur ("Euteneur") was appointed Sprint's Chief Financial Officer on April 4, 2011. In this role, Euteneur manages the Company's day-to-day financial operations and long-term financial strategy and planning. Euteneuer has also served as Executive Vice President, Chief Financial Officer of Qwest, a wireline telecom company, from September 12, 2008 until April 2011 and served as Executive Vice President and Chief Financial Officer of XM Satellite Radio Holdings Inc. from 2002 until September 2008 after it merged with SIRIUS Satellite Radio, Inc. Prior to joining XM, Mr. Euteneuer held various management positions at Comcast Corporation and its subsidiary, Broadnet Europe. He began his career in public accounting with Deloitte and has also worked at PricewaterhouseCoopers. Euteneuer is a current member of the Board of Directors of Media News Group, Inc.

6

16.     Defendant Robert H. Brust ("Brust") was the Company's Chief Financial Officer between May 2008 and April 2011.   Defendant Brust had also served as Executive Vice President and Chief Financial Officer of Eastman Kodak Company from 2000 to 2007 and served two years as Senior Vice President and Chief Financial Officer of Unisys Corporation.

17.     Defendant Paul N. Saleh ("Saleh") served as the Company's Chief Financial Officer from August 2005 through 2008.   Saleh also served as the Company's interim CEO in late 2007.

18.     Defendant James H. Hance, Jr. ("Hance") is the Company's Chairman of the Board and has served as a Director of the Company since February 2005.   Hance is a member of the Company's Audit Committee and has been designated as an Audit Committee Financial Expert.   In addition, he is a member of Sprint Nextel's Finance Committee and the Executive Committee.   Hance also serves as a Senior Advisor to The Carlyle Group.   He served as the Vice Chairman of Bank of America Corp. from 1993 until his retirement on January 31, 2005 and as the Chief Financial Officer of Bank of America Corp. from 1988 until April 2004.   Hance is currently a member of the Board of Directors of Cousins Properties Inc., Duke Energy Corp., Ford Motor Co. and Morgan Stanley.

19.     Defendant Robert R. Bennett ("Bennett") has served as a Director of the Company since October 2006.   He is also a member of the Company's Audit Committee and has been designated as an Audit Committee Financial Expert.   In addition, Bennett serves as the Chairman of the Company's Finance Committee and is a member of the Executive Committee.   Bennett is also a Principal of Hilltop Investments, LLC, a private investment company.   Bennett served as President of Discovery Holding Co. from March 2005 until September 2008, when the company merged with Discovery Communications, Inc.   and served as President and CEO of

7

Liberty Media Corp. from April 1997 until August 2005 and continued as President until March 2006. Bennett also served as Principal Financial Officer of Liberty Media and worked with Tele-Communications, Inc. and the Bank of New York. Bennett currently serves as a Director of Discovery Communications, Inc., Demand Media, Inc., and Liberty Media Corporation.

20.     Defendant Gordon M. Bethune ("Bethune") has served as a Director of the Company since March 2004. He is also a member of the Company's Nominating & Corporate Governance Committee and the Executive Committee. In addition, Bethune serves as Chairman of Sprint Nextel's Compensation Committee. Bethune is the retired Chairman and Chief Executive Officer of Continental Airlines, Inc. and has served as CEO of Continental Airlines from 1994 and as Chairman and Chief Executive Officer from 1996 until December 30, 2004. Currently, he is a Director of Honeywell International Inc. and Prudential Financial, Inc.

21.     Defendant Larry C. Glasscock ("Glasscock") has served as a Director of the Company since August 2007. Glasscock is also Chairman of the Company's Audit Committee as has been designated as an Audit Committee Financial Expert. He is also a member of Sprint Nextel's Finance Committee and the Executive Committee. Glasscock is the retired Chairman of the Board of WellPoint, Inc. and served as President and Chief Executive Officer of WellPoint, Inc. from November 2004 (following the merger between Anthem, Inc. and WellPoint Health Networks Inc.) until June 2007 and as Chairman of WellPoint, Inc. from November 2005 until March 2010. Prior to Anthem's merger with WellPoint Health Networks in November 2004, Glasscock served as Anthem's President and Chief Executive Officer since 2001 and also as Anthem's Chairman since 2003. He is currently a Director of Simon Property Group, Inc., Sysco Corporation and Zimmer Holdings, Inc.

8

22.     Defendant V. Janet Hill ("Hill") has been a member of the Company's Board since 2005.   Hill is also the Chairwoman of the Company's Nominating & Corporate Governance Committee and is a member of the Executive Committee and the Compensation Committee.  Hill is a Principal of Hill Family Advisors.  In 2010, Hill retired from Alexander & Associates, Inc., a corporate consulting firm, after serving as a Vice President since 1981.  She also serves as a Director of The Wendy's Company and Dean Foods, Inc.  Defendant Hill served as a Director of Nextel Communications, Inc. from November 1999 until its merger with Sprint Corp. in August 2005.

23.     Defendant Frank Ianna ("Ianna") has served as a Director of the Company since March 2009 and is a member of the Audit Committee and the Nominating & Corporate Governance Committee.  Ianna is the CEO and a Director of Attila Technologies LLC, a Technogenesis company incubated at Stevens Institute of Technology.  Ianna retired from AT&T in 2003 and served in various executive positions, most recently as President of Network Services.  Ianna also served as a business consultant, executive and board member for several private and nonprofit enterprises.  Ianna is currently a Director of Tellabs, Inc.

24.     Defendant Sven-Christer Nilsson ("Nilsson") has served as a member of the Company's Board since November 2008 and is a member of the Nominating & Corporate Governance Committee.  Nilsson is the owner and founder of Ripasso AB, Ängelholm, Sweden, a private business advisory company.  Nilsson serves as an advisor and Board member for companies throughout the world.  He previously served in various executive positions for The Ericsson Group from 1982 through 1999, including as its President and Chief Executive Officer from 1998 through 1999.  Nilsson is a current Director of Ceva, Inc. and Assa Abloy AB and

serves as the Chairman of the Swedish Public Service Broadcasting Foundation and of the (Swedish) Defense Materiel Administration.

25.     Defendant William R. Nuti ("Nuti") has been a member of the Company's Board since June 2008 and is a member of the Finance Committee and Compensation Committee. Nuti is the Chairman of the Board of NCR Corp., a global technology company, and served as its CEO and President since August 2005, and as Chairman of NCR since October 2007. Before joining NCR, Nuti had served as President and CEO of Symbol Technologies, Inc. from 2003 to 2005, and as President and Chief Operating Officer of Symbol Technologies from 2002 to 2003. Nuti joined Symbol Technologies in 2002 following his tenure at Cisco Systems, where he was Senior Vice President of the company's Worldwide Service Provider Operations and Senior Vice President of U.S. Theater Operations.

26.     Defendant Rodney O'Neal ("O'Neil") has served as a member of the Company's Board since August 2007 and is a member of the Nominating & Corporate Governance Committee as well as the Compensation Committee. O'Neal is the CEO and President of Delphi Automotive PLC, a global supplier of mobile electronics and transportation systems. He has served as CEO and President of Delphi since January 2007.  He previously served as President and Chief Operating Officer of Delphi from January 2005 until January 2007.  In 2000, O'Neal was named Executive Vice President of the former Safety, Thermal & Electrical Architecture Sector at Delphi and in 2003, he was named president of the Dynamics, Propulsion, and Thermal Sector. Previously, he served in a variety of domestic and international operating assignments for both Delphi and its former parent company, General Motors.

27.     Defendants Hesse, Euteneur, Brust, Saleh, Hance, Bennett, Bethune, Glasscock, Hill, Ianna, Nilsson, Nuti, and O'Neil are collectively referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

28.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders, which the Individual Defendants knew, or should have known, posed a risk of serious injury to the Company.

## SUBSTANTIVE ALLEGATIONS

29.     Sprint Nextel is mainly a holding company, with its operations primarily conducted by its subsidiaries.  The Company is a communications company offering a range of wireless and wireline communications products and services that are designed to meet the needs of individual consumers, businesses, government subscribers and resellers.  Sprint Nextel is the third largest wireless communications company in the United States based on wireless revenue, one of the largest providers of wireline long distance services, and one of the largest carriers of Internet traffic in the nation.  The Company offers wireless and wireline voice and data transmission services to subscribers in all 50 states, Puerto Rico, and the U.S. Virgin Islands under the Sprint corporate brand, which includes its retail brands of Sprint®, Nextel®, Boost Mobile®, Virgin Mobile®, and Assurance Wireless® on networks that utilize third generation

(3G) code division multiple access, integrated Digital Enhanced Network, or Internet protocol technologies. The Company also offers fourth generation (4G) services utilizing Worldwide Interoperability for Microwave Access technology through its mobile virtual network operator wholesale relationship with Clearwire Corp. and its subsidiary Clearwire Communications LLC. In October 2011, Sprint Nextel announced its intention to deploy Long Term Evolution (LTE) technology as part of its network modernization plan, Network Vision. The Company utilizes these networks to offer its wireless and wireline subscribers differentiated products and services whether through the use of a single network or a combination of these networks.

30.     On March 31, 2011, Empire State Ventures, LLC filed (under seal) a *qui tam* action in the Supreme Court of the State of New York, County of New York. On April 19, 2012, following an extensive investigation of the allegations raised by Empire State Ventures, LLC, the New York Attorney General filed the New York Complaint. The New York Complaint details a *seven year ongoing* scheme to defraud the State of New York and its localities out of approximately $100 million in tax revenue. To make matters worse, the Company's fraudulent practices can lead to treble damages (*i.e.*, approximately $300 million), plus annual interest of 14.5%, and a penalty of double the amount of fraudulent underpayments or up to 30% of other underpayments, and substantial harm to the Company's goodwill.

### Sprint Nextel's Conduct Is "Unequivocally Illegal" Under New York Tax Law

31.     Sprint Nextel illegally avoided its New York sales tax obligations on approximately 25% of its receipts for flat-rate calling plans – plans for which customers pay a fixed monthly charge for a set or unlimited amount of calling time. Unlike Sprint Nextel, the Company's primary wireless competitors, including Verizon, AT&T, T-Mobile, and Metro PCS, have followed the law regarding collecting and paying its taxes New York taxes. Each of these

competitors collects and pays sales taxes in New York on the full amount of their revenues from flat-rate charges for wireless voice services.

32.     In New York, Sprint Nextel sells wireless calling plans through its subsidiaries, including Sprint Spectrum L.P., Nextel of New York, Inc., and Nextel Partners of Upstate New York. These plans are all branded as "Sprint" plans and are centrally developed and overseen by Sprint Nextel.

33.     From 2005 through the present, the Company has offered for sale to its customers wireless calling plans that include voice services in exchange for fixed monthly charges. The voice services provided under these plans allow its customers the ability to use Sprint Nextel's wireless network to make phone calls for a set number of minutes, or for an unlimited number of minutes, depending on the specific plan. The fixed monthly charge for these voice services is billed to customers regardless of whether the customer actually uses the network during the month, regardless of how much they use the available minutes, and regardless of whether calls are made to people or phones within the same state – i.e., intrastate calls – or people in other states – i.e., interstate calls.

34.     The contracts between Sprint Nextel and its customers – which are written by the Company and not subject to negotiation – represent that the Company will collect all applicable state and local sales taxes on the customer's behalf and pay the amount collected to the government. The invoices sent to customers do not indicate that Sprint Nextel has calculated sales taxes on less than the full fixed monthly charge for voice services.

35.     Since at least August of 2002, the State of New York and localities within New York require and have required payment of sales taxes on the full amount of fixed monthly charges for wireless voice services sold to customers in New York. The Company, as the

13

provider of the services, is required to collect the sales taxes from its customers and pay them to the State of New York.

36.     New York Tax Law is clear in regards to its taxation of fixed monthly charges for wireless services.  According to N.Y. Tax Law Section 1105(b)(2), sales taxes are to be applied to:

> The receipts from every sale of mobile telecommunications services provided by a home service provider, … that are voice services, or any other taxable under subparagraph (B) of paragraph one of this subdivision, sold for a fixed periodic charge (not separately stated), whether or not sold with other services.

37.     Thus, New York Tax Law, and Section 1105(b)(2) in particular, clearly requires the payment of sales taxes on the *full amount* of fixed periodic charges for wireless voice services sold by companies – including Sprint Nextel – in New York.

38.     On July 30, 2002, the New York State Department of Taxation & Finance (the "New York Tax Department") issued guidance on this provision in a "Technical Services Bureau Memorandum" (the "2002 TSB-M").  There, the New York Tax Department explained that for mobile telecommunications, "*the total charge for a given number of minutes of air time that may be used for voice transmission is subject to sales tax under new section 1105(b)(2).*"

39.     The 2002 TSB-M gave a concrete example demonstrating that Section 1105(b)(2) requires the payment of New York sales taxes on the full amount of the fixed monthly charges for wireless voice services, regardless of how, or whether, a customer uses them.  For instance, Example 1 of the 2002 TSB-M states as follows:

> Mr. Smith buys a cellular calling plan from a home service provider which includes up to 2500 minutes for use for a flat-rate charge of $49.95 per month. The contract provides that additional charges will apply for calling minutes that exceed the minutes allowed under the plan.  In November 2002, Mr. Smith does not exceed the calling minutes allowed under the plan, and is charged $49.95 for the month. *Such charge is subject to sales tax under section 1105(b)(2) of the*

*Tax Law, regardless of whether the calls made under the plan were intrastate, interstate, or international calls.*

40.    The various counties within the State of New York, along with New York City and certain school districts and other local entities, impose sales taxes on the identical services. The sales tax rate imposed by such localities might vary and the taxes in each must be paid in addition to the New York State sales tax.

41.    Under New York Tax Law, the obligations are different with respect to certain telecommunications services that are *not* sold for a fixed period charge.  For example, when overage charges are charged to a customer on a per minute basis, the companies are required to collect and pay New York taxes only when such calls are intrastate and are not required to collect and pay them on such calls that are interstate.  Example 2 of the 2002 TSB-M provided the following situation:

> The facts are the same as in *Example 1*, except that Mr. Smith exceeds the calling minutes allowed under the plan. *The $49.95 flat-rate charge is subject to tax under section 1105(b)(2) of the Tax Law*, and the separate charges for intrastate calls included in the excess minutes are subject to sales tax under section 1105(b)(1)(B) of the Tax Law. The separate charges for interstate or international calls included in the excess minutes are not subject to sales tax.

42.    New York Tax Law is also clear on how a wireless carrier can apply sales taxes when selling "bundles" of services for a fixed periodic charge where some of the services included in the bundle would be taxable if they were sold separately from the bundle (such as voice services sold for a fixed periodic charge), while other services would ***not*** be taxable if they were sold separately from the bundle (such as internet services).

43.    Generally, if any one component service included in a bundle is subject to sales tax when sold on its own, then the charge for the entire bundle is subject to sales taxes.  New York Tax Law, however, allows a wireless carrier, in certain circumstances, to break out from

the bundle, or "unbundle," the charge so it does not have to collect and pay sales tax on a charge for a service that would not be subject to sales tax if it were sold separately and not as a component of a bundle of services. This unbundling is referred to as "component taxation."

44.    For example, Sprint Nextel's $39.99 flat-rate plan for access to its network can include an option for $30.00 per month to include internet access. The plan, therefore, consists of two components – (i) wireless voice services and (ii) internet access. Because a charge for internet access is not, on its own, subject to New York State sales tax, the Company is permitted – if it follows certain rules – to unbundle the internet portion of the overall charge and not collect and pay sales tax on the internet portion.

45.    New York's unbundling rules are set forth in Section 1111(l) of the New York Tax Law. Under Section 1111(l), wireless providers are permitted to treat separately for sales tax purposes components of a bundled charge as long as the charges are not for voice services and the provider uses an "*objective, reasonable and verifiable standard for identifying each of the components*" of a bundled charge.

### The Company's Decision To Illicitly Unbundle Its Plans Was Based On Greed In Order To Gain A Competitive Advantage Over Its Competitors

46.    Beginning in July 2005, Sprint Nextel began to implement a nationwide program of unbundling its wireless offerings for sales tax purposes. As part of this program, the Company began treating part of its fixed monthly access charges for wireless voice services as if they were charges for inter*state* calls charged on a per-minute basis and not collecting and paying sales taxes on that part.

47.    From the outset, Sprint Nextel's decision to unbundle its calling plans was driven by its desire to gain a competitive advantage over its competitors by reducing the amount of sales

tax it collected from its customers and, thereby, appearing to be a low-cost carrier while reducing revenues for state and local governments and not reducing its own revenues.

48.     Prior to 2002, the Company began to consider unbundling its flat-rate plans that included wireless voice services.  This responsibility fell to Sprint Nextel's business group called the "State and Local Tax Group," which was headed by an Assistant Vice President who reported to Sprint Nextel's Vice President of Tax who, in turn, reported directly to the Company's Chief Financial Officer.  In 2005, the State and Local Tax Group included 108 permanent employees and included individuals with access to and knowledge of New York State Tax Law.

49.     There were two basic options the Company considered in implementing component taxation – the so-called "conservative" case and the more "aggressive" case.

50.     The conservative case simply involved unbundling internet services from voice services.  Under the conservative approach, the Company could save approximately $623,000 per month in taxes.  Sprint Nextel encouraged its competitors to take this conservative approach and be open and honest with regulators regarding component taxation.  Company executives preached this conservative approach at numerous conferences attended by competitors of Sprint Nextel.  During this same time, Sprint conducted – in the words of the New York Complaint, "competitive surveillance" – and learned that its competitors were utilizing the conservative approach.  Sprint, however, rejected the conservative approach because, as one Sprint Nextel employee stated: *the project was scrapped because there wasn't enough bang for the buck.*"

51.     Thus, Sprint began implementing the more aggressive and risky approach to component taxation.  To effectuate this aggressive and risky plan, Sprint Nextel began to unbundle "interstate usage" from within its fixed monthly charge.  However, because the fixed

monthly charge is not divisible based on customer usage, the Company was forced to use an arbitrary method of allocating the charge into subparts. Using this aggressive – and illicit – plan, Sprint Nextel was able to reduce its taxes by an *additional $4.6 million per month*.

52.     In early 2005, Sprint's Assistant Vice President of State and Local Tax, its Director of External Tax, and other Sprint employees met and decided to recommend to more senior Sprint Nextel executives that the Company adopt the aggressive approach to unbundling that included breaking out its fixed monthly charge for wireless voice services and treating part of the charge as if it were for interstate usage billable on a per-minute basis.  The senior executives of the Company authorized this approach.

53.     The implementation of this aggressive approach allowed Sprint Nextel to avoid collecting and paying more than $100 million in taxes throughout New York from mid-2005 through the present.

**Sprint Nextel Attempt To Cover-Up Its Illicit Scheme**

54.     Not surprisingly, there were times when Sprint Nextel employees discovered the arbitrary nature of the Company's billing and taxing policies in regards to component taxation.

55.     For example, by 2009, Sprint Nextel had discovered that, for certain plans sold around the country, including New York, it had failed to break out its fixed monthly charges for wireless voice services and treat part as non-taxable.  In other words, the Company discovered that it did not adhere completely to its own unbundling program and therefore accidently collected and paid the *correct* amount of sales taxes on a number of its plans.  As a result, Sprint Nextel collected and paid approximately $30 million in taxes from its customers that it had not intended to collect or pay.

56.     Once this $30 million "error" occurred, Sprint Nextel employees not familiar with the nature of the Company's unbundling suggested that Sprint Nextel seek a refund from taxing authorities for this $30 million "overpayment." This idea, obviously, was rejected by higher level Sprint Nextel tax employees that understood the importance of concealing their illegal unbundling scheme. Indeed, Sprint's Director of Telecom Tax wrote in an email: "My 2 cents is that, based on what [another Sprint employee] has laid out here, I don't think we should [seek a refund] – i.e., *we can't change our books and records after the fact to support a refund*. Sprint Nextel's Senior Tax Counsel added: "*Sprint is already taking some risk with unbundling. Our risks are exponentially increased if we try to pursue refunds when we didn't jump through the hoops on unbundling*." Taking this advice, the Company did not seek a refund.

57.     Before Sprint Nextel began unbundling its services, members of its State and Local Tax Group and its marketing group considered in the early part of July 2005 whether to communicate with customers about the fact that Sprint had embarked on an aggressive component taxation program. They jointly opted not to communicate the change to the Company's customers because, as Sprint Nextel's Director of External Tax stated: disclosing this information would "drive too many calls" to its customer care division. Similarly, in November 2005, a Sprint Nextel employee in its Customer Billing Services department questioned a member of the Company's State and Local Tax Group whether unbundling was "presented to the customer as part of the Subscriber agreement, shown in the invoice and/or available to Customer Care Rep." The response was simply that Sprint Nextel had "*not educated our customers on how we are de-bundling transactions for their tax relief.*"

19

## DERIVATIVE ALLEGATIONS

58.      Plaintiff brings this action derivatively on behalf of nominal defendant Sprint

Nextel.  Plaintiff brings this action in the right of and for the Company to redress the wrongdoing

committed by the Individual Defendants as alleged herein.

59.      Plaintiff can, and will, fairly and adequately protect the rights and interests of the

Company and its shareholders.

60.      Plaintiff currently owns substantial amounts of Sprint Nextel common stock and

has owned such stock during the period of wrongdoing complained of herein.

## DEMAND EXCUSED ALLEGATIONS

61.      Plaintiff brings this action derivatively on behalf, and for the benefit, of Sprint

Nextel to redress injuries suffered, and to be suffered, by the Company as a direct result of

breaches of fiduciary duty and waste of corporate assets by the Individual Defendants.  Sprint

Nextel is named as a nominal defendant solely in a derivative capacity.

62.      The current Board of Sprint Nextel consists of the following ten individuals:

Defendants Bennett, Bethune, Glasscock, Hance, Hesse, Hill, Ianna, Nilsson, Nuti and O'Neal.

63.      Defendants Bennett, Hance, Ianna and Glasscock are also members of the Board's

Audit Committee (collectively, the "Audit Committee Defendants").    Indeed, Defendants

Bennett, Glasscock and Hance have been designated as Audit Committee Financial Experts.

According to the Audit Committee charter:

> The primary purposes of the Audit Committee are to assist the Board in fulfilling
> its oversight responsibilities with respect to:
>
> (a)      *the integrity of Sprint Nextel Corporation's ("Sprint Nextel") financial
>          statements and related disclosures as well as related accounting and
>          financial reporting processes,*
> (b)      *Sprint Nextel's compliance with legal and regulatory requirements,*

(c)     the independent registered public accounting firm's qualifications, independence, audit and review scope, and performance,

(d)     *the audit scope and performance of the internal audit function*,

(e)     *Sprint Nextel's Ethics and Compliance Program*, and

(f)     *Enterprise Risk Management Program.*

The Audit Committee is to act on behalf of the Board and to *oversee all material aspects of Sprint Nextel's accounting and financial reporting processes and the quality and integrity of Sprint Nextel's financial statements and related disclosures, including oversight of the activities of Sprint Nextel's management* and of the independent registered public accounting firm. ... Sprint Nextel's management is responsible for the preparation, presentation and integrity of Sprint Nextel's financial statements and related disclosures, the appropriateness of the accounting and reporting policies used by
Sprint Nextel, and the effectiveness of the accounting and financial reporting processes. The independent registered public accounting firm is responsible for auditing those financial statements and controls.

64.     The Charter further provides that, "The Audit Committee will have *full access to Sprint Nextel's records, officers, employees and outside advisors as necessary to perform its duties. The Audit Committee also has the authority to engage, at Sprint Nextel's expense, the services of independent counsel or other independent advisors as it determines necessary to perform its duties.*"

65.     The Audit Committee met repeatedly during the period of wrongdoing, including: fourteen times in 2005; seventeen times in 2006; seven times in 2007; ten times in 2008; ten times in 2009; ten times in 2010; and ten times in 2011.

66.     Despite their duties and responsibilities to the Company, and their unfettered access to the Company's records, officers and employees, the Audit Committee Defendants knowingly or recklessly turned a blind eye to the Company's blatant tax evasion scheme, which spanned a period of approximately *seven years and is currently ongoing.*

67.     Indeed in 2009, it became known internally that the Company had paid approximately $30 million in taxes, which were rightfully owed but which, pursuant to the

Company's tax evasion scheme, should not have been collected or paid.   When certain employees raised the issue to the Director of Telecom Tax, recommending that the Company seek a refund, the Director of Telecom Tax demurred, noting "Sprint is already taking some risk with unbundling. *Our risks are exponentially increased if we try to pursue refunds.* . . ." Despite the fact that the Director of Telecom Tax's direct supervisor reported to the Company's Chief Financial Officer, this information was never acted upon by the Audit Committee or any other members of the Board of Directors.

68.     Thus, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties because they:  (i) failed to oversee Sprint Nextel's compliance with legal and regulatory requirements; (ii) failed to perform its internal auditing function; and (iii) failed to properly oversee management.

69.     Of the remaining six Directors, four serve on the Company committee charged with overseeing matters of corporate governance.   More specifically, Defendants Bethune, Nilsson, Hill and O'Neal serve on the Nominating and Corporate Governance Committee, whose primary function is "to ensure that [the Company] has effective corporate governance policies and procedure and an effective Board and Board review process."

70.     More generally, each Director had, at all relevant times, the responsibility to: "approv[e] policies of corporate conduct, including policies regarding (a) compliance with applicable laws and regulations, and (b) maintenance of accounting, financial and other controls . . .; assess[] Sprint Nextel's material risks and business resiliency. . .; ensur[e] processes are in place to maintain the ethics, integrity and good corporate citizenship of Sprint Nextel . . .; [and] perform[] other responsibilities specifically prescribed by applicable laws and regulations and Sprint Nextel's Bylaws or Articles of Incorporation."

71.     The Company was warned twice by the New York taxing authorities that what they were doing was illegal.  Given that that Company has established reporting channels, it is understood that the Board was informed of the claimed illegal conduct by New York State.  Yet in face of these red flags, the Board did nothing.  Further, since the disclosure of the illegal conduct, the Board has *still* taken no action, despite that they *know* that the conduct is illicit.

72.     Further, Sprint is a Company experiencing serious business issues, and the amount of funds at issue is very material to the Company.  Accordingly, the harm to the Company caused by the Individual Defendants' wrongful conduct here is very serious indeed.

73.     Accordingly, each of the Individual Defendants  faces a sufficiently substantial likelihood of liability for breach of their fiduciary duties because they:  (i) failed to take the necessary actions to insure that the Company was not engaged in a concerted, ongoing course of illegal conduct; (ii) failed to maintain accounting, financial and other controls; (iii) failed to adequately assess material risks to the business, including the risk of substantial obligations in unpaid, accrued taxes and penalties related thereto; and (iv) failed to implement processes sufficient to maintain the ethics and integrity of the Company's operations.  The Individual Defendants also face a substantial likelihood of liability for wasting corporate assets due to the substantial penalties that the Company will now incur for the intentional failure to pay the appropriate tax amounts.  Moreover, the Company will be liable for 14.5% in interest on the massive tax liability adding millions of dollars in losses for the Company because of the tax evasion scheme.

74.     Due to the knowing or reckless breach of their fiduciary duties and acts of corporate waste, each of the Individual Defendants face a substantial likelihood of liability for the wrongful conduct alleged herein.  Thus, the each of the members of the Board of Directors

23

cannot fairly and fully prosecute a suit to remedy the misconduct, even if such a suit were instituted by them.

75.     The futility of making demand on the Board of Directors is borne out by the fact that Sprint Nextel has been and will continue to be exposed to significant losses due to the wrongful conduct alleged herein.   Nonetheless, the Board of Directors have not ceased the wrongful conduct.

76.     Furthermore, Director and Officer liability insurance policies covering the Defendants in this case contain provisions that eliminate coverage for any action brought directly by Sprint Nextel against these Defendants (the "insured versus insured exclusion").  As a result, if the Defendants were to cause Sprint Nextel to sue the Directors or certain Officers of Sprint Nextel, there would be no Director and Officer insurance protection, providing a further disincentive for the Board to bring such a suit.

## CAUSES OF ACTION

### COUNT I
### (AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY)

77.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

78.     The Individual Defendants owed a fiduciary duty to the Company to execute their duties and responsibilities to the highest degree of due care and good faith.  The Individual Defendants, however, breached their fiduciary duties by failing to properly supervise and monitor the adequacy of the Company's internal controls and by allowing the Company to engage in an illegal tax evasion scheme for a period of over seven years and, in fact, is currently ongoing.

24

79.     The Individual Defendants knowingly or recklessly failed to exercise their oversight responsibilities and failed to ensure that the Company complied with applicable laws, rules and regulations.

80.     As members of the Board and/or executive officers of the Company, the Individual Defendants were directly responsible for authorizing, permitting the authorization of, or failing to monitor the practices that resulted in violations of applicable laws as alleged herein. Each of the Individual Defendants had knowledge of, actively participated in, approved, and/or acquiesced in the wrongdoing alleged herein or abdicated his or her responsibilities with respect to this wrongdoing.   The alleged acts of wrongdoing have subjected the Company to unreasonable risks of loss and expenses.

81.     Each of the Individual Defendants' acts in causing or permitting the Company to commit the wrongs described herein have subjected the Company to liability for violations of applicable laws, and therefore were not the product of a valid exercise of business judgment, constituting a complete abdication of their duties as officers and/or directors of the Company.

### COUNT II
### (AGAINST THE INDIVIDUAL DEFENDANTS FOR CONTRIBUTION AND INDEMIFICATION)

82.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

83.     The Company is alleged to be liable to various persons, entities and/or classes by virtue of the facts alleged herein that give rise to the Defendants' liability to the Company.

84.     The Company's alleged liability on account of the wrongful acts, practices, and related misconduct alleged arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Individual Defendants, and the Company is entitled to

contribution and indemnification from each Individual Defendant in connection with all such claims that have been, are, or may in the future be asserted against the Company by virtue of the Individual Defendants' misconduct.

**COUNT III**
**(AGAINST THE INDIVIDUAL DEFENDANTS FOR**
**WASTE OF CORPORATE ASSETS)**

85.    Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

86.    The Individual Defendants' conduct, as alleged herein, constituted a waste of the corporate assets of the Company.

87.    As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable.  Plaintiff, moreover, has no adequate remedy at law.

**PRAYER FOR RELIEF**

Plaintiff prays for judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and acts of corporate waste;

B.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

C. Granting such other and further relief as the Court deems just and proper.

Dated: April 30, 2012

**ROY JACOBS & ASSOCIATES**

By: _____
Roy L. Jacobs, Esq.

60 East 42nd St. 46th Floor
New York, NY 10165
212-867-1156
212-504-8343 (Fax)
rjacobs@jacobsclasslaw.com

**BLOCK & LEVITON LLP**
Jeffrey C. Block
Jason M. Leviton
Whitney E. Street
155 Federal Street, Suite 1303
Boston, MA 02110
Telephone: (617) 398-5600
Facsimile: (617) 507-6020
jblock@blockesq.com
jleviton@blcokesq.com
wstreet@blockesq.com

*Attorneys for the Plaintiff*

OF COUNSEL:

Laurence Paskowitz, Esq.
**THE PASKOWITZ LAW FIRM, P.C.**
60 East 42nd St. 46th Floor
New York, NY 10165
212-685-0969
212-685-2306
classattorney@aol.com

## VERIFICATION

I, R. Randall Roche, am the General Counsel of the Louisiana Municipal Police Employees' Retirement System.  I verify and declare that I have reviewed the Verified Shareholder Derivative Complaint in this action captioned *Louisiana Municipal Police Employees' Retirement System v. Hesse, et al.* (the "Complaint").  The allegations contained within the Complaint are true and correct to the best of my knowledge, information and belief.  I have also authorized the filing of this Complaint.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: April 27, 2012

_____
R. Randall Roche, Esq.

FILED: NEW YORK COUNTY CLERK 04/30/2012

INDEX NO. 651436/2012

NYSCEF DOC. NO. 2                                          RECEIVED NYSCEF: 04/30/2012

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
-------------------------------------------------------------------X
PEOPLE OF THE STATE OF NEW YORK, by ERIC
T. SCHNEIDERMAN, Attorney General for the State
of New York, and

STATE OF NEW YORK, *ex rel.* EMPIRE STATE                INDEX NO. 103917-2011
VENTURES, LLC,

                       Plaintiff,                **SUPERSEDING COMPLAINT**

          v.

SPRINT NEXTEL CORP., SPRINT SPECTRUM L.P.,
NEXTEL OF NEW YORK, INC., NEXTEL
PARTNERS OF UPSTATE NEW YORK, INC.,

                  Defendants.

-------------------------------------------------------------------X

      The State of New York, through the Attorney General of the State of New York, having

superseded the complaint of the *qui tam* plaintiff herein, brings this action against defendants

Sprint Nextel Corp., Sprint Spectrum L.P., Nextel of New York, Inc., and Nextel Partners of

Upstate New York, Inc. (collectively, "Sprint"), pursuant to the New York False Claims Act,

Executive Law, and the Tax Law.

### NATURE OF THIS ACTION

    1.    This action arises out of Sprint's knowing and fraudulent failure to collect and

pay more than $100 million in New York sales taxes on receipts from its sale of wireless

telephone services since July 2005.  Specifically, Sprint illegally avoided its New York sales tax

obligations on about 25% of its receipts for "flat-rate" calling plans – plans for which customers

pay a fixed monthly charge for a set or unlimited amount of calling time.

2.      Sprint's decision to not collect and pay the required sales taxes in New York arose out of a nationwide scheme to gain an advantage over its competitor wireless carriers, not by cutting its prices or offering better service, but by failing to collect and pay sales taxes, thereby reducing the cost of its products to its customers.  The consequence of this scheme was that Sprint knowingly deprived state and local governments of the tax revenues that provide necessary services to citizens.

3.      Sprint concealed this scheme from taxing authorities, its competitors, and its customers.

4.      New York unequivocally imposes sales taxes on the entire amount of fixed monthly charges for wireless voice services.  For example, one of Sprint's wireless calling plans provides for up to 450 minutes of talking time for $39.99 per month.  Under New York sales tax law, the fixed monthly charge of $39.99, in full, is subject to sales taxes.

5.      Sprint had actual knowledge that it was required to collect and pay New York sales taxes on the full amount of these fixed monthly charges, yet it chose to act contrary to the law to advance its own competitive interests.  Starting in July 2005 and continuing today, Sprint knowingly and deliberately failed to collect and pay the taxes on about one quarter of its revenue from these fixed monthly charges, and Sprint has repeatedly and knowingly submitted false records and statements to New York State concealing this failure.  It falsely asserted on its sales tax filings that it owed less in sales taxes than it really did.  Each of these statements and records was material to Sprint's sales tax obligations.  Sprint owed substantially more than it reported.

6.      Even after New York tax authorities instructed Sprint that its tax avoidance scheme was illegal, Sprint not only failed to pay the back taxes it owed, but it has continued to underpay sales taxes and submit false tax returns.

2

7.      Unlike Sprint, Sprint's primary wireless competitors, including Verizon, AT&T, T-Mobile, and MetroPCS, have followed the law regarding these taxes. Each collects and pays sales taxes in New York on the full amount of their revenues from flat-rate charges for wireless voice services.

8.      Sprint has also misled millions of New York customers who purchased Sprint flat-rate plans. In its customer contracts, on its website and elsewhere, Sprint represented that it would collect and pay all applicable sales taxes. Yet Sprint did not, and it concealed this fact from its New York customers. As a result, Sprint exposed these customers to the risk of having to pay the unpaid taxes, for they are also liable under the law if Sprint fails to pay. Although Sprint misrepresented how it would handle sales taxes, it has locked its customers into contracts with early termination fees. The customers must remain in these contracts sold under false pretenses unless they pay hundreds of dollars to Sprint.

9.      In this action, New York, through the Attorney General, seeks to (a) recover damages from Sprint for the tax revenue lost to the State of New York and its local governments, trebled, as a result of Sprint's violation of the New York False Claims Act; (b) require Sprint to collect and pay sales taxes on the full amount of its fixed monthly charges for voice services going forward; (c) enjoin Sprint from charging early termination fees currently applicable to customers that have purchased flat-rate wireless plans in New York under false pretenses; and (d) obtain penalties against Sprint as provided by law for its deliberate and illegal conduct.

3

## WHISTLEBLOWER ACTION

10.     This action was filed on or about March 31, 2011 by whistleblower, or *qui tam* plaintiff, Empire State Ventures, LLC under the New York False Claims Act.  The New York False Claims Act permits whistleblowers who know of information concerning false or fraudulent conduct that victimizes the government through the failure to pay taxes and otherwise to bring an action on behalf of the government.  The government then has an opportunity to investigate the matter and decide whether to take over the action.

11.     In this case, the Office of the Attorney General has conducted an investigation of Sprint's New York state and local sales tax practices with respect to its fixed monthly charges for wireless calling plans.  On April 19, 2012, the Attorney General notified the Court of its decision to supersede the *qui tam* plaintiff's complaint.  The People of the State of New York have thus been substituted as the plaintiff, and the action has been converted in all respects from a *qui tam* civil action brought by a private person into a civil enforcement action by the Attorney General.

## JURISDICTION & PARTIES

12.     The State of New York, through the Attorney General, brings this action in its sovereign capacity, and pursuant to State Finance Law § 190(b), Executive Law § 63(12), and Tax Law § 1141(a).  It sues to redress injury to the State and to its local governments, general economy and citizens, and seeks injunctive relief, damages, costs, penalties and other relief with respect to Sprint's fraudulent and otherwise unlawful conduct.

13.     This Court has personal jurisdiction over the defendants because the defendants can be found, reside and/or transact business in New York State and New York County.

14.     Venue is proper in this Court pursuant to CPLR § 503.

15.     Defendant Sprint Nextel Corporation is a mobile telecommunications service provider that does business in the State of New York and nationally and internationally.  Sprint currently has about 55 million customers, including about 1.82 million wireless customers in New York State, and annual revenues of approximately $33 billion.  Sprint Nextel Corporation is incorporated in the State of Kansas, with a principal executive office located at 6200 Sprint Parkway, Overland Park, Kansas 66251.  Sprint Nextel Corporation is registered to be traded on the New York Stock Exchange.

16.     Defendant Sprint Spectrum, L.P. is a mobile telecommunications service provider that does business in the State of New York.  Sprint Spectrum, L.P. is incorporated in the State of Delaware and is a wholly-owned indirect subsidiary of Sprint Nextel Corporation.

17.     Defendant Nextel of New York, Inc. is a mobile telecommunications service provider that does business in the State of New York.  Nextel of New York, Inc. is incorporated in the State of Delaware and is a wholly-owned indirect subsidiary of Sprint Nextel Corporation.

18.     Defendant Nextel Partners of Upstate New York, Inc. is a mobile telecommunications service provider that does business in the State of New York.  Nextel Partners of Upstate New York, Inc. is incorporated in the State of Delaware and is a wholly-owned indirect subsidiary of Sprint Nextel Corporation.

## FACTUAL ALLEGATIONS

**I.     Sprint's Flat-Rate Wireless Calling Plans**

19.     In New York, Sprint sells wireless calling plans through its subsidiary entities Sprint Spectrum L.P., Nextel of New York, Inc., and Nextel Partners of Upstate New York, Inc.  These plans are all branded as "Sprint" plans and are centrally developed and overseen by Sprint Nextel Corporation.

20.     Throughout the period from July 2005 to the present, Sprint has offered for sale to New York customers wireless calling plans that include voice services in exchange for fixed monthly charges. The voice services provided under these plans consist of the ability of Sprint's customers to use Sprint's wireless network to make phone calls for a set number of minutes, or for an unlimited number of minutes.

21.     The fixed monthly charge for these voice services is billed to customers regardless of whether the customers actually use the network during the month, regardless of how much they use the available minutes, and regardless of whether calls are made to people or phones within the same state – intrastate calls – or people or phones in other states – interstate calls. Under these plans, calls within the monthly number of minutes are not billed on a per-minute basis.

22.     In short, the fixed monthly charges that Sprint's customers pay for wireless voice services under Sprint's flat-rate plans are for *access*, not for specific calls; hence Sprint identifies these charges on customer invoices as "monthly recurring *access* charges" (emphasis added).

23.     Sprint charges its customers differently for calls that are *not* within the fixed monthly charge. When customers use more than the allowed minutes in a month for phone calls, they are charged for that separate usage – or "overage" – on a per-minute basis.

24.     By way of illustration, Sprint currently offers a calling plan under which a customer is charged $39.99 a month for the ability to use – or access – Sprint's network for up to 450 minutes of calling time per month. Overage minutes cost 45 cents each. The $39.99 will be charged if the customer makes no calls at all, uses one minute of calling time or uses 449 minutes of calling time. If the customer uses 451 minutes of calling time, he or she will have to pay the $39.99 fixed monthly charge plus a $0.45 usage charge for the overage.

25.     Sprint's customers typically purchase flat-rate calling plans by signing a contract with Sprint.  These contracts are provided by Sprint and are not subject to negotiation by the customer.  They usually have a term of one or two years.  A customer who chooses to cancel a contract before the term ends is subject to an early termination fee payable to Sprint.  Usually, these early termination fees are in excess of $200.

26.     Sprint represents in its contracts and on its website that it will collect all applicable state and local sales taxes on the customer's behalf and pay the amount collected to the government.

27.     Since before July 2005, Sprint has sent its New York customers monthly invoices for services provided under its flat-rate plans.  These invoices state the fixed monthly charge for the plan, and they separately state the charges for any overage minutes.  They also set forth a charge for sales taxes, but they do not indicate how the sales taxes are calculated.

28.     The invoices do not indicate that Sprint has calculated sales taxes on less than the full fixed monthly charge for voice services.

29.     The invoices do not indicate to customers that Sprint is charging less sales taxes than required by law, and that customers can be held liable for any resulting underpayment.

**II.     Sprint's Obligation to Pay New York Sales Taxes on Its Flat-Rate Calling Plans**

30.     Since at least August of 2002, New York State and localities within New York State require and have required the payment of sales taxes on the *full amount* of fixed monthly charges for wireless voice services sold to customers in New York.  Sprint, as the provider of the services, is required to collect the sales taxes from its customers and pay them to the State.

7

31.     For example, when Sprint receives payment of a fixed monthly charge of $39.99 for 450 minutes of wireless voice services, Sprint is required to collect and pay sales taxes on the entire $39.99.

32.     New York Tax Law contains a specific provision concerning how sales taxes are to be applied to fixed monthly charges for wireless voice services.  According to N.Y. Tax Law Section 1105(b)(2), sales taxes are to be applied to:

> the receipts from every sale of mobile telecommunications services provided by a home service provider, other than sales for resale, that are voice services, or any other services that are taxable under subparagraph (B) of paragraph one of this subdivision, sold for a fixed periodic charge (not separately stated), whether or not sold with other services.

This provision has been in effect continuously since August 2, 2002.

33.     The Tax Law, and this section in particular, clearly requires the payment of sales taxes on the *full amount* of fixed periodic charges for wireless voice services sold by companies like Sprint to New York customers, as follows:

a.   Sprint is a "home service provider" because it is a facilities-based carrier with which mobile telecommunications customers contract for the provision of mobile telecommunications service.

b.   The mobile telecommunications services sold by Sprint under the flat-rate plans are not sold for resale.

c.   Under Sprint's flat-rate plans, Sprint sells wireless voice services for a fixed periodic charge.

d.   Sprint does not separately state or otherwise break out any portions of the fixed periodic charge for voice services in invoices or other communications with customers.

8

e. Sprint's fixed monthly charges for wireless voice services are not for "other services that are taxable under subparagraph (B) of paragraph one of [Section 1105(b)]."

34. On July 30, 2002, the New York State Department of Taxation & Finance (the "New York Tax Department") issued guidance on this provision in a "Technical Services Bureau Memorandum" (the "2002 TSB-M"). There, it explained that for mobile telecommunications, "the *total charge* for a given number of minutes of air time that may be used for voice transmission is subject to sales tax under new section 1105(b)(2)" (emphasis added).

35. The 2002 TSB-M gave a concrete example demonstrating that the amended law requires the payment of New York sales taxes on the full amount of the fixed monthly charges for wireless voice services, regardless of how – or whether – a customer uses them:

> *Example 1*: Mr. Smith buys a cellular calling plan from a home service provider which includes up to 2500 minutes for use for a flat-rate charge of $49.95 per month. The contract provides that additional charges will apply for calling minutes that exceed the minutes allowed under the plan. In November 2002, Mr. Smith does not exceed the calling minutes allowed under the plan, and is charged $49.95 for the month. *Such charge is subject to sales tax under section 1105(b)(2) of the Tax Law, regardless of whether the calls made under the plan were intrastate, interstate, or international calls.* (2002 TSB-M at 3) (emphasis added).

36. The various counties within the State of New York, along with New York City and certain school districts and other local entities, impose sales taxes on the identical services. The sales tax rate imposed on such services varies by locality, and the taxes in each must be paid in addition to the New York State sales taxes.

37. Under New York sales tax law, the obligations are different with respect to certain telecommunications services that are *not* sold for a fixed periodic charge. For overage minutes that are charged to customers on a per-minute usage basis, Sprint and other wireless carriers are

required to collect and pay New York state and local sales taxes only when such calls are

intrastate, and are not required to collect and pay them on such calls that are interstate.

38.     The New York Tax Department's 2002 TSB-M guidance further illustrated this

situation in its next example:

> *Example 2:* The facts are the same as in *Example 1*, except that Mr. Smith
> exceeds the calling minutes allowed under the plan. *The $49.95 flat-rate
> charge is subject to tax under section 1105(b)(2) of the Tax Law*, and the
> separate charges for intrastate calls included in the excess minutes are
> subject to sales tax under section 1105(b)(1)(B) of the Tax Law. The
> separate charges for interstate or international calls included in the excess
> minutes are not subject to sales tax.  (2002 TSB-M at 3-4) (emphasis
> added).

39.     New York tax law also spells out how wireless carriers can apply sales taxes

when selling "bundles" of services for a fixed periodic charge where some of the services

included in the bundle would be taxable if they were sold separately from the bundle (such as

voice services sold for a fixed periodic charge), while other services would *not* be taxable if they

were sold separately from the bundle (such as Internet services).

40.     As a general matter, if any one component service included in a bundle is subject

to sales taxes when sold on its own, then the charge for the entire bundle is subject to sales taxes.

New York tax law, however, allows a wireless carrier, in defined situations, to break out from

the bundle, or "unbundle," the charge so it does not have to collect and pay sales tax on a charge

for a service that would not be subject to sales tax if it were sold separately and not as a

component of a bundle of services.  This unbundling is also referred to as "component taxation."

41.     For example, Sprint's $39.99 flat-rate plan for access to Sprint's wireless network

for 450 minutes of calling time is sold in another variation:  for an additional $30, the customer

can include unlimited Internet access in the plan.  The plan thus consists of two components:

wireless voice services and Internet access.  Because a charge for Internet access is not, on its

own, subject to New York state and local sales taxes, Sprint is permitted (if it follows all the rules set forth in New York law) to unbundle the Internet portion of the overall charge and not collect and pay sales taxes on that Internet portion.

42.     New York's unbundling rules are set forth in section 1111(*l*) of the New York Tax Law.  Under that section, wireless providers are permitted to treat separately for sales tax purposes certain components of a bundled charge for mobile telecommunication services, so long as the charges are *not* for voice services, and so long as service provider uses an "objective, reasonable and verifiable standard for identifying each of the components" of a bundled charge. The New York Tax Department's 2002 TSB-M guidance also illustrated this situation with examples:

> *Example 7*: Mrs. Johnson's place of primary use is an address in Buffalo, NY. She receives both cellular telephone service and Internet access service from her home service provider. The home service provider separately states the charge on Mrs. Johnson's bill for the cellular service and for the Internet access service. *The charge for the cellular service is subject to sales tax*, while the charge for Internet access service (so long as reasonable) is not, because it is separately stated.

> *Example 8*: The facts are the same as in *Example 7*, but the charges for the cellular service and the Internet access service are not separately stated. In this instance, the total charge is considered a receipt from the charge for mobile telecommunications service and is subject to sales tax, under section 1105(b)(2).

> *Example 9*: The facts are the same as in *Example 8*, except the home service provider properly identifies, accounts for, and quantifies the receipts from each of the components of the total charge attributable to the cellular service and the Internet access service based on objective, reasonable and verifiable standards. *In this instance, the home service provider is only required to collect and pay over sales tax that is attributable to the receipts associated with the cellular service*. The portion of the receipt attributable to the Internet access service is excluded from taxation.  (2002 TSB-M at 3-4) (emphasis added).

43.    Unbundling cannot be used to avoid sales tax on a component service that the state or local government has chosen to tax; it can only be used to separate non-taxable services from taxable ones. A wireless carrier cannot, under the guise of unbundling, avoid sales tax on a taxable service.  Because New York law treats fixed monthly charges for wireless voice services as a single, irreducible, taxable service that cannot be broken out for sales tax purposes, Sprint violated the law by failing to collect and pay New York state and local sales taxes on the full amount of the charges.

**III.    Sprint's Decision to "Unbundle" Its Plans Nationwide**

44.    Beginning in July 2005, Sprint began to implement a nationwide program of unbundling its wireless offerings for sales tax purposes.  As part of this program, it began treating part of its fixed monthly access charges for wireless voice services as if they were charges for "interstate" calls charged on a per-minute basis, and, in states like New York, not collecting and paying sales taxes on that part.  The fixed monthly charges for access to Sprint's network, however, were and are not taxable in the same way as per-minute usage charges.

45.    Internally, Sprint acknowledged that its approach to unbundling in this way was aggressive and risky because tax authorities throughout the country could object to the practice. However, it served Sprint's interest of gaining a competitive advantage by having uniquely low sales tax collections, and thus low overall billing for its plans.

46.    Under New York law, Sprint's approach was and is unequivocally illegal.

**A.    Sprint's Decision to Unbundle Its Plans Nationwide to Gain a Competitive Advantage**

47.    From the outset, Sprint's decision to unbundle its calling plans nationwide was driven by its desire to gain an advantage over its competitors by reducing the amount of sales

taxes it collected from its customers and, thereby, appearing to be a low-cost carrier while reducing revenues for state and local governments and not reducing its own revenues.

48.     Before 2002, Sprint began to consider unbundling its flat-rate plans that included wireless voice services.  Responsibility for implementing the plan fell to Sprint's business unit called the State and Local Tax Group.  This group was and is headed by a Sprint Assistant Vice President who reports to Sprint's Vice President of Tax, who, in turn, reports to Sprint's Chief Financial Officer.  In 2005, the group had 108 permanent employees.  It also had resources that gave it ready access to tax laws, guidance and other materials to aid in the analysis and understanding of Sprint's state and local sales tax obligations, including its obligations under the New York Tax Law.

49.     Initially, Sprint did not recognize the financial benefit of component taxation.  One Sprint employee reported that Sprint had earlier considered unbundling Internet access from combined Internet/voice plans, but "the project was scrapped because there wasn't enough bang for the buck."

50.     By 2002, Sprint came to realize, however, that if it collected less in sales taxes than its competitors by deeming part of its fixed monthly charges to be non-taxable, it could effectively lower the cost of its service as compared with its competitors, without hurting its own bottom line, and thereby obtain a competitive advantage.

51.     On or about May 15, 2002, a member of Sprint's State and Local Tax Group prepared Sprint's "business case" for component taxation.  The business case stated that unbundling would "provide a competitive advantage over wireless carriers who aren't able to perform component taxing."

52.     To further its plan, Sprint encouraged its competitors to take a conservative path and be open and transparent with regulators with regard to component taxation, while Sprint quietly took another path.  Also in 2002, the head of Sprint's State and Local Tax Group warned other companies at a Communications Tax Executive Conference at Vail, Colorado that unbundling posed risks of audits by taxing authorities and litigation, and that they should protect themselves from these risks by entering into agreements with taxing authorities or by seeking clarifying legislation before they began to unbundle.  Sprint itself did not seek out any such agreements with taxing authorities in New York, nor did it seek additional legislation in New York.

53.     In 2003, Sprint's Senior State and Local Tax Counsel presented to another industry group – the Wireless Tax Group – about "Sprint's Bundling Experience."  He told other wireless carriers that "unbundling for taxes causes significant assessment risk."  He told the group that his "marching orders" at Sprint were to "mitigate tax issues by pursuing legislation or pre-audit agreements that allow for component taxing."

54.     Sprint did not follow those "marching orders" in New York.

55.     Around the time Sprint was advising competitors how they should approach component taxation, Sprint conducted competitive surveillance, and learned that other major wireless carriers were working to unbundle by breaking out charges for Internet access from charges for wireless voice services, but were not seeking to break out their charges for wireless voice services into smaller portions for sales tax purposes.

56.     By September 2004, Sprint was refining its consideration of how to approach unbundling and component taxation.  One approach, which Sprint identified as "conservative,"

involved unbundling only Internet access from voice services. This was the approach to component taxation that Sprint understood some its competitors were pursuing.

57.     Another approach, which Sprint viewed as aggressive and risky, and which would allow Sprint to be a "low cost tax leader in the wireless industry," involved unbundling "interstate usage" from within its fixed monthly charge for wireless voice services. Because the fixed monthly charge is not divisible based on customer usage, unbundling in this way required Sprint to come up with an arbitrary method of allocating the charge into sub-parts.

58.     At the time Sprint was considering these approaches to component taxation, the majority of Sprint's revenue from its wireless plans was coming from its fixed monthly charges for wireless voice services. Treating some portion of these charges as "interstate usage" presented the greatest opportunity for Sprint to reduce its collection of taxes, and improve its competitive standing nationwide because many states, including New York, do not charge sales taxes on receipts from charges for interstate calls billed on a per-minute basis.

59.     An internal Sprint analysis from January 2005 showed that, if Sprint unbundled only its Internet access charges, it would reduce sales taxes by about $623,000 per month. The analysis further revealed that if Sprint also broke out charges for wireless voice services into what it deemed taxable and non-taxable categories, it would reduce sales taxes by an additional $4.6 million per month. Thus, if competitors were breaking out only Internet access charges, Sprint concluded that its plans would be about $4.6 million per month cheaper, collectively, than competitors' plans by paying less money to the government, without any cost to Sprint.

60.     In early 2005, Sprint's Assistant Vice President of State and Local Tax, its Director of External Tax, and other Sprint employees met and decided to recommend to more senior Sprint executives that the company adopt the aggressive approach to unbundling that

15

included breaking out its fixed monthly charge for wireless voice services and treating part of the charge as if it were for interstate usage billable on a per-minute basis.

61.    The senior executives authorized that approach.

62.    Sprint made its decision to break out its fixed monthly charges for voice services before it completed the merger with Nextel Corporation in August of 2005.  After the merger was complete, Sprint used the same approach to unbundling plans sold by Nextel, and justified this approach internally by citing to the competitive advantage it would achieve by unbundling in the same way as the pre-merger Sprint plans.  It described the "quantitative impact" of the move as "decreas[ing] churn," and described a "key benefit" as "lower churn."  "Churn" is a measure used within the telecom industry to refer to the loss of subscribers.  A low churn rate is favorable to a wireless carrier.  Sprint and other telecom carriers publicly disclose their churn rates, and analysts and investors closely monitor churn.  Sprint incentivizes its employees to lower churn by increasing employee bonuses when Sprint's churn rate declines.

63.    Other major wireless carriers, unlike Sprint, did not break their fixed monthly charges for wireless voice services into subparts for sales tax purposes.

64.    In New York alone, by under-collecting and under-paying New York state and local sales taxes, Sprint plans were made $100 million less expensive than its competitors' plans from mid-2005 to the present.

**B.     Sprint Classifies Arbitrary Percentages of Its Fixed Monthly Charges as Non-Taxable**

65.    Sprint used data systems to generate its customer invoices and to create its sales tax filings.  It could accurately collect and pay taxes only if it used the categories within the systems appropriately.  One of the systems allows Sprint to break out its charges into various taxing categories, and contains settings that will cause the system to treat charges placed in a

16

category as "taxable" or "non-taxable" for any given taxing jurisdiction. The vendor for this taxing system provided Sprint with these taxable and non-taxable decisions for each tax category, and Sprint reviewed these taxability decisions. Where Sprint disagreed with the vendor, it overrode the vendor's taxability decisions.

66.     Before starting to unbundle its wireless calling plans, Sprint used the taxing system by classifying the full amount of its fixed monthly access charges for wireless voice services as "network access." "Network access" is defined in the system's reference manual as "a charge to have access to a cellular or paging network." Sprint's fixed monthly charges for wireless voice services were just such charges.

67.     Once Sprint began its unbundling program, however, it did not use the taxing system for purposes of collecting and paying sales taxes in the way it was designed. While the system was set up to treat the full amount of a fixed monthly charge for wireless voice services as "network access," Sprint manipulated the system by classifying part of the charge as being in a category called "usage airtime: interstate," which was set up and used by Sprint to be non-taxable in New York.

68.     The taxing system's category for "usage airtime: interstate" was not set up to capture parts of a fixed periodic charge, but rather to capture per-minute usage charges – such as overage charges – that were for interstate calls. The reference manual for the data system defined "usage (or airtime) charges" as "per minute charges for using a wireless network." The portion of its fixed monthly charges that Sprint classified as "usage airtime: interstate" did not represent such per-minute usage charges.

69.     The taxing system's vendor considered charges for "usage airtime: interstate" (as the system defined it) to be non-taxable for purposes of New York state and local sales taxes and

set up the system to reflect that fact.  Sprint knew of that non-taxable setting and did not change it, even though it knew that it was not using this category for its intended purpose.

C.  **Sprint's Allocations Between Taxable and Non-Taxable Categories Were Arbitrary**

70.  The percentage figures that Sprint used in dividing up its fixed monthly charges for wireless voice services between the "network access" and "usage airtime: interstate" categories varied by calling plan and over time in an arbitrary and inconsistent manner.

71.  For its Sprint Spectrum plans, from July 2005 to October 2008, Sprint classified 28.5% of its fixed monthly charges for wireless voice services as "airtime usage: interstate."  For its Nextel of New York plans, from about April 2006 through October 2008, it classified 13.7% as "airtime usage: interstate."  For its Nextel Partners of Upstate New York plans, from about May 2006 to October 2008, Sprint represents, without support, that it classified 15% as "airtime usage: interstate."  For all of its plans, since October 2008 until the present, it has classified 22.5% as "airtime usage: interstate."

72.  For example, Sprint would have applied New York sales taxes to a Sprint Spectrum plan with a $39.99 fixed monthly charge for access to Sprint's network for 450 minutes of calling time in August of 2006 as follows:  It would have classified 28.5%, or $11.40, as "usage airtime: interstate" and not paid New York state and local sales taxes on it.  It would have classified the remaining $28.59 as "network access" and paid taxes only on that part.

73.  In deciding to use these various percentages, Sprint did not apply values for the wireless network access it was providing to its New York customers, or any other customers around the country.  It also did not apply values for the minutes that New York or other customers actually used for interstate calls or intrastate calls, or values for the minutes that were not used but were available under the plans.

18

74.     Instead, these allocations of Sprint's fixed monthly charges were arbitrary.  At times, for example, Sprint calculated a percentage for "interstate usage" from an unrelated federal telecommunications surcharge, but Sprint did not use that same percentage in calculating its obligations for that federal surcharge, nor did Sprint modify how it allocated its charges for sales tax purposes when the federal government changed the percentage.

75.     Even though Sprint has set up its system this way, it has not consistently adhered to its percentage allocations.  For some of its plans for certain periods of time, Sprint cannot tell what it taxed or why, and it lacks records reflecting its method of determining sales taxes in New York and elsewhere.  For example, Sprint lacks data that could show how it broke out its fixed monthly charges for voice services offered under plans sold by Nextel Partners (including plans sold by Nextel Partners of Upstate New York).

76.     Sprint also took action to conceal that it failed, at times, to apply its own percentage allocations as it intended.  It knew that disclosure would likely meet with resistance from taxing authorities nationwide and present the company with an increased nationwide audit risk.

77.     For example, by 2009, Sprint had discovered that, for certain plans sold around the country, including in New York, it had failed to break out its fixed monthly charges for wireless voice services and treat part as non-taxable.  In other words, Sprint discovered that it did not adhere completely to its own unbundling program, and therefore accidentally collected and paid the correct amount of sales taxes on a number of its plans.  As a result, Sprint collected and paid about $30 million in taxes from its customers around the nation that it had not intended to collect or pay.

78.     Once Sprint discovered this issue, employees not familiar with the nature of Sprint's unbundling suggested that Sprint seek a refund from taxing authorities of this $30 million "overpayment" on behalf of its customers.  This idea was promptly rejected by higher level Sprint tax employees who understood the importance of concealing both Sprint's unbundling practices and the state of its record keeping.  Sprint's Director of Telecom Tax wrote in an e-mail: "My 2 cents worth is that, based on what [another Sprint employee] has laid out here, I don't think we should [seek a refund] - i.e., we can't change our books and records after the fact to support a refund."  Sprint's Senior State Tax Counsel then added to the discussion that "Sprint is already taking some risk with unbundling.  Our risks are exponentially increased if we try to pursue refunds when we didn't jump through the hoops on unbundling."  After this internal consideration, Sprint did not seek refunds, nor did it notify consumers of the issue.

**IV.     Sprint's Avoidance of Over $100 Million in New York Sales Taxes**

79.     Sprint has not collected and paid state and local sales taxes required by New York law because it excluded about a quarter of its fixed monthly charges to New York customers for wireless voice services from its calculation of New York sales taxes.

80.     From July 2005 through the present day, Sprint has treated that excluded portion of the monthly charges as if it were not part of a fixed periodic charge for gaining access to Sprint's wireless network for a set number of minutes of calling time, which is what it was. Instead, Sprint inaccurately treated it as if it were a charge for per-minute usage for interstate calls and did not pay sales taxes on it in New York (and elsewhere) because per-minute usage charges for interstate calls are not subject to New York state and local sales taxes.

81.     Based on Sprint's approach, the three taxpayer defendant entities did not pay New York state and local sales taxes as follows:

a.  For flat-rate plans sold by defendant Sprint Spectrum L.P., Sprint did not collect or pay New York state and local sales taxes on 28.5% of its fixed monthly charges for wireless voice services, from July 2005 until October 2008.

b.  For flat-rate plans sold by defendant Nextel of New York, Inc., Sprint did not collect or pay New York state and local sales taxes on 13.7% of its fixed monthly charges for wireless voice services, from about April 2006 through October 2008.

c.  For flat-rate plans sold by defendant Nextel Partners of Upstate New York, Inc., Sprint did not collect or pay New York state and local sales taxes on an amount that Sprint cannot confirm, but has represented as being 15% of its fixed monthly charges for wireless voice services, from about May 2006 through October 2008.

d.  For flat-rate plans sold by all three of these companies, from October 2008 to the present, Sprint has not collected or paid New York state and local sales taxes on 22.5% of its fixed monthly charges for wireless voice services.

82.  As a result of Sprint's treatment of its fixed monthly charges for voice services, Sprint deprived New York state and local governments of more than $100 million of tax revenue.

83.  Under the New York Tax Law, such underpayments are also subject to interest, currently at an annual rate of 14.5%, and penalties of double the amount of fraudulent underpayments or up to 30% of other underpayments.

84.  The amounts of Sprint's under-collection and underpayment of taxes continues to grow.  Sprint still does not collect and pay New York state and local sales taxes on the full amount of its fixed monthly charges for voice services.

21

**V.      Sprint Knew It Was Violating Its New York Sales Tax Obligations**

85.      At the time Sprint made the decisions to unbundle its flat-rate plans and to treat a part of its fixed monthly charges for wireless voice services as non-taxable in New York, and at all times since, Sprint was fully aware of the New York Tax Law provisions concerning its obligation to pay sales taxes with respect to fixed monthly charges for wireless voice services.

86.      In 2002, when amendments to the New York Tax Law were under consideration with respect to telecommunications sales taxes, Sprint was part of an industry group that actively lobbied for the law to match its interests.  As part of these lobbying efforts, an internal lobbyist at Sprint, together with other industry representatives, met with representatives of the New York Tax Department shortly before the May 29, 2002 enactment of the amendments, in an effort to influence the legislation.

87.      In connection with these lobbying efforts, Sprint reviewed the pending legislation.

88.      Sprint's lobbyists were also in communication with the New York Tax Department concerning the guidance the Department issued just before the sales tax law amendments became effective.  An outside lobbyist for Sprint obtained a copy of the draft of the 2002 TSB-M from the New York Tax Department and then forwarded it to Sprint's internal lobbyist, who then forwarded it to the leaders of Sprint's internal State and Local Tax Group. According to the internal lobbyist, Sprint was being given an opportunity to comment on the TSB-M.  Sprint reviewed the draft of the 2002 TSB-M.  The draft was in all material respects the same as the final version of the 2002 TSB-M issued on July 30, 2002.

89.      By July 2005, when Sprint began to implement its decision not to pay New York sales taxes on the full amount of its fixed monthly charges to New York customers for wireless voice services, Sprint had reviewed New York sales tax law, including New York Tax Law

Sections 1105(b) and 1111(*l*).  Similarly, it made the decision only after reviewing the guidance from the New York Tax Department in the 2002 TSB-M.

90.      Sprint's Senior State and Local Tax Counsel, who was charged with understanding state and local tax law, when asked "how many times would you say you have read [the relevant New York tax law]," including Section 1105(b), testified "a hundred or more."

91.      Sprint did not seek, and has not sought, any guidance from the New York Tax Department about the application of the 2002 amendments or other New York law concerning sales taxes on the fixed monthly charges for wireless voice services or other bundled mobile telecommunications products.  It chose not to despite the fact that the New York Tax Department routinely provides such guidance to taxpayers and that Sprint has, in the past, consulted with the New York Tax Department on other tax matters.

92.      While it considered how to unbundle its flat-rate plans, Sprint did not seek or obtain any advice from outside attorneys or others outside the company with respect to its New York sales tax obligations concerning its fixed monthly charges for wireless voice services.

93.      Internally, Sprint did not prepare any memoranda or other documents analyzing these obligations.

94.      Sprint continues to not collect and pay New York state and local sales taxes on the full amount of its receipts from its fixed monthly charges for wireless voice services, despite being specifically informed of the illegality of this practice by a field-auditor of the New York Tax Department in 2009, and then, in 2011, by a senior enforcement official of the New York Tax Department.

23

## VI.   Sprint's Knowingly False Records and Statements

95.     Sprint has repeatedly caused to be made false records and statements material to its obligations to collect and pay New York sales taxes on the full amount of the fixed monthly charges it received from New York customers for wireless voice services.

96.     Since it began its unbundling program, Sprint has submitted to the New York Tax Department each month tax forms – including Forms ST 809, ST 810 and Schedule T – that have purported to spell out the amount of sales taxes due to be paid by Sprint to the New York State and local governments.  The sales tax submissions are made separately for defendants Sprint Spectrum L.P., Nextel of New York, Inc. and Nextel Partners of Upstate New York, Inc.  All of these sales tax submissions are prepared and submitted centrally by employees of Sprint Nextel Corporation.

97.     Each and every one of the submitted tax forms, for all periods since Sprint began its unbundling program has been false in that not one states the accurate amount of sales taxes due.  Instead, these statements understate the taxes due because Sprint illegally and fraudulently failed to apply sales taxes to the part of its fixed monthly charges that it internally chose to classify as non-taxable "usage airtime: interstate" in its data systems.

98.     At the time Sprint submitted each of these tax forms and made these false statements as to each of the various taxing jurisdictions, it had actual knowledge of what was required by New York sales tax law, that it was not paying state and local sales taxes on its full fixed monthly charges for wireless voice services, and that such breaking out of the fixed monthly charges was not permitted under New York tax law.  Sprint thus knew that its repeated statements of the sales taxes it owed were false because they severely understated the tax due.

24

At a minimum, Sprint acted in deliberate ignorance of the truth or falsity of the information it included in its sales tax filings or it recklessly disregarded the truth or falsity of the information.

99.    Each of Sprint's New York sales tax filings and each of its representations to the various taxing authorities within the State was material to the obligation of Sprint to pay the correct amount of sales taxes for the tax period represented by each filing.

100.    Each of Sprint's New York sales tax filings and each of its representations to the various taxing authorities within the State was also material to Sprint's obligation to pay its total past underpayment of the sales taxes.  Each filing continued to conceal (a) the existence of the underpayment in past periods, and (b) Sprint's ongoing and continuing conduct of submitting false tax filings.  Each filing was a false record and statement that ensured that the taxing authorities of the state and local governments would not know of the underpayment and therefore would not seek to collect the moneys owed.

101.    When Sprint made each of its New York sales tax filings and the separate representations in them for each taxing jurisdiction, Sprint made it less likely that the state or local governments would know about, or collect, or attempt to collect or receive any payment of Sprint's obligation to pay the total underpayment that had accumulated at that time.

**VII.    Sprint Misled Its New York Customers That It Was Collecting and Paying All Applicable Sales Taxes**

102.    Sprint also misled its New York customers.

103.    From July 2005 until the present, Sprint has had over three million customers in New York who purchased flat-rate calling plans.  It currently has about 1.82 million such customers.

104.    These customers have entered into contracts with Sprint to purchase their plans, and they were locked into these plans for one or two years by early termination fees that Sprint would charge customers who terminated their plans before the contract period was over.

105.    In its contracts with these customers, on its website and elsewhere, Sprint represented that it would collect and pay all applicable sales taxes on its calling plans. As described above, however, it did not do so. Sprint's representations in the contracts, on its website and elsewhere were false because Sprint knew it would not collect and pay the applicable sales taxes in New York.

106.    Contrary to its promises, Sprint failed to collect and pay sales taxes on substantial portions of the fixed monthly charges for voice services under its flat-rate calling plans. As a result of this non-payment, Sprint left its New York customers liable for those unpaid amounts of sales taxes under New York law.

107.    At no point did Sprint disclose to its New York customers that it was leaving them liable for the sales taxes that Sprint failed to collect from the customers and pay to the government, as promised.

108.    Before Sprint began unbundling, members of its State and Local Tax Group and its marketing group considered in the early part of July 2005 whether to communicate with customers about the fact that Sprint was unbundling and that the unbundling would affect taxes for some customers. They jointly opted not to communicate the change. Sprint's Director of External Tax was concerned that disclosing the information would "drive too many calls" to Sprint's customer care division.

109.    In November 2005, just months after Sprint began unbundling, a Sprint employee in the Customer Billing Services department questioned a member of Sprint's State and Local

Tax Group about whether unbundling was "presented to the customer as part of the Subscriber agreement, shown in the invoice and/or available to Customer Care Rep."  The response was simply that "we have not educated our customers on how we are de-bundling transactions for their tax relief."

110.    Sprint continues to misinform its current and prospective customers about sales taxes, and to subject them to undisclosed sales tax liability even today.

## FIRST CAUSE OF ACTION

### New York False Claims Act – State Fin. Law § 189(1)(g)

111.    Plaintiff repeats and re-alleges paragraphs 1 through 110 as if fully set forth herein.

112.    Defendants violated State Finance Law § 189(1)(g) in that they knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the state and local governments.

113.    The thresholds set forth in State Finance Law § 189(4)(i) and (ii) are satisfied because Sprint and the other defendants have net income or sales in excess of one million dollars for any taxable year subject to this action, and the damages pleaded exceed three hundred and fifty thousand dollars.

## SECOND CAUSE OF ACTION

### New York False Claims Act – State Fin. Law § 189(1)(c)

114.    Plaintiff repeats and re-alleges paragraphs 1 through 110 as if fully set forth herein.

115.    Defendants violated State Finance Law § 189(1)(c) in that they conspired to commit a violation of State Finance Law § 189(1)(g).

27

116.    The thresholds set forth in State Finance Law § 189(4)(i) and (ii) are satisfied because Sprint and the other defendants have net income or sales in excess of one million dollars for any taxable year subject to this action, and the damages pleaded exceed three hundred and fifty thousand dollars.

## THIRD CAUSE OF ACTION

### Persistent Fraud or Illegality – Executive Law § 63(12)

117.    Plaintiff repeats and re-alleges paragraphs 1 through 110 as if fully set forth herein.

118.    The acts and practices alleged herein constitute conduct proscribed by § 63(12) of the Executive Law, in that defendants engaged in repeated fraudulent or illegal acts or otherwise demonstrated persistent fraud or illegality in the carrying on, conducting or transaction of business.

119.    Specifically, as described in the foregoing paragraphs, defendant repeatedly engaged in the fraudulent and illegal acts of failing to collect and pay sales taxes due and owing and submitting false sales tax filings to the New York Department of Taxation & Finance in violation of New York State Tax Law § 1105, and as such is liable for the underpayment of taxes, interest thereon provided for in the New York Tax Law, and penalties provided for in the tax law, including, but not limited to, the penalties applicable where taxpayers fraudulently fail to pay taxes due.

## FOURTH CAUSE OF ACTION

### Violation of Article 28 of the Tax Law

120.    Plaintiff repeats and re-alleges paragraphs 1 through 110 as if fully set forth herein.

28

121.   The acts and practices alleged herein constitute conduct proscribed by Article 28 of the Tax Law.  Defendants, who were required to collect sales taxes, failed to collect and pay over sales taxes, penalties and interest imposed by said Article.

122.   The Tax Commissioner has requested that the Attorney General bring or cause to be brought this action to enforce Article 28 against Sprint for the conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands and prays that judgment be entered against defendants Sprint Nextel Corp., Sprint Spectrum L.P., Nextel of New York, Inc., and Nextel Partners of Upstate New York, Inc. as follow:

A.   Declaring, pursuant to CPLR § 3001, that defendants' practices and conduct have violated Tax Law § 1105, State Finance Law §187, *et seq.*, and Executive Law § 63(12);

B.   Enjoining and restraining defendants from engaging in any conduct, conspiracy, contract, or agreement, and from adopting or following any practice, plan, program, scheme, artifice or device similar to, or having a purpose and effect similar to, the conduct complained of above;

C.   Directing that defendants, pursuant to the New York False Claims Act, State Finance Law §§ 187, *et seq.,* pay an amount equal to three times the amount of damages sustained as a result of defendant's violations of the New York False Claims Act;

D.   Directing that defendants, pursuant to the State Finance Law §§ 187, *et seq.*, pay penalties of not less than $6,000 and not more than $12,000 for each violation of State Finance Law §189;

E.   Directing defendants to pay all damages caused by the fraudulent and deceptive acts and practices alleged herein, including all sales taxes due and owing, plus applicable interest

and penalties under the New York Tax Law, to all injured persons or entities, including those not identified at the time of the order;

      F.      Restraining defendants from enforcing any early termination fee provisions in effect in their contracts with customers in New York;

      G.      Awarding plaintiff costs of $2,000 against each defendant pursuant to CPLR § 8303(a)(6);

      H.      Directing that defendants pay plaintiff's costs, including attorneys' fees as provided by law;

      I.      Directing such other equitable relief as may be necessary to redress defendants' violation of New York law; and

      J.      Granting such other and further relief as the Court deems just and proper.


DATED:      New York, New York
               April 19, 2012

                                **ERIC T. SCHNEIDERMAN**
                                Attorney General of the State of New York
                                Attorneys for Plaintiff


                                BY: _____
                                      Randall M. Fox
                                      Bureau Chief
                                      Emily Bradford
                                      Senior Counsel
                                Taxpayer Protection Bureau
                                Office of the New York Attorney General
                                120 Broadway, 25th Floor
                                New York, New York  10271
                                Tel:    (212) 416-6012
                                Fax:    (212) 416-6087