**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

LOUISIANA MUNICIPAL POLICE
EMPLOYEES' RETIREMENT SYSTEM,
Derivatively on Behalf of Itself, and All Others
Similarly Situated,

                Plaintiff,

      v.

DAN R. HESSE, JOSEPH J. EUTENEUR,
ROBERT H. BRUST, PAUL N. SALEH,
JAMES H. HANCE, JR., ROBERT R.
BENNETT, GORDON M. BETHUNE,
LARRY C. GLASSCOCK, V. JANET HILL,
FRANK IANNA, SVEN-CHRISTER
NILSSON, WILLIAM R. NUTI, and
RODNEY O'NEAL,

                Defendants,

       -and-

SPRINT NEXTEL CORP.,

              Nominal Defendant.

Civil Action No.  1:12-cv-04017-ALC-JCF

ECF Case Electronically filed

---

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

CHADBOURNE & PARKE LLP
Thomas J. McCormack
Marc D. Ashley
Robert Kirby
30 Rockefeller Plaza
New York, NY 10112

*Attorneys for the Individual Defendants*

PILLSBURY WINTHROP SHAW PITTMAN LLP
E. Leo Milonas
David G. Keyko
1540 Broadway
New York, NY 10036

*Of counsel:*
Dane H. Butswinkas
David S. Blatt
Kenneth J. Brown
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005

*Attorneys for Defendant Sprint Nextel Corp.*

# <u>TABLE OF CONTENTS</u>

BACKGROUND ................................................................................................................2

     A.     Sprint's Tax Treatment of Flat-Rate Plans ................................................3

     B.     New York's Statutory Scheme................................................................3

     C.     Sprint's Allegedly False Statements ........................................................6

     D.     Allegations Regarding the Individual Defendants ..................................6

ARGUMENT ...................................................................................................................7

I.     Legal Standard ...........................................................................................7

II.     Plaintiff Does Not Plead "With Particularity" Facts Showing Demand Futility. ...............8

     A.     In This Case, Demand Futility Is Subject to the *Rales* Test. ..................9

     B.     Sprint's Exculpatory Provision Must Be Considered in Applying the *Rales* Standard. ..................................................................................11

     C.     Plaintiff's Specific Demand Futility Arguments Lack Merit. ..................13

          1.     Plaintiff's "Red Flags" Theory Does Not Make Demand Futile. ..............13

               a.     Plaintiff Does Not Plead Particularized Facts Showing Any Individual Defendant Was Even Aware of the Taxation Issue. ................................................................13

               b.     Plaintiff Does Not Plead Particularized Facts Showing That Any Defendant Deliberately Caused Sprint to Take an Improper Tax Position. ................................................15

          2.     Plaintiff's Allegations That the Individual Defendants Face Personal Liability for a Failure of Oversight Do Not Make Demand Futile. ..........................................................................19

          3.     Membership on Board Committees Does Not Make Demand Futile. ..................................................................................21

          4.     An Alleged "Insured Versus Insured" Exclusion Does Not Make Demand Futile. .........................................................21

III.     Plaintiff Fails to State a Claim for Corporate Waste. ....................................22

IV.     Plaintiff's Claim for Contribution or Indemnification Should Be Dismissed. ................23

CONCLUSION ..............................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................................7

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......................................................................7

*Comeau v. Rupp*, 762 F. Supp. 1434 (D. Kan. 1991) ..................................................................23

*Ferre v. McGrath*, 2007 WL 1180650 (S.D.N.Y. Feb. 16, 2007) ...............................11, 15, 20, 21

*Fink v. Weill*, 2005 WL 2298224 (S.D.N.Y. Sep. 19, 2005) ........................................................10

*Halebian v. Berv*, 590 F.3d 195 (2d Cir. 2009) ............................................................................7

*Halpert Enters., Inc. v. Harrison*, 362 F. Supp. 2d 426 (S.D.N.Y. 2005) ...................................21

*In re AIG, Inc. Derivative Litig.*, 700 F. Supp. 2d 419 (S.D.N.Y. 2010)...........................7, 10, 20

*In re Intel Corp. Derivative Litig.*, 621 F. Supp. 2d 165 (D. Del. 2009) .....................9, 14, 17, 18

*In re Johnson & Johnson Derivative Litig.*, 2011 WL 4526040 (D.N.J. Sept. 29, 2011) ..... passim

*In re Kauffman Mut. Fund Actions*, 479 F.2d 257 (1st Cir. 1973)................................................19

*In re Merck & Co. Secs., Derivative & "ERISA" Litig.*, 2008 WL 2788400 (D.N.J. June 17, 2008) ..............................................................................................................16, 17

*In re Morgan Stanley Derivative Litig.*, 542 F. Supp. 2d 317 (S.D.N.Y. 2008)............................10

*In re United Telecomms., Inc., Secs. Litig.*, 1993 WL 100202 (D. Kan. Mar. 4, 1993) ..........23, 24

*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90 (1991)..............................................................8, 9

*Kaufman v. Kansas Gas & Elec. Co.*, 634 F. Supp. 1573 (D. Kan. 1986) ...............................7, 19

*Kautz v. Sugarman*, 2011 WL 1330676 (S.D.N.Y. Mar. 31, 2011)................................................7

*Kernaghan v. Franklin*, 2008 WL 4450268 (S.D.N.Y. Sept. 29, 2008)...................................7, 21

*Kramer v. Time Warner, Inc.*, 937 F.2d 767 (2d Cir. 1991) ........................................................11

*LAMPERS v. Blankfein*, 2009 WL 1422868 (S.D.N.Y. May 19, 2009) ....................10, 11, 20, 21

*LAMPERS v. Pandit*, 2009 WL 2902587 (S.D.N.Y. Sept. 10, 2009).................................. passim

*Logicom Inclusive, Inc., v. W.P. Stewart & Co.*, 2004 WL 1781009 (S.D.N.Y. Aug. 10, 2004) ............................................................................................................................11

*Pall v. KPMG*, 2006 WL 2800064 (D. Conn. Sept. 29, 2006) ....................................................23

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Lundgren*, 579 F. Supp. 2d
520 (S.D.N.Y. 2008) ................................................................................................................21

*Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133 (2d Cir. 2004) ................................................9

*Strickland v. Hongjun*, 2011 WL 2671895 (S.D.N.Y. July 8, 2011) ............................................9

## STATE CASES

*Achey v. Linn Cnty. Bank*, 931 P.2d 16 (Kan. 1997) ....................................................................8

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984) ............................................................................8, 9

*Baker v. City of Topeka*, 644 P.2d 441 (Kan. 1982) ..................................................................24

*Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ......................................................................7, 8, 22

*Debevoise & Plimpton v. N.Y. State Dep't of Taxation & Fin.*, 80 N.Y.2d 657 (1993) .................5

*Desimone v. Barrows*, 924 A.2d 908 (Del. Ch. 2007) ................................................................19

*FLI Deep Marine LLC v. McKim*, 2009 WL 1204363 (Del. Ch. Apr. 21, 2009) ...........................8

*Frank v. Elgamal*, 2012 WL 1096090 (Del. Ch. Mar. 30, 2012) ..................................................8

*Glazer v. Zapata Corp.*, 658 A.2d 176 (Del. Ch. 1993) .............................................................22

*Gray v. Manhattan Med. Ctr., Inc.*, 18 P.3d 291 (Kan. Ct. App. 2001) ........................................8

*Guttman v. Huang*, 823 A.2d 492 (Del. Ch. 2003) ....................................................................20

*In re Caremark Int'l. Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996) ...................12, 14, 19

*In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106 (Del. Ch. 2009) .....................16, 21

*In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104 (Del. Ch. Oct. 12,
2011) ...................................................................................................................................11, 15

*In re Lear Corp. S'holder Litig.*, 967 A.2d 640 (Del. Ch. 2008) .................................................23

*In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27 (Del. 2006) .........................................12, 22

*Kan. Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs., Inc.*, 927 P.2d 466 (Kan. 1996) ........23, 24

*Kansas Heart Hosp., L.L.C. v. Idbeis*, 184 P.3d 866 (Kan. 2008) ...............................................8

*Leiker v. Gafford*, 819 P.2d 655 (Kan. 1991) ...........................................................................24

*Lightner v. Lightner*, 266 P.3d 539 (Kan. Ct. App. 2011) ...............................................8

*Rales v. Blasband*, 634 A.2d 927 (Del. 1993) ....................................................9, 11

*Stone v. Ritter*, 911 A.2d 362 (Del. 2006) ..........................................................12, 19

*Wayne Cty. Emps.' Ret. Sys. v. Corti*, 2009 WL 2219260 (Del. Ch. July 24, 2009) .....................8

*White v. Panic*, 783 A.2d 543 (Del. 2001) ..............................................................22

*Wood v. Baum*, 953 A.2d 136 (Del. 2008) ....................................................12, 15, 16

## STATUTES AND RULES

4 U.S.C. § 123(b) ...........................................................................................5

Fed. R. Civ. P. 23.1(b)(3) ..................................................................................7

Kan. Stat. Ann. § 60-2413(b) .............................................................................23

N.Y. State Finance Law § 189 ...........................................................................6

N.Y. Tax Law § 1105(b) ..................................................................................4

N.Y. Tax Law § 1105(b)(1)(B) ............................................................................3

N.Y. Tax Law § 1111(*l*) ...................................................................................5

## OTHER AUTHORITIES

McKinney's Cons. Laws of N.Y., Book 1, Statutes § 97 .................................................4

This shareholder derivative action is predicated entirely on a pending tax case brought by the New York Attorney General ("NYAG") against Sprint Nextel Corporation ("Sprint" or "the Company") in the Supreme Court for New York County (the "State Court Action"). The State Court Action presents significant issues of first impression regarding the interpretation and application of New York's Tax Law to mobile telecommunications services. Sprint has chosen to fight the NYAG's allegations because they are based on an erroneous reading of New York law, and that reading would be preempted by federal law if it were correct. Relying on the NYAG's assertions, Plaintiff Louisiana Municipal Police Employees' Retirement System ("LAMPERS") claims in this case that Sprint's directors (the "Directors") breached their fiduciary duties to the Company, wasted corporate assets, and made themselves liable for "contribution and indemnification" by allowing Sprint to take the tax position at issue in the State Court Action. Plaintiff's claims, however, fail as a matter of law and should be dismissed.

LAMPERS did not make a demand on Sprint's Board of Directors before filing suit. Instead, it rushed to the courthouse 11 days after the NYAG filed the State Court Action. LAMPERS asserts that demand would have been futile because Sprint's directors face personal liability in this case for allegedly allowing the Company to take the challenged tax position and, therefore, are not disinterested. But, as often is the case in derivative actions involving a race to the courthouse, Plaintiff has not gathered, and thus does not plead, any facts to support its assertion of demand futility. It pleads no facts showing that any Board member was even aware of the disputed tax issue, much less that he or she deliberately caused Sprint to violate the law. Such an allegation would be necessary to establish that any Director is personally liable, as Sprint's articles of incorporation exculpate the Directors from liability for breach of fiduciary duty except for breaches of the duty of loyalty and bad faith conduct.

Moreover, Sprint's position in the State Court Action is that the NYAG is ***wrong***, and that the Company did not improperly fail to collect any tax from its customers. As a matter of law, the Directors' fiduciary duties did not require them to cause the Company to capitulate when the State took a legal position with which the Company reasonably disagreed. Plaintiff's contrary suggestion is legally unprecedented and troubling. If it were accepted, the government could wrongfully coerce directors into abandoning meritorious legal positions as a matter of course.

LAMPERS's remaining arguments concerning demand futility, including that certain Directors sit on board committees and that the relevant D&O insurance policy contains an "insured versus insured" exclusion, are stock contentions that lack merit for the same reasons they have been rejected in other derivative actions Plaintiff has brought. Plaintiff's inability to establish demand futility is fatal to each of its claims.

In addition to demand futility, Plaintiff has failed to state a valid claim for corporate waste, contribution, or indemnification. Plaintiff's complaint should be dismissed with prejudice.

## BACKGROUND

Plaintiff lifts its factual allegations almost entirely from the NYAG's complaint. *See, e.g.*, Complaint ("Compl.")[1] ¶ 3 (incorporating NYAG's entire complaint by reference). It asserts that Sprint sells wireless calling plans, including "flat-rate" plans that provide a certain number of minutes of talk time for a fixed fee, such as Sprint's wireless plan providing 450 minutes of talk time for $39.99 per month. *Id.* ¶¶ 4, 32-33.

---

[1] LAMPERS's complaint is found at Docket 1, Exhibit 1. The NYAG complaint is attached as Exhibit A to LAMPERS's complaint.

A.      **Sprint's Tax Treatment of Flat-Rate Plans**

The Complaint alleges that, beginning in July 2005, Sprint began disaggregating, or "unbundling," its flat-rate plans for sales tax purposes.  *Id.* ¶ 46.  In particular, it claims that Sprint disaggregated the portion of its plans that was attributable to "intrastate" voice calls (calls "made to people or phones within the same state") from the portion attributable to "interstate" calls (calls to "people in other states").  *Id.* ¶¶ 33, 46.  The NYAG asserts that Sprint improperly did not collect from its customers sales tax on the portion of the flat-rate charge for interstate calls, and instead collected tax on only the intrastate amount.  NYAG Compl. ¶ 44.  For the years in question, the percentage of fixed-rate calling plans on which Sprint did not collect sales tax allegedly ranged from 13.7% to 28.5% of the overall flat rate.  *Id.* ¶¶ 74, 81.

The Complaint asserts that Sprint's decision to unbundle its wireless plans for tax purposes "was driven by its desire to gain a competitive advantage over its competitors by reducing the amount of sales taxes collected from its customers and, thereby, appearing to be a low-cost carrier."  Compl. ¶ 47.  In the next breath, however, it undercuts that allegation, acknowledging that Sprint did not "communicate with customers about the fact that [it] had embarked on an aggressive component taxation program," and did "not educate[] [its] customers about how [it was] de-bundling transactions for their tax relief."  *Id.* ¶ 57.

B.      **New York's Statutory Scheme**

The Complaint does not allege that New York imposes a sales tax on interstate telephone service.  That is for good reason; the New York Tax Law expressly excludes "interstate" voice services from sales tax.  N.Y. Tax Law § 1105(b)(1)(B) (McKinney 2012).  Undeterred, the Complaint parrots the NYAG's assertion that, since August 2002, New York has "required the payment of sales taxes on the ***full amount*** of fixed periodic charges for wireless services sold by companies—including Sprint Nextel—in New York."  Compl. ¶ 37 (emphasis in original).  In

3

other words, the NYAG (and thus Plaintiff) claims that if a provider bundles non-taxable services (like "interstate" telephony) with taxable services (like "intrastate" telephony), the "entire amount" becomes taxable. NYAG Compl. ¶¶ 4, 40. These terms on which the NYAG places such weight—"full amount" and "entire amount"—are nowhere found in any pertinent provision of the Tax Law.

Instead, the NYAG and Plaintiff rely on subsection (2) of section 1105(b), ignoring subsections (1) and (3). Subsection (2), however, cannot be understood without reading the entire section. Section 1105(b) provides in full:

> [T]here is hereby imposed and there shall be paid a tax of four percent upon: . . . .
>
> (1)  The receipts from every sale, other than sales for resale, of the following: . . .
>
>> (B)  telephony and telegraphy and telephone and telegraph service of whatever nature ***except interstate and international telephony*** and telegraphy and telephone and telegraph service and except any telecommunications service the receipts from the sale of which are subject to tax under paragraph two of this subdivision; . . .
>
>  (2)  The receipts from every sale of mobile telecommunications service provided by a home service provider, other than sales for resale, that are voice services, or any ***<u>other</u> services that are taxable under subparagraph (B) of paragraph one of this subdivision***, sold for a fixed periodic charge (not separately stated), whether or not sold with other services.
>
> (3)  ***The tax imposed pursuant to this subdivision is imposed on receipts from charges for <u>intrastate</u> mobile telecommunications service*** of whatever nature in any state if the mobile telecommunications customer's place of primary use is in this state.

N.Y. Tax Law § 1105(b).[2]  Sections 1105(b)(1) and (b)(3) are conspicuously absent from the Complaint, despite the rule in New York, as elsewhere, that a statute "is to be construed as a whole, and all parts of an act are to be read and construed together to determine the legislative intent." McKinney's Cons. Laws of N.Y., Book 1, Statutes § 97.

---

[2] All emphases are added except as otherwise specified.

4

The Complaint further alleges that the "unbundling" rules in section 1111(*l*) of the Tax Law—which recognize that a provider may disaggregate components of a flat-fee charge— permit a provider "to treat separately for sales tax purposes components of a bundled charge as long as the charges are not for voice services and the provider uses an 'objective, reasonable and verifiable standard for identifying each of the components' of a bundled charge."  Compl. ¶ 45 (quoting N.Y. Tax Law § 1111(*l*)(2)).  Here again, however, the Complaint is more notable for what it omits than what it contains.  If the NYAG/Plaintiff's reading of New York law (including section 1111(*l*)) were correct, it would be preempted by the federal Mobile Telecommunications Sourcing Act ("MTSA"), which allows providers to unbundle flat-rate services and not collect sales tax on those portions of the bundle that are not taxable under state law.  4 U.S.C. § 123(b) (2006) ("If a taxing jurisdiction does not otherwise subject charges for mobile telecommunications services to taxation and if these charges are aggregated with and not separately stated from charges that are subject to taxation, then the charges for nontaxable mobile telecommunications services may be subject to taxation *unless the home service provider can reasonably identify charges not subject to such tax, charge, or fee from its books and records* . . . .").[3]  The MTSA likewise goes unmentioned in the Complaint.

Nor does the Complaint acknowledge that, even if section 1105 were ambiguous, it would have to be construed in favor of Sprint as a matter of law.  *See Debevoise & Plimpton v. N.Y. State Dep't of Taxation & Fin.*, 80 N.Y.2d 657, 661 (1993) ("When the particular statute is one which levies a tax, it is well established that *it must be narrowly construed and that any doubts concerning its scope and application are to be resolved in favor of the taxpayer*.").

---

[3] Neither the Complaint nor the NYAG alleges that Sprint failed to "reasonably identify" charges for non-taxed service from its books and records.

### C.      Sprint's Allegedly False Statements

Rather than plead the State Court Action case as the tax dispute it is, the NYAG attempts to penalize Sprint by adding two claims for treble damages under New York's False Claims Act ("FCA"), State Finance Law § 189.   It asserts that, by not collecting tax on "interstate" telecommunications, "Sprint has submitted to the New York Tax Department each month tax forms . . . that ha[ve] been false in that not one states the accurate amount of sales taxes due." NYAG Compl. ¶¶ 96-97.   The Complaint conclusorily asserts that Sprint knowingly submitted false tax forms based on its awareness of the relevant statutes and the New York Department of Taxation and Finance ("DTF")'s interpretation of those statutes.   *Id.* ¶¶ 85-94.   The Complaint contains no allegation that Sprint believed that the DTF's interpretation was correct (it is not), or that Sprint believed it was violating New York law by not collecting and paying sales tax on the portion of its flat-rate plans attributable to "interstate" voice service.

### D.      Allegations Regarding the Individual Defendants

The NYAG's complaint does not mention any Individual Defendant.[4]   And LAMPERS copies the NYAG's allegations nearly verbatim.   Other than the membership of certain Directors on two committees, *id.* ¶¶ 63, 69, LAMPERS makes no specific allegation regarding any Individual Defendant.   Indeed, the Complaint says not one word about any Individual Defendant's awareness or consideration of the tax issues underlying this case.   Instead, the crux of Plaintiff's claim is that all of the Individual Defendants breached their fiduciary duties to Sprint by failing to prevent Sprint from taking the challenged tax position.   *Id.* ¶ 78.

---

[4]   The Individual Defendants are Sprint's ten current Directors, current CFO, and two immediately previous CFOs.

**ARGUMENT**

## I.    Legal Standard

Shareholder derivative suits must satisfy the pleading standards of Federal Rules of Civil Procedure 12(b)(6) and 23.1.  *See Halebian v. Berv*, 590 F.3d 195, 204 (2d Cir. 2009); *Kautz v. Sugarman*, 2011 WL 1330676, at *3 (S.D.N.Y. Mar. 31, 2011).  To survive a motion to dismiss under Rule 12(b)(6), "'a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' . . . Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Rule 23.1 imposes additional requirements on derivative claims.  In particular, Rule 23.1(b)(3) requires that derivative complaints "state **with particularity** . . . any effort by the plaintiff to obtain the desired action from the directors . . . and the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3).  "The burden is on the plaintiff to show that the requirements of the rule have been satisfied." *Kaufman v. Kansas Gas & Elec. Co.*, 634 F. Supp. 1573, 1578 (D. Kan. 1986).  "'Because Rule 23.1 requires that plaintiffs make particularized allegations, it imposes a pleading standard higher than the normal standard applicable to the analysis of a pleading challenged under Rule 12(b)(6).'" *In re AIG, Inc. Derivative Litig.*, 700 F. Supp. 2d 419, 430 (S.D.N.Y. 2010) (quoting *Kernaghan v. Franklin*, 2008 WL 4450268, at *3 (S.D.N.Y. Sept. 29, 2008)).  This standard "'is not satisfied by conclusory statements or mere notice pleading.'"  *In re AIG, Inc.*, 700 F. Supp. 2d 419, 430 (S.D.N.Y. 2010) (quoting *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000)).

## II.  Plaintiff Does Not Plead "With Particularity" Facts Showing Demand Futility.

The "'foundational principle'" of corporate law in Delaware (and thus Kansas)[5] is "'that the directors, and not the court, properly manage the corporation.'"[6] *Frank v. Elgamal*, 2012 WL 1096090, at *10 n.75 (Del. Ch. Mar. 30, 2012) (quoting *Wayne Cty. Emps.' Ret. Sys. v. Corti*, 2009 WL 2219260, at *15 (Del. Ch. July 24, 2009)).  "By its very nature the derivative action impinges on the managerial freedom of directors." *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), *overruled on other grounds* by *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)).  Rule 23.1's stringent requirements pertaining to demand "effectuate[ this] 'cardinal precept' that directors manage the business and affairs of the corporation." *FLI Deep Marine LLC v. McKim*, 2009 WL 1204363, at *2 (Del. Ch. Apr. 21, 2009) (quoting *Aronson*, 473 A.3d at 811).  As such, "the test for demand futility is not whether a shareholder reasonably expects the board to refuse a

---

[5] The Court "must apply the demand futility exception as it is defined by the law of the State of incorporation," which in this case is Kansas.  *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108–09 (1991).  Kansas, like many jurisdictions, looks to Delaware authority on issues of corporate law:  "Reliance on a Delaware decision is consistent with our long history of looking to Delaware for guidance when applying the Kansas General Corporation Code, which was modeled on the Delaware Code." *Kansas Heart Hosp., L.L.C. v. Idbeis*, 184 P.3d 866, 878 (Kan. 2008); *see also id.* at 887 (citing Delaware law in determining whether director of Kansas corporation was "interested"); *Achey v. Linn Cnty. Bank*, 931 P.2d 16, 21 (Kan. 1997) ("[D]ecisions of the Delaware courts involving corporation law are persuasive, as [the Kansas] General Corporation Code has been patterned after, and at times contains identical provisions of, the Delaware general corporation law."); *Lightner v. Lightner*, 266 P.3d 539, 545-46 (Kan. Ct. App. 2011) ("Kansas courts have a long history of looking to the decisions of the Delaware courts involving corporation law, as the Kansas Corporation Code was modeled after the Delaware Code.  Thus, we must give significant precedential value to those cases . . . from Delaware."); *Gray v. Manhattan Med. Ctr., Inc.*, 18 P.3d 291, 297 (Kan. Ct. App. 2001) ("Kansas follows Delaware's basic principles regarding application of the business judgment rule to insulate board decisions from attack.").

[6] "[F]or purposes of demand-futility analysis, the question is whether a majority of the directors—not officers—could face liability for their conduct."  *In re Johnson & Johnson Derivative Litig.*, 2011 WL 4526040, at *25 (D.N.J. Sept. 29, 2011).  Because demand is not futile for the reasons set forth herein, the claims against all Defendants, including the officers, must be dismissed.  *See, e.g.*, *LAMPERS v. Pandit*, 2009 WL 2902587, at *3 n.2, *12 (S.D.N.Y. Sept. 10, 2009).

demand, but rather whether there is reasonable doubt as to the board's impartiality to consider a demand." *Strickland v. Hongjun*, 2011 WL 2671895, at *2 (S.D.N.Y. July 8, 2011) (applying law of Nevada, which "has explicitly adopted" Delaware law of demand futility). Under this standard, demand is excused only in the most "'extraordinary'" circumstances. *Kamen*, 500 U.S. at 96 (citation omitted); *see also Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 138 (2d Cir. 2004).

### A.   In This Case, Demand Futility Is Subject to the *Rales* Test.

"There are two tests for determining demand futility under Delaware law." *LAMPERS v. Pandit*, 2009 WL 2902587, at *4 (S.D.N.Y. Sept. 10, 2009). "The two-prong *Aronson* test applies where a plaintiff is challenging 'conscious' board conduct." *Id.* (quoting *Aronson*, 473 A.2d at 813). Under *Aronson*, "plaintiffs seeking to establish demand futility must plead particularized facts that create a reasonable doubt that (1) the directors are disinterested and independent, or that (2) the challenged transaction was a valid exercise of business judgment." *Id.* "The single-part *Rales* test," by contrast, "applies '[w]here there is no conscious decision by directors to act or refrain from acting.'" *Id.* (quoting *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993)). In such situations, "'[t]he absence of board action . . . makes it impossible to perform the essential inquiry contemplated by *Aronson*—whether the directors have acted in conformity with the business judgment rule in approving the challenged transaction.'" *Pandit*, 2009 WL 2902587, at *5 (quoting *Rales*, 634 A.2d at 933); *see also In re Intel Corp. Derivative Litig.*, 621 F. Supp. 2d 165, 173 (D. Del. 2009). As such, the *Rales* test focuses solely on "whether plaintiff has alleged particularized facts creating a reasonable doubt that a majority of directors are disinterested and independent . . . ." *Pandit*, 2009 WL 2902587, at *5.

In this case *Rales*—not *Aronson*—governs the demand futility analysis. Plaintiff makes four arguments concerning demand futility, none of which turns on any affirmative decision by

the Directors.  First, Plaintiff claims that the Directors collectively failed to respond to "red flags" that should have apprised them that Sprint's taxation position was in error.  Compl. ¶ 71. Second, it claims that the Directors failed to implement mechanisms to ensure that the Company was not engaged in improper conduct.  *Id.* ¶¶ 68, 73.  Third, it claims that four of Sprint's ten directors are members of the audit committee, *see id.* ¶¶ 63-68, and another four are members of the corporate governance committee, *see id.* ¶ 69.  Finally, Plaintiff asserts that applicable D&O insurance policies contain an "insured versus insured exclusion," which would deprive the Individual Defendants of insurance coverage, further disincentivizing them to sue themselves. *Id.* ¶ 76.

These arguments—the same ones LAMPERS makes in most of the derivative cases it brings[7]—are evaluated under *Rales*.  *See, e.g., LAMPERS v. Blankfein*, 2009 WL 1422868, at *3-4 (S.D.N.Y. May 19, 2009); *In re AIG, Inc.*, 700 F. Supp. 2d at 431.[8]  As the court explained in *Pandit*, because "no specific decision (active or inactive) of the Board has been identified and challenged," the Court should apply *Rales*.  2009 WL 2902587, at *5.[9]

---

[7] *See, e.g., Pandit*, 2009 WL 2902587, at *7-10; *LAMPERS v. Blankfein*, 2009 WL 1422868, at *6-8 (S.D.N.Y. May 19, 2009) (same); *In re AIG, Inc.*, 700 F. Supp. 2d 419, 433-38 (S.D.N.Y. 2010).

[8] Other cases applying Delaware law are in accord.  *See, e.g., In re Morgan Stanley Derivative Litig.*, 542 F. Supp. 2d 317, 322 (S.D.N.Y. 2008) ("The Court finds that the *Rales* standard is applicable here, because the isolated and conclusory references to the board's concealment of, or failure to disclose, Morgan Stanley's receipt of the Wells Notice are insufficiently particularized to allege a specific board decision to omit the information from the proxy statement." (quotation and citations omitted)) (citing cases); *Fink v. Weill*, 2005 WL 2298224, at *3 n.6 (S.D.N.Y. Sep. 19, 2005) (applying *Rales* where plaintiff claimed "Citigroup's directors knew or should have known of the illegitimate corporate transactions and did nothing to stop them").

[9] Even if *Aronson* applied, Plaintiff's four specific arguments regarding demand futility uniformly lack merit, as set forth below.  Plaintiff's arguments fail under either standard.

10

**B.      Sprint's Exculpatory Provision Must Be Considered in Applying the *Rales*
          Standard.**

Where, as here, allegations of a "director's interest [are] based on his potential personal

liability, the director can only be considered 'interested' if the potential personal liability rises to

'a substantial likelihood'; it is not sufficient that 'a mere threat' of personal liability is alleged."

*Pandit*, 2009 WL 2902587, at *6 (quoting *Rales*, 634 A.2d at 936).   In applying the *Rales*

standard against this background, the Court should take judicial notice of Sprint's articles of

incorporation, which expressly limit when the Directors may be liable to the Company:

> No Director of the Corporation shall be personally liable to the Corporation or its
> stockholders for monetary damages for breach of fiduciary duty by such Director
> as a Director; <u>provided</u>, <u>however</u>, that this ARTICLE NINTH shall not eliminate
> or limit the liability of a Director to the extent provided by applicable law (i) for
> any breach of the Director's duty of loyalty to the Corporation or its stockholders,
> (ii) for acts or omissions not in good faith or which involve intentional
> misconduct or a knowing violation of law, (iii) under the provisions of K.S.A.
> Section 17-6424, and amendments thereto (or any successor provision), or (iv) for
> any transaction from which the Director derived an improper personal benefit.

Exs. 1 at 48, 2 at 46-47.[10]

Thus, in claiming the Directors face personal liability, it is not enough for Plaintiff to

allege that any of them was grossly negligent—or otherwise breached the duty of care—in

failing to cause Sprint to take a different tax position.  *See, e.g.*, *In re Goldman Sachs Grp., Inc.*

*S'holder Litig.*, 2011 WL 4826104, at *15 (Del. Ch. Oct. 12, 2011) (analogous provision in

Goldman's charter rendered "gross negligence, by itself, [an] insufficient basis upon which to

---

[10] These exhibits—Sprint's Amended and Restated Articles of Incorporation, as amended on
August 11, 2005, and May 17, 2012, respectively—are appended to the Affidavit of Kimberly A.
Donnelly (Dkt. 24).   Pursuant to Federal Rule of Evidence 201, the Court may take judicial
notice of these publicly-filed corporate documents that "'are relevant not to prove the truth of
their contents but only to determine what the documents state[].'"   *Logicom Inclusive, Inc., v.
W.P. Stewart & Co.*, 2004 WL 1781009, at *4 (S.D.N.Y. Aug. 10, 2004) (quoting *Kramer v.
Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (taking judicial notice of various publicly-
filed corporate documents)); *see also Blankfein*, 2009 WL 1422868, at *7 (taking judicial notice
of exculpatory provision (citing *Ferre v. McGrath*, 2007 WL 1180650, at *8 (S.D.N.Y. Feb. 16,
2007))).

impose liability"). Instead, "[w]here directors are contractually or otherwise exculpated from liability for certain conduct, 'then a serious threat of liability may only be found to exist if the plaintiff pleads a ***non-exculpated*** claim against the directors based on particularized facts.'" *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008) (citation omitted). To show such a threat, Plaintiff must "plead particularized facts that demonstrate that the directors acted with scienter, *i.e.,* that they had 'actual or constructive knowledge' that their conduct was legally improper." *Id.*; *see also In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006) (standard may be satisfied where fiduciary deliberately acts against the corporation's best interests, "acts with the intent to violate applicable positive law, or . . . intentionally fails to act in the face of a known duty to act"); *Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 370 (Del. 2006) ("[I]mposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations.").

The Complaint does not remotely meet this standard. It does not allege any fact that, if proved, would show that any Director was even aware that there was a New York tax issue, much less that he or she deliberately caused Sprint to take an illegal tax position.[11] In fact, other than membership on the audit and corporate governance committees, Plaintiff makes no individualized demand futility allegation regarding any Director. And it certainly pleads no facts showing that Sprint did anything other than disagree with the Department of Taxation and Finance ("DTF")'s interpretation of New York tax law.

---

[11] *See In re Caremark Int'l. Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996) (claim that directors "allowed a situation to develop and continue which exposed the corporation to enormous legal liability" and failed to actively monitor corporate performance did not charge "self-dealing or the more difficult loyalty-type problems arising from cases of suspect director motivation, such as entrenchment or sale of control contexts").

C.     **Plaintiff's Specific Demand Futility Arguments Lack Merit.**

1.     **Plaintiff's "Red Flags" Theory Does Not Make Demand Futile.**

Plaintiff's "red flags" theory is that each Director is not disinterested because he or she should have known that Sprint had taken an improper tax position, but "did nothing" "in [the] face of these red flags."  Compl. ¶ 71.  In particular, Plaintiff claims that "[t]he Company was warned twice by the New York taxing authorities that what they were doing was illegal.  Given that that [sic] Company has established reporting channels, it is understood that the Board was informed of the claimed illegal conduct by New York State."  *Id.*  Plaintiff lifts this allegation from the NYAG's complaint, which asserts that Sprint was "informed of the illegality of [the challenged taxation] practice by a field-auditor of the New York Tax Department in 2009, and then, in 2011, by a senior enforcement official of the New York Tax Department."  NYAG Compl. ¶ 94.  Neither the NYAG nor Plaintiff claims that any DTF official spoke to any Director.  Nor does Plaintiff plead any facts that support its claimed "underst[anding]" that any Director was informed of the purported warning.  Plaintiff further alleges that, "since the disclosure of the illegal conduct"—that is, since the filing of the NYAG's action on April 19, 2012, 11 days before Plaintiff filed this case—"the Board has ***still*** taken no action, despite that they ***know*** that the conduct is illicit."  Compl. ¶ 71 (emphasis in original).  These allegations do not show that any Director was even aware of the taxation issue (at least until 11 days prior to this lawsuit), much less that he or she deliberately caused the Company to take an illegal tax position.

a.     **Plaintiff Does Not Plead Particularized Facts Showing Any Individual Defendant Was Even Aware of the Taxation Issue.**

As an initial matter, Plaintiff makes no particularized allegation that any Director was even aware of the New York taxation issue.  As the court observed in *Caremark*, "[m]ost of the

decisions that a corporation, acting through its human agents, makes are, of course, not the subject of director attention.  Legally, the board itself will be required only to authorize the most significant corporate acts or transactions . . . ."  698 A.2d at 968.  But, for any Director to be liable to Sprint, Plaintiff must plead particularized facts showing that *that person* acted with scienter in causing the Company to take an improper tax position.  *See, e.g.*, *Pandit*, 2009 WL 2902587, at *8 ("[E]ven if Plaintiff had adequately alleged 'red flags,' Plaintiff has failed to proffer specific factual allegations regarding the individual directors' conduct in response to these alleged 'red flags.'"); *In re Intel Corp.*, 621 F. Supp. 2d at 174 ("Plaintiff fails to identify what the Directors actually knew about the 'red flags' and how they responded to them.").

Plaintiff makes no individualized allegation regarding any Director's consideration of or involvement with any taxation issue.  Instead, it claims that the "Company has established reporting channels" and that it is therefore "understood" that the Directors were aware of these purported "red flags."  Compl. ¶ 71.

That is insufficient.  As the court observed in *In re Intel Corp.*, "what is most notable about Plaintiff's 'red flags' allegation . . . is what is lacking.  . . .  Plaintiff fails to identify what the Directors actually knew about the 'red flags' and how they responded to them.  For instance, there are no allegations regarding how often the Board met, if at all, to discuss the alleged anti-competitive activity and no allegations that the Board approved any such 'red flag' activity.  Similarly, there are no allegations as to how often and by whom the Board was advised regarding the 'red flags.'"[12]  621 F. Supp. 2d at 174; *see also In re Johnson & Johnson Derivative Litig.*,

---

[12] Plaintiff's allegation that the "Audit Committee met fourteen times in 2005; seventeen times in 2006; seven times in 2007; ten times in 2008; ten times in 2009; ten times in 2010; and ten times in 2011," Compl. ¶ 65, does not establish who was present or what was discussed at these meetings, much less that any Director approved of any "red flag" activity.  And even if it did, Plaintiff claims that only four Directors are members of that committee, *id.* ¶ 63, meaning a

2011 WL 4526040, at *16 (D.N.J. Sept. 29, 2011) ("[T]here are no allegations regarding meeting dates, who was actually present at the meetings, or what subjects were discussed.  Without this sort of factual detail, the Court cannot infer that a majority of the Board knew about [the purported red flags].");  *Ferre*, 2007 WL 1180650, at *8.[13]  As the Delaware Supreme Court has noted, "red flags are only useful when they are either waved in one's face or displayed so that they are visible to the careful observer."  *Wood*, 953 A.2d at 143 (quotation and citation omitted). The Complaint does not begin to describe how any so-called red flags allegedly were waved in the face of any Director.

> **b.**      **Plaintiff Does Not Plead Particularized Facts Showing That Any Defendant Deliberately Caused Sprint to Take an Improper Tax Position.**

Even assuming *arguendo* that the Directors were aware of the tax issue being litigated in the State Court Action, Sprint's position in that case is that the NYAG is **wrong**, and that the Company did not improperly fail to collect sales tax from its customers.  In other words, this is not a case where the Company has idly allowed misconduct to occur.  Instead, this case involves an issue of state tax law on which Sprint has simply disagreed with the State's legal position. Even assuming the Directors had anything to do with Sprint's position on this issue, that hardly constitutes a breach of the duty of loyalty or an intentional violation of law.  Indeed, it is a novel

---

majority of the board was disinterested.  *See, e.g.*, *In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *10 ("Having already found that a majority of the Goldman board was independent, I could simply omit analysis of the independence of [the remaining] directors . . . .").

[13] The inadequacy of Plaintiff's allegations is exemplified by its contention that the Company's Director of Telecom Tax stated that "[o]ur risks are exponentially increased if we try to pursue refunds . . . ."  Compl. ¶ 67 (emphasis omitted).  Plaintiff claims that the Board should have acted on this information because the Director of Telecom Tax's direct supervisor reported to the Company's CFO.  In other words, the person who allegedly made this comment reported to someone who reported to the CFO, who was not a Director and whose knowledge is thus irrelevant for demand futility purposes.

and troubling proposition that the Directors' fiduciary duties required them to cause the Company to capitulate when the State made a suggestion of wrongdoing with which the Company reasonably disagreed. Directors are not required—indeed, are not permitted—to cede to the government their responsibility to make judgments about the corporation's best interests.

But that is the implication of Plaintiff's position. By its account, the Directors' only choice (assuming they even knew about the Company's tax position) was to accede to New York's expansive view of the tax it is due, at the risk of personal liability. That is not the law. *See In re Johnson & Johnson*, 2011 WL 4526040, at *10 ("[E]ven when allegations suggest that a director knew of a given red flag, that mere knowledge 'do[es] not support a reasonable inference that the director defendants' [failure to act] . . . was not in good faith.' In other words, Plaintiffs must plead specific facts from which the Court can infer not simply a failure to act but a failure to act ***in bad faith***." (quoting *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 135 (Del. Ch. 2009))); *Wood*, 953 A.2d at 142 (citing cases). Plaintiff pleads no facts showing that any Individual Defendant considered the issue, determined that the New York authorities were correct and Sprint was wrong (which is not the case), and nonetheless caused Sprint to proceed.

This case is similar to *In re Merck & Co. Securities., Derivative & "ERISA" Litigation*, where demand futility likewise turned on whether "the Board acted egregiously or in bad faith" (there, by allegedly ignoring the health risks of Vioxx). 2008 WL 2788400, at *6 (D.N.J. June 17, 2008) (quotation omitted). In answering that question in the negative, the court observed that, while the plaintiff (unlike LAMPERS) made specific allegations "about what the Board knew," it "at best . . . succeed[ed] in demonstrating that the Directors were aware of an active debate in the medical and scientific communities over whether a causal link between Vioxx and

16

cardiovascular events . . . existed." *Id.* It concluded: "Plaintiffs in effect would have this Court believe that Board members . . . were required to ignore [certain information suggesting Vioxx was safe] in the face of contrary information about Vioxx. Only then, according to Plaintiff's theory, would the Board members be able to avail themselves of the business judgment rule. Such a result would turn the demand futility requirement on its head, expose corporate directors to unpredictable and extraordinary levels of personal liability and potentially cripple effective corporate management. Under the business judgment rule, corporate directors are not required to exercise 20/20 hindsight where reasonable minds could differ." *Id.* at *7.

At most, the New York Department of Taxation and Finance's "warnings" were red flags that it had a different view of New York tax law than did Sprint. As a matter of law, that does not excuse demand. In *In re Johnson & Johnson Derivative Litigation*, for example, the plaintiffs alleged several red flags, including "FDA warning letters, an FDA report, state attorney general subpoenas, qui tam complaints, a criminal plea, a settlement agreement with the U.S. Department of Justice ('DOJ'), and a DOJ subpoena." 2011 WL 4526040, at *2. The court held that these "red flags" did not establish that the directors knew Johnson & Johnson engaged in misconduct. It noted that subpoenas, like "other forms of preliminary matters in an investigation of corporate misconduct," "do not shed light on whether the corporation actually engaged in misconduct," but instead "suggest only that the board was aware that the company was under investigation." *Id.* at *17 (citing *In re Intel Corp.*, 621 F. Supp. 2d at 175). Likewise, the filing of two qui tam complaints was "not probative because knowledge of unsubstantiated qui tam allegations, on their own, do not suggest that the Board was aware of continued corporate

misconduct." 2011 WL 4526040, at *18.[14]   Even the filing of a criminal complaint, which resulted in an $85 million settlement, did not provide the directors with knowledge that the entity had engaged in misconduct, as the settlement recited that it was not an admission of wrongdoing. *Id.* at *20 ("[T]he Board may have reasonably concluded that the settlement reflected nothing more than a business decision on [the entity's] part."); *see also In re Intel Corp.*, 621 F. Supp. 2d at 169, 176 (alleged red flags—investigations into Intel's trade practices by European Commission, Japan's Fair Trade Commission, South Korean Fair Trade Commission, NYAG, and FTC—were not "so severe that the Defendants now face a 'substantial likelihood' of liability for allegedly ignoring them.   At the very most, the Directors face a 'mere threat' of liability, which . . . is insufficient to establish demand futility").

At an absolute minimum, even assuming *arguendo* that Sprint's tax position was incorrect and that any Director knew about that position, Plaintiff has not pleaded any particularized facts showing that any Director committed anything other than a mistake in judgment.   The Directors cannot be liable on this basis as a matter of law given the exculpatory provision in Sprint's articles of incorporation.   *See, e.g.*, *In re Johnson & Johnson Derivative Litig.*, 2011 WL 4526040, at *20 ("Even if the directors assumed that the settlement was merely a business decision [as opposed to an acknowledgement of wrongdoing], and that . . . assumption

---

[14] The court went on to note that, although "it is significant that the federal government intervened in the qui tam complaints," that happened only three months prior to the filing of the derivative action, which was an insufficient time from which to infer "that the directors consciously chose, in bad faith, not to act." *In re Johnson & Johnson*, 2011 WL 4526080, at *18-19; *see also id.* at *18 (lapse of five months between alleged red flag and filing of complaint "does not provide a sufficient basis for inferring that the directors engaged in the sort egregious, conscious disregard of their duties like that alleged in those cases").   Here, the gap between the two actions was 11 days.   In any event, to the extent that the *Johnson & Johnson* court implied that governmental takeover of a qui tam action somehow renders the allegations therein anything more than mere allegations, Defendants respectfully disagree.   The NYAG's position in the State Court Action directly contravenes New York and federal law.

was erroneous, nonetheless they would not be subject to liability if they made that assumption in good faith."); *Kaufman*, 634 F. Supp. at 1580 ("'It does not follow . . . that a director who merely made an erroneous business judgment in connection with what was plainly a corporate act will "refuse to do [his] duty in behalf of the corporation if [he] were asked to do so." Indeed, to excuse demand in these circumstances—majority of the board approval of an allegedly injurious corporate act—would lead to serious dilution of Rule 23.1.'" (quoting *In re Kauffman Mut. Fund Actions*, 479 F.2d 257, 265 (1st Cir. 1973))).

### 2. Plaintiff's Allegations That the Individual Defendants Face Personal Liability for a Failure of Oversight Do Not Make Demand Futile.

Separate from its "red flags" allegation, Plaintiff claims that the Directors failed to exercise sufficient oversight to prevent the Company from taking the challenged tax position. Compl. ¶¶ 68, 73. This "failure of oversight" claim has been described as "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d at 967; *see also Pandit*, 2009 WL 2902587, at *7 (same). To prevail on it, Plaintiff must plead particularized facts showing: (1) "the directors utterly failed to implement any reporting or information system or controls"; or (2) "having implemented such a system or controls, consciously failed to monitor or oversee its operations[,] thus disabling themselves from being informed of risks or problems requiring their attention." *Stone*, 911 A.2d at 370; *accord Caremark*, 698 A.2d at 971. "In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations," and therefore, acted in bad faith. *Stone*, 911 A.2d at 370. By contrast, "Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so." *Desimone v. Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007).

19

Here, Plaintiff concedes that the "Company has established reporting channels." Compl. ¶ 71. That eliminates the first basis for arguing futility under this theory. Plaintiff also contends that those channels were functioning properly, as the Board monitored communications received through them. *Id.* That is the basis for its purported "underst[anding] that the Board was informed of the claimed illegal conduct by New York State." *Id.* The Complaint further acknowledges that Sprint had an audit committee, which was responsible for "oversee[ing] all material aspects of Sprint's accounting and financial reporting processes," *id.* ¶ 63, and a "Nominating and Corporate Governance Committee, whose primary function is 'to ensure that [the Company] has effective corporate governance policies and procedure and an effective Board and Board review process,'" *id.* ¶ 69. Plaintiff pleads no particularized facts alleging that any Director consciously decided to ignore any reports arriving through those channels. These allegations are fatal to its *Caremark* claim. *See, e.g.*, *Pandit*, 2009 WL 2902587, at *8 ("Plaintiff has not alleged a complete failure to implement any reporting or information system. In fact, . . . Plaintiff has alleged the existence of an Audit and Risk Management Committee."); *Guttman v. Huang*, 823 A.2d 492, 507 (Del. Ch. 2003) (plaintiffs' "conclusory complaint [was] empty of the kind of fact pleading that is critical to a *Caremark* claim, such as contentions that the company lacked an audit committee, that the company had an audit committee that met only sporadically and devoted patently inadequate time to its work, or that the audit committee had clear notice of serious accounting irregularities and simply chose to ignore them or, even worse, to encourage their continuation"); *Ferre*, 2007 WL 1180650, at *8.[15]

---

[15] Nor can Plaintiff establish demand futility based on the allegations that it has sued the entire Board or that the Individual Defendants cannot be expected to sue themselves. *See Blankfein*, 2009 WL 1422868, at *6; *Pandit*, 2009 WL 2902587, at *9; *In re AIG, Inc.*, 700 F. Supp. 2d 419, 433 (S.D.N.Y. 2010).

### 3.     Membership on Board Committees Does Not Make Demand Futile.

Plaintiff's "allegations regarding the multiple committee memberships and committee positions of the . . . directors" also "fail to create a reasonable doubt as to the disinterestedness . . . of these directors."  *Pandit*, 2009 WL 2902587, at *10; *see also* Compl. ¶¶ 63-69 (making precisely such allegations).  As LAMPERS is well aware, courts routinely reject this argument. *See Pandit*, 2009 WL 2902587, at *10; *Blankfein*, 2009 WL 1422868, at *7; *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust ex rel. Macy's Inc. v. Lundgren*, 579 F. Supp. 2d 520, 532 (S.D.N.Y. 2008) (allegations that "the members of the Audit Committee were responsible for 'reviewing and discussing . . . the Company's earnings press releases, . . . financial information and earnings guidance . . . and . . . disclosure and internal controls,' and 'participated in the wrongdoing' by preparing and/or failing to correct the allegedly false statements at issue" insufficient as a matter of law); *Kernaghan*, 2008 WL 4450268, at *8; *Ferre*, 2007 WL 1180650, at *6; *In re Citigroup*, 964 A.2d at 135.

### 4.     An Alleged "Insured Versus Insured" Exclusion Does Not Make Demand Futile.

Similarly, "the [alleged] existence of an 'insured vs. insured' exclusion in the Company's directors' and officers' liability insurance policies . . . does not establish a substantial likelihood of personal liability that would prevent directors from exercising independent business judgment."  *Pandit*, 2009 WL 2902587, at *9; *see also* Compl. ¶ 76 (making precisely this argument).  "'[T]his argument has been rejected repeatedly under Delaware law.'"  *Id.* (quoting *Ferre*, 2007 WL 11180650, at *8); *see also Kernaghan*, 2008 WL 4450268, at *7; *Halpert Enters., Inc. v. Harrison*, 362 F. Supp. 2d 426, 433 (S.D.N.Y. 2005).

* * * * *

21

For all of the foregoing reasons, Plaintiff cannot establish demand futility. This is dispositive of each of Plaintiff's claims, which should be dismissed with prejudice. The inability to show demand futility, however, is not the only shortcoming in Plaintiff's complaint. LAMPERS separately has failed to state a claim for corporate waste or "contribution and indemnification."

### III.   Plaintiff Fails to State a Claim for Corporate Waste.

The standard for establishing corporate waste is "onerous." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 74 (Del. 2006). "Directors are guilty of corporate waste, only when they authorize an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *Glazer v. Zapata Corp.*, 658 A.2d 176, 183 (Del. Ch. 1993).[16] Such a claim "will arise only in the rare, 'unconscionable case where directors irrationally squander or give away corporate assets.'" *In re Walt Disney Co.*, 906 A.2d at 74 (quoting *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000)); *see also White v. Panic*, 783 A.2d 543, 554 n.36 (Del. 2001). This is not such a case.

As an initial matter, the Complaint contains no allegation that any Individual Defendant knew of, much less "authorize[d]," Sprint's tax position. *Glazer*, 658 A.2d at 183. Defendants cannot be liable for "authorizing" a transaction of which they were unaware.

Plaintiff also does not allege a "transaction" or "exchange" for which the Company received inadequate consideration, as required to state a claim for corporate waste. *See e.g.*, *Glazer*, 658 A.2d at 183 (challenging board's approval of a financing agreement where the interest rate was alleged to be too high); *In re Walt Disney Co. Derivative Litig.*, 906 A.2d at 74

---

[16] Defendants are not aware of any Kansas authority recognizing a corporate waste claim under Kansas law, although as discussed above, Kansas courts look to Delaware authority in corporate matters. Defendants assume *arguendo* that Kansas courts would follow Delaware in this regard, although they do not appear to have done so to date.

(challenging severance payment); *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 656 (Del. Ch. 2008) (challenging board's decision to provide a "No-Vote Termination Fee" in conjunction with a merger as consideration for a higher-priced offer). Instead, Plaintiff claims Defendants caused the Company to take a position on a legal issue that, it asserts, is incorrect. That is not a "transaction" or "exchange" and cannot constitute corporate waste.

Even if Plaintiff had a corporate waste claim, it would not be ripe. To date, Sprint has not expended, much less wasted, any assets. Although the Complaint asserts that the Company "***will*** now incur" "substantial penalties" and "***will be*** liable for 14.5% in interest on the massive tax liability," Compl. ¶ 73, Plaintiff does not allege that Sprint presently has sustained any such damages. And to be sure, if Sprint prevails in the State Court Action, it never will. Because the "claimed injury is 'contingent upon the outcome of a separate, pending lawsuit'"—the State Court Action—Plaintiff's corporate waste claim is premature and must be dismissed. *Pall v. KPMG*, 2006 WL 2800064, at *3 (D. Conn. Sept. 29, 2006) (quoting *In re United Telecomms., Inc., Secs. Litig.*, 1993 WL 100202, at *3 (D. Kan. Mar. 4, 1993)).

## IV.   Plaintiff's Claim for Contribution or Indemnification Should Be Dismissed.

Plaintiff's claim for contribution or indemnification also is unripe and should be dismissed. "Kansas adheres to the common law rule that there is no right of contribution between joint tort-feasors." *Kan. Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs., Inc.*, 927 P.2d 466, 481 (Kan. 1996) (quotation omitted). "The only exception to this rigid rule is the statutory right to contribution between the joint ***judgment debtors*** of the plaintiff." *Comeau v. Rupp*, 762 F. Supp. 1434, 1439 (D. Kan. 1991) (emphasis in original); *see also* Kan. Stat. Ann. § 60-2413 (contribution between joint judgment debtors and joint contract obligors). The Complaint does not allege that Sprint is a joint judgment debtor with any Individual Defendant. Nor could that

situation arise, as the Individual Defendants are not parties to the State Court Action.  Plaintiff therefore does not, and will never, have a claim for contribution.

Indemnification, by contrast, is "'a right which inures to a person who has fulfilled an obligation owed by him but which as between himself and another person should have been discharged by the other.'"  *Leiker v. Gafford*, 819 P.2d 655, 659 (Kan. 1991) (citation and emphasis omitted), *overruled on other grounds by Martindale v. Tenny*, 829 P.2d 561, 566 (Kan. 1992).  An indemnification claim does not accrue until the plaintiff "has suffered an ***actual loss***." *Kan. Pub. Emps. Ret. Sys.*, 927 P.2d at 484 (quotation omitted).  Here, Sprint has not suffered— and may never suffer—the losses for which Plaintiff seeks to "recover" on the Company's behalf.  Any indemnification claim therefore has not accrued.  *See Kan. Pub. Emps. Ret. Sys.*, 927 P.2d at 484 ("A condition precedent to indemnification is that the indemnitee must actually have paid on the obligation for which he seeks indemnification." (quotation omitted)); *Leiker*, 819 P.2d at 659 (defendant not entitled to bring indemnification action where it had "not discharged any obligation . . . on the underlying judgment"); *Baker v. City of Topeka*, 644 P.2d 441, 446 (Kan. 1982) (affirming dismissal of common law indemnification claim because "[a]ny right to implied indemnity can only arise when one has paid the obligation of another"); *In re United Telecomms., Inc., Secs. Litig.*, 1993 WL 100202, at *3 (dismissing derivative plaintiff's indemnification claim where asserted damages were "contingent upon the outcome of a separate, pending lawsuit").

## CONCLUSION

For the foregoing reasons, Plaintiff's Complaint should be dismissed with prejudice.

Dated:  September 19, 2012
      New York, NY                 Respectfully submitted,


CHADBOURNE & PARKE LLP

By     /s/ Thomas J. McCormack
         Thomas J. McCormack
         Marc D. Ashley
         Robert Kirby
         30 Rockefeller Plaza
         New York, NY 10112
         Tel.: (212) 408-5100
         E-Mail:  tmccormack@chadbourne.com

         *Attorneys for the Individual Defendants*


PILLSBURY WINTHROP SHAW PITTMAN LLP

By     /s/ E. Leo Milonas
         E. Leo Milonas
         David G. Keyko
         1540 Broadway
         New York, NY 10036
         Tel.: (212) 858-1000
         E-Mail:  eleo.milonas@pillsburylaw.com

         *Of counsel:*

         Dane H. Butswinkas
         David S. Blatt
         Kenneth J. Brown
         WILLIAMS & CONNOLLY LLP
         725 Twelfth Street, N.W.
         Washington, DC  20005
         Tel.: (202) 434-5000
         E-Mail:  dbutswinkas@wc.com

         *Attorneys for Defendant Sprint Nextel Corp.*