**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LOUISIANA MUNICIPAL POLICE EMPLOYEES' RETIREMENT SYSTEM, Derivatively on Behalf of Itself, and All Others Similarly Situated,<br><br>            Plaintiff,<br><br>    vs.<br><br>DAN R. HESSE, JOSEPH J. EUTENEUR, ROBERT H. BRUST, PAUL N. SALEH, JAMES H. HANCE, JR., ROBERT R. BENNETT, GORDON M. BETHUNE, LARRY C. GLASSCOCK, V. JANET HILL, FRANK IANNA, SVEN-CHRISTER NILSSON, WILLIAM R. NUTI, and RODNEY O'NEAL,<br><br>            Defendants,<br><br>    -and-<br><br>SPRINT NEXTEL CORP.<br><br>            Nominal Defendant. | Civil Action No. 1:12-cv-04017-ALC-JCF<br><br>ECF Case Electronically Filed |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THE VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUD ..................................................................................... 4

A.   Background ............................................................................................. 4

B.   The State of New York's Taxation Laws Are Clear and Unambiguous ................................ 4

C.   Defendants Attempt to Cover-Up Their Illegal Tax Scheme ................................ 7

D.   The New York Attorney General Files A Lawsuit Against Sprint ........................ 9

E.   Defendants Knew or Should have Known of the Company's Illegal Tax Scheme .............. 10

ARGUMENT ................................................................................................... 11

A.   The Legal Standard for Demand Futility ........................................................ 12

B.   Tests for determining demand futility ......................................................... 13

  1.   Demand Would Be Patently Futile Where, As Here, The Board Has Already Announced Its Intentions To Continue Engaging in the Illegal Scheme. ............................................. 13

  2.   The allegations set forth in the complaint create a "reasonable apprehension of actionable director malfeasance" and demand should therefore be excused. .................................... 14

    (a) The Complaint Creates Reasonable Doubt As To Whether Defendants Are Disinterested and Independent ....................................................... 16

      (i)   Sprint's Articles Do Not Exculpate the Directors' Misconduct .................... 16

      (ii)  Defendants' knowing and/or reckless misconduct constitutes an actionable breach of their fiduciary duties. ................................... 17

    (b) The challenged transaction was not a valid exercise of business judgment ............... 20

C.   Plaintiffs Have Stated a Valid Claim for Corporate Waste ................................ 23

D.   Plaintiffs have Stated Valid Claims for Contribution and Indemnification ........................ 24

i

CONCLUSION.............................................................................................................. 26

# TABLE OF AUTHORITIES

**CASES**

*Aronson v. Lewis*,
  473 A.2d 805 (Del. 1984) ................................................................................ 15

*Carson v. Lynch Multimedia Corp.*,
  123 F. Supp. 2d 1254 (D. Kan. 2000) .............................................................. 12

*Geer v. Cox*,
  242 F. Supp. 2d 1009 (D. Kan. 2003) .............................................................. 21

*Harbor Fin. Partners v. Huizenga*,
  751 A.2d 879 (Del. Ch. 1999) .......................................................................... 23

*In re Abbott Labs. Derivative S'holders Litig.*,
  325 F.3d 795 (7th Cir. 2001) ........................................................................... 20

*In re Johnson & Johnson Derivative Litig.*,
  No. 10-2033, 2011 U.S. Dist. LEXIS 112292 (D. N.J. Sept. 29, 2011) ............ 18, 19

*In re Manulife Fin. Corp. Sec. Litig.*,
  No. 09 Civ. 6185 (JFK), 2012 U.S. Dist. LEXIS 134172 (S.D.N.Y. Sept. 19, 2012) ............... 9

*In re Maxim Integrated Prods., Inc., Derivative Litig.*,
  574 F. Supp. 2d 1046 (N.D. Cal. 2008) ............................................................ 21

*In re Oxford Health Plans, Inc. Sec. Litig.*,
  192 F.R.D. 111 (S.D.N.Y. 2000) ..................................................................... 14, 20

*In re Pfizer Inc. S'holder Derivative Litig.*,
  722 F. Supp. 2d 453 (S.D.N.Y. 2010) .......................................................... 17, 19, 22, 23

*In re Rasterops Corp. Sec. Litig.*,
  No. 92-20115, 1993 U.S. Dist. LEXIS 21504 (N.D. Cal. Sept. 9, 1993) ............ 24, 25

*In re Veeco Instruments, Inc. Sec. Litig.*,
  434 F. Supp. 2d 267 (S.D.N.Y. 2006) .......................................................... passim

*Kansas Heart Hosp., LLC v. Idbeis*,
   184 P. 3d 866 (Kan. 2008) .......................................................................... 23

*Kansas Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs.*,
   927 P.2d 466 (Kan. 1996) ........................................................................... 25

*LMPERS v. Pandit*,
   No. 08 Civ. 7389, 2009 U.S. Dist. LEXIS 82308 (S.D.N.Y. Sept. 10, 2009) ......................... 19

*McSparran v. Career Educ. Corp.*,
   No. 04 C 0041, 2006 U.S. Dist. LEXIS 3787 (N.D. Ill. Jan. 27, 2006) ............................ 24, 25

*Newton v. Hornblower*,
   224 Kan. 506 (Kan. 1978) ............................................................................ 12

*Rales v. Blasband*,
   634 A.2d 927 (Del. 1993) ..................................................................... 2, 13, 15

*Randolph, derivatively and on behalf of Sprint Nextel Corp., v. Forsee*,
   No. 10-2445, 2010 U.S. Dist. LEXIS 131807 (D. Kan. 2010) ......................................... 12, 19

*Ryan v. Gifford*,
   918 A.2d 341 (Del. Ch. 2007) .............................................................. 13, 14, 15, 20

*U.S. Fidelity & Guar. Co. v. Sulco*,
   939 F. Supp. 820 (D. Kan. 1996) .................................................................... 25

*Walt Disney Co. Derivative Litig.*,
   906 A.2d 27 (Del. 2006) ............................................................................ 23

*Waltrip v. Sidwell Oil & Gas, Inc.*,
   774 P.2d 948 (Kan. 1989) ........................................................................... 25

*White v. ICN Pharm., Inc.*
   783 A.2d 543 (Del. 2001) ........................................................................... 23

## STATUTES

Kan. Stat. Ann § 60-2413 ............................................................................ 25

N.Y. Tax Law § 1111(l) ............................................................................... 6

N.Y. Tax Law §1105(b)(2) ............................................................................. 5

The Louisiana Municipal Police Employees' Retirement System ("LMPERS" or "Plaintiff") respectfully submits this Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Verified Shareholder Derivative Complaint ("Complaint").  For the reasons set forth herein, Defendants' Motion should be denied.

## PRELIMINARY STATEMENT

This derivative action seeks relief for harm that Sprint Nextel Corporation's ("Sprint" or the "Company") Board of Directors ("Board," "Board Members," or "Defendants") caused to the Company by implementing and concealing a seven-year *ongoing* campaign to deliberately and/or recklessly under-collect and underpay more than $100 million in New York state and local taxes. This scheme continued even after the Company was twice informed of its illegality by officials from the New York State Tax Department of Taxation and Finance ("New York Tax Department") in 2009 and 2011.  The goal of the scheme was simple – gain a competitive advantage for Sprint in the New York market by appearing to be a low-cost carrier through the evasion of collecting and paying sales tax.[1]

The Sprint Board had the direct duty and responsibility to oversee Sprint's operations in order to prevent exactly the type of tax fraud the Company perpetrated against the State of New York.  Each director had, at all relevant times, the responsibility to:  "*approve policies of corporate conduct, including policies regarding (a) compliance with applicable laws and regulations*" under Sprint's Bylaws or Articles of Incorporation.[2]

In addition, four directors were members of the Company's Audit Committee and were designated with oversight responsibilities for the "*integrity of Sprint Nextel Corporation's [ ] financial statements and related disclosures as well as related accounting and financial reporting processes, [and] [] Sprint Nextel's compliance with legal and regulatory requirements.*

---

[1] ¶¶ 3, 7, 5; "¶ __" refer to citations from Plaintiff's Verified Shareholder Derivative Complaint dated April 30, 2012.
[2] ¶¶ 62-70.

…" Of the remaining six directors, four served on the Company's Nominating & Corporate Governance Committee, whose primary function was "to ensure that [the Company' has ***effective corporate governance policies and procedure*** and an ***effective*** Board and ***Board review process***."[3]

Despite their clear duties and obligations, the Board failed to fulfill its obligation to oversee the Company and put a stop to the tax scheme.  Making this dereliction of duty even more egregious were the numerous red flags that should have alerted the Directors to the 7-year long scheme had the Directors been properly discharging their duties, including warnings by the New York taxing authority that its scheme was illegal, a year-long investigation by the New York Attorney General's office and an accidental $30 million "overpayment" of New York sales tax which went unclaimed for fear that it would tip off the taxing authorities to the Company's tax scheme.  Further, since public disclosure of the illegal conduct, the Board has still taken no action and the Company is currently engaged in frivolous and expensive litigation with the State of New York in a vain attempt to justify its actions.[4]

By not acting to stop the tax scheme (or turning a blind eye to it), the Sprint Board effectively adopted a violation of New York state tax law as a commercial strategy (and gambled with stockholder money that it wouldn't get caught, or that if it did, the consequences would be minor).  These facts demonstrate the likelihood that Defendants will be found liable for breach of their fiduciary duties of good faith and loyalty – breaches which are ***not*** subject to the Company's limitations on liability described in Sprint's Articles of Incorporation.  They, therefore, cannot be deemed disinterested for the purposes of assessing the demand requirement and can find no shelter under the business judgment rule. *See e.g.*, *Rales v. Blasband,* 634 A.2d 927, 934 (Del. 1993) ("a director cannot be expected to exercise his or her independent business judgment without being influenced by the adverse personal consequences resulting from the decision.").

---

[3] ¶¶ 63-65, 69.
[4] ¶¶ 66, 7, 55-56, 2-3, 7.

Under Kansas and Delaware law, no pre-suit demand is required of a derivative plaintiff where there is a reasonable doubt, as of the time the Complaint was filed, that the Board could have properly exercised its independent and disinterested business judgment in responding to a demand.  This is the case here.   Defendants' knowing and/or reckless failure to fulfill their fiduciary obligations by appropriately overseeing the Company's operations is not protected by the business judgment rule and creates a substantial likelihood that Defendants will be found personally liable for breach of their duties of loyalty and good faith.  As such, Plaintiff has adequately alleged demand futility under both the *Aronson* test and the *Rales* test (both discussed herein), and Defendants' Motion to Dismiss on these grounds should be denied.

In addition, Defendants argue that Plaintiffs' corporate waste claims should be dismissed because the Company has not incurred any losses and the mere specter of future fines and penalties are too speculative and contingent – making the Complaint's allegations premature.  This argument is spurious.  The Complaint alleges seven years of illegal conduct, which has exposed the Company not only to a $300 million future liability, but also immediate damage to the Company's goodwill and financial loss through extensive litigation expense in defending the New York Action.  Moreover, the Company's market capitalization fell by more than $360 million in a single day once the tax scheme was disclosed.   This is more than adequate to sustain the Complaint's claim of corporate waste.

Defendants' final argument in support of dismissing the claims for contribution and indemnification are equally flawed.  With regards to the claim for contribution, Defendants contend that such claims are precluded because Defendants and the Company cannot be categorized as "joint tort-feasors" or "judgment debtors" as supposedly required by Kansas statute.  In doing so, Defendants ignore long-standing principles of equitable contribution recognized by Kansas courts.  These equitable principles focus on the relative burdens of the parties in relation to

their fault – not legalistic labels.  Defendants also argue that the claim for indemnification is not ripe for adjudication because there is no current injury to the Company.  Again, Defendants ignore the real and immediate damage that the Company has also suffered to its goodwill, its extensive legal expenses, and the drop in its market capitalization.

We respectfully submit that Defendants Motion to Dismiss be denied in its entirety.

## FACTUAL BACKGROUND

### A.    Background

Sprint is the third largest United States wireless communications company and offers a wide range of wireless communications products and services.[5]  Defendants are all members of Sprint's Board of Directors.[6]  Moreover, Defendants Dan Hesse ("Hesse") (CEO, President), Joseph Euteneur ("Euteneur") (CFO since April 4, 2011), Robert Brust ("Brust") (CFO from May 2008 through April 2011), and Paul Saleh ("Saleh") (CFO from August 2005 through 2008) have been – or currently serve as – the Company's most senior executive officers.[7]  The remaining Defendants – in addition to being Board Members – serve on other high level Sprint committees, including the Company's Audit Committee,[8] Finance Committee,[9] Executive Committee,[10] Nominating & Corporate Governance Committee,[11] and Compensation Committee.[12] [13]

### B.    The State of New York's Taxation Laws Are Clear and Unambiguous

---

[5] ¶ 29.

[6] ¶¶ 14-26.

[7] ¶¶ 14-17.

[8] Defendants James Hance, Jr. ("Hance"), Robert Bennett ("Bennett"), Larry Glasscock ("Glasscock"), and Frank Ianna ("Ianna") serve on the Company's Audit Committee.

[9] Defendants Hance, Bennett, Glasscock, and William Nuti ("Nuti") serve on the Company's Finance Committee.

[10] Defendants Hance, Bennett, Gordon Bethune ("Bethune"), Glasscock, and V. Janet Hill ("Hill") serve on the Company's Executive Committee.

[11] Defendants Bethune, Hill, Ianna, and Rodney O'Neal ("O'Neal") serve as members of the Company's Nominating & Corporate Governance Committee.

[12] Defendants Bethune, Hill, Sven-Christer Nilsson ("Nilsson"), Nuti, O'Neal serve as members of the Company's Compensation Committee.

[13] ¶¶ 14, 18-26.

Since 2002, New York Tax Law has required mobile phone companies to collect from its customers (and remit to taxing authorities) the full amount of their monthly access charges for their calling plans.[14]   Specifically, N.Y. TAX LAW §1105(b)(2) states that sales taxes ***must*** be applied to:

> The receipts of every sale of mobile telecommunications services provided by a home service provider, … that are voice services, or any other taxable under subparagraph (B) of paragraph one of this subdivision, sold ***for a fixed periodic charge*** (not separately stated), whether or not sold with other services.[15]

Thus, §1105(b)(2) is clear that taxes must be paid on the full amount of ***fixed*** periodic charges for wireless voice services.[16]   In fact, in order to avoid any confusion with regards to the obligations of wireless carriers, the New York Tax Department issued guidance on this provision in a 2002 Technical Services Bureau Memorandum ("2002 TSB-M"),  which emphasized that:  "the total charge for a given number of minutes of air time that may be used for voice transmission is subject to sales tax under new §1105(b)(2) … ***regardless of whether the calls made under the plan were intrastate, interstate, or international calls.***"[17]   Further, the New York Tax Department provided explicit examples of the proper application of §1105(b)(2), which would have made the statute's requirements clear to Sprint.[18]

New York Tax Law is equally clear on how a wireless carrier can apply sales taxes when selling "bundles" of services for a fixed monthly charge where certain types of services would ***not*** be taxable if they were sold separately from the bundle (*i.e.,* internet services and overage charges involving interstate calls).[19]   Because a charge for internet access is not, on its own, subject to New York State Tax, the Company is permitted to unbundle the internet portion of the overall

---

[14] ¶ 4.
[15] ¶ 36.
[16] ¶ 37.
[17] ¶¶ 38-39.
[18] ¶¶ 39, 41
[19] ¶ 42.

charge and not pay taxes on the internet portion – assuming, if and only if, the provider uses an "*objective, reasonable and verifiable standard for identifying each of the components*" of a bundled charge.[20]   However, the New York tax laws and New York Tax Department guidance were clear that interstate calls could not be unbundles from fixed monthly access charges.

Nonetheless, beginning in July 2005, Sprint undertook a scheme to gain a competitive advantage by not paying New York Sales taxes on an arbitrary portion of its fixed monthly access charges for voice services it deemed to be "interstate."[21]   Sprint undertook this scheme in the guise of "unbundling" its fixed rate calling plans.[22]   Sprint's allocations between these taxable (intrastate) and supposedly non-taxable (interstate) categories not only ignored the applicable law, but were also arbitrary, because they were not related to any customer's actual interstate usage.[23] The tax scheme adopted by Sprint was approved at the highest levels of the corporation.[24] Responsibility for implementing the unbundling plan fell to Sprint's business unit called the "State and Local Tax Group."[25]   This Group was headed by an Assistant Vice President who reported to the Company's Vice President of Tax who, in turn, reported directly to the Company's Chief Financial Officer.[26]

From the outset, Sprint's decision to "unbundle" certain services was driven by a desire to improve its competitive position in the New York market by reducing the amount of sales tax it collected from its customers and, thereby, appearing to be a low-cost carrier.[27]   This is clear as Company executives attended numerous conferences with its competitors in which the requirements of New York state tax law were discussed.  At these conferences, Sprint advocated

---

[20] ¶¶ 44-45 (citing N.Y. TAX LAW § 1111(l)).
[21] ¶ 46-47
[22] *Id.*
[23] ¶ 51.
[24] ¶ 7.
[25] *Id.*
[26] *Id.*
[27] ¶ 47.

for and sought agreement with its competitors on a conservative approach to unbundling (*i.e.*, separating voice services from internet services) as a means of modestly reducing sales taxes on fixed monthly access charges.  Sprint's competitors eventually agreed with the Company and adopt this approach.[28]   Internally, however, Sprint rejected this conservative approach to unbundling for its ***own*** New York operation because it would only save approximately $623,000 per month in taxes.[29]  As one Sprint employee stated, "***the project was scrapped because there wasn't enough bang for the buck***."[30]   Instead, contrary to what was advocated for and agreed to by Sprint with its competitors, Sprint illegally unbundled interstate calls from its fixed monthly access charge using an arbitrary method of allocation unrelated to actual usage.[31]  This aggressive and illicit plan reduced the Company's obligations to collect sales tax from its customers by an additional $4.6 million per month.[32]   Internally, Sprint acknowledged that this was a "***risky***" approach.[33] Implementation of this risky approach allowed Sprint to avoid collecting and paying more than $100 million in New York taxes from mid-2005 through the present and portray itself to customers as providing a lower-cost plan.[34]   Unlike Sprint, however, the Company's primary wireless competitors – namely Verizon, AT&T, T-Mobile, and Metro PCS – have followed the law regarding collecting and paying its New York taxes.[35]

C.     **Defendants Attempt to Cover-Up Their Illegal Tax Scheme**

Sprint was specifically informed of the illegality of its unbundling scheme by a New York Tax Department field-auditor in 2009, and again by a New York Tax Department senior

---

[28] ¶ 50.
[29] ¶ 50.
[30] *Id.*
[31] ¶ 51.
[32] *Id.*
[33] *Id.*
[34] ¶ 53.
[35] ¶ 31.  Sprint knew its competitors were following the law through "competitive surveillance."  ¶ 50.

enforcement official in 2011.[36]  Thus, by no later than 2009, Defendants knew (or should have known), that its interpretation of the New York Tax Law was objectively wrong.[37]

In fact, Sprint went to extreme measures in concealing the truth about its illegal activities. For example, in 2009, Sprint discovered that for certain calling plans, it had failed to break out interstate calls from its fixed monthly charges for mobile voice services, and unintentionally collected and paid the correct amount of sales taxes on a number of its plans.[38]  As a result, Sprint collected and paid **approximately $30 million** in sales tax that it did not intend to pay or collect. *Id*.  Instead of seeking a refund for this overpayment – as would be expected of a company operating in good faith – Sprint was concerned that if it sought a refund, it would unnecessarily expose its decision to under collect and pay sales tax.  For instance, Sprint's Director of Telecom Tax wrote in an email:  "My 2 cents is that, based on what [another Sprint employee] has laid out here, I don't think we should [seek a refund] – i.e., **we can't change our books and records after the fact to support a refund**."[39]  Sprint's Senior Tax Counsel added:  "**Sprint is already taking some risk with unbundling.  Our risks are exponentially increased if we try to pursue refunds when we didn't jump through the hoops on unbundling**."[40]

Similarly, Sprint decided to keep its customers in the dark as to its illegal practices.[41]  In 2005, members of the Company's State and Local Tax Group and its Marketing Group considered whether to communicate with Sprint's New York customers about the unbundling of its monthly access charge in order to reduce its collection and payment of sales taxes.[42]  They jointly opted not to communicate the practice to customers because, as Sprint's Director of External Tax stated:

---

[36] ¶ 7.
[37] *Id*.
[38] ¶ 55.
[39] ¶ 56.
[40] *Id*.
[41] ¶ 57.
[42] *Id*.

disclosing the information would "drive too many calls" to its customer care division.[43]  Similarly, in November 2005, a member of the Company's State and Local Tax Group advised an employee in the Company's Customer Billing Department that this information was not being disclosed to Sprint's customers because the Company had "not educated our customers on how we are de-bundling transactions for their tax relief."[44]

**D.      The New York Attorney General Files A Lawsuit Against Sprint**

On March 31, 2011, Empire State Ventures, LLC filed (under seal) a *qui tam* action in the Supreme Court of the State of New York, County of New York.  After an extensive investigation, New York Attorney General Eric T. Schneiderman filed suit on April 19, 2012 against Sprint, referred to herein as the "New York Action."[45]

The New York Complaint illustrates in great detail the Company's multi-year ongoing campaign to deliberately and/or recklessly under-collect and underpay more than $100 million in New York state and local taxes on its flat rate access charges for wireless calling plans.[46] Moreover, the New York Action has already caused a loss to Sprint's goodwill and the Company's market capitalization fell by approximately $360 million when the scheme was first announced.[47]  However, instead of acknowledging its wrongdoing and making amends by paying the State of New York the sales taxes to which it is entitled, Sprint decided to fight the Attorney General's lawsuit, which is still pending.

In pursing this litigation with the State of New York, Sprint is simply trying to justify its seven-year illegal tax scheme as a "reasonable" disagreement over statutory interpretation of the

---

[43] *Id.*
[44] *Id.*
[45] ¶ 2.  The case is captioned *People of the State of New York, et. al. v. Sprint Nextel Corp., et. al.,* No. 103917-2011.
[46] ¶ 3.
[47] The Company's stock price fell from $2.52 on April 18, 2012 to close at $2.40 on April 19, 2012 following the announcement of the New York Action.  This decrease in Sprint's share price had the effect of eliminating more than $360 million in the Company's market capitalization in a single day.  The Court can take judicial notice of Sprint's stock decline.  *See, e.g., In re Manulife Fin. Corp. Sec. Litig.,* No. 09 Civ. 6185 (JFK), 2012 U.S. Dist. LEXIS 134172, at *10 (S.D.N.Y. Sept. 19, 2012) (citations omitted).

applicable tax laws.  Its position, however, is untenable.  To quote the New York Opposition:

> *Sprint's interpretation of the New York tax law at issue, as set forth in its motion to dismiss, is not only wrong, it is patently unreasonable.  Sprint is trying to create in litigation what it failed to create over the last seven years: some plausible justification for its decision to grossly underpay New York State sales taxes.*  In the course of the Attorney General's year-long False Claims Act investigation, *Sprint could not produce any evidence that it was acting in good faith when it repeatedly underpaid its taxes, or even that it was following the unreasonable interpretation of the law that it now espouses*. … *Sprint not only got the law wrong, it did so knowingly and in reckless disregard or deliberate ignorance of the truth.*[48]

Despite its unreasonable position, Sprint's tax scheme is ***ongoing***.  Sprint did not correct its sales tax practices when it was initially informed of its illegality, and it has not corrected them as of today.[49]  To underscore its defiance, the Company issued a press release on April 19, 2012, the same day that the Attorney General filed suit, refusing to acknowledge its wrongdoing and proclaiming that it would fight the lawsuit.

**E.**     **Defendants Knew or Should have Known of the Company's Illegal Tax Scheme**

Defendants had the direct duty and responsibility to oversee Sprint's operations in order to prevent exactly the type of tax fraud the Company perpetrated against the State of New York.[50]  Indeed, each Director had, at all relevant times, the responsibility to:  "approve policies of corporate conduct, including policies regarding (a) compliance with applicable laws and regulations" under Sprint's Bylaws or Articles of Incorporation.[51]  In addition, Defendants Bennett, Hance, Ianna and Glasscock were members of the Company's Audit Committee and were designated as Audit Committee Financial Experts with oversight responsibilities for the "integrity of Sprint Nextel Corporation's [ ] financial statements and related disclosures as well as related accounting and financial reporting processes, [and] [] Sprint Nextel's compliance with legal and

---

[48] "New York Opposition" refers to the Opposition filed by the New York AG in the New York Action, pp. 1-2, attached as Exhibit A to Plaintiff's Request for Judicial Notice submitted herewith.
[49] ¶ 7.
[50] ¶ 62-70.
[51] ¶ 70.

regulatory requirements.…"[52]   Of the remaining six directors, four served on the Company's Nominating & Corporate Governance Committee, whose primary function was "to ensure that [the Company] has effective corporate governance policies and procedure and an effective Board and Board review process."[53]

Despite their clear duties and obligations, the Board failed to fulfill its obligation to oversee the Company and put a stop to the tax scheme.[54]   Making this dereliction of duty even more egregious were the numerous red flags that alerted the Directors to the 7-year long scheme, including two warnings by the New York taxing authority that its scheme was illegal,[55] a year-long investigation of the tax scheme by the Attorney General's office and an accidental $30 million "overpayment" of New York sales tax, which went unclaimed for fear that it would tip off the taxing authorities to the Company's tax scheme.[56]   Further, since disclosure of the illegal conduct, the Board has still taken no action, and the Company is currently engaged in frivolous and expensive litigation with the State of New York in a vain attempt to justify its actions.[57]

## ARGUMENT

Prior to the filing of this action, and in response to the filing of New York Complaint, the Company issued a press release expressly announcing that:   "[the New York Complaint] is without merit and Sprint categorically denies the complaint's allegations. ...  We intend to ... fight this suit."[58]   If ever there was a case where demand should be deemed futile it is here, where Defendants have *expressly* stated that they will not take action to cease the illegal tax evasion

---

[52] ¶¶ 63-65.
[53] ¶ 69.
[54] ¶ 66.
[55] ¶ 71
[56] ¶¶ 55-56.
[57] ¶¶ 2-3, 7.
[58] *See* Company Press Release, attached to Plaintiff's Request for Judicial Notice, Exhibit B.  *See also* Def. Mem. at 13 ("Plaintiff further alleges that, 'since the disclosure of the illegal conduct' – that is, since the filing of the NYAG's action on April 19, 2012, 11 days before Plaintiff filed this case – 'the Board has *still* taken no action, despite that they *know* that the conduct is illicit'.").

scheme, a scheme that is ongoing and which has already subjected the Company to liability for hundreds of millions of dollars in fines, penalties and other payments.  Accordingly, there should be little dispute that demand on the Board is futile.

### A.     The Legal Standard for Demand Futility

Sprint is a Kansas corporation and, as such, Kansas law applies to assess demand futility. Under Kansas law "a determination about whether demand is excused [is] a *lenient* standard." *Randolph, derivatively and on behalf of Sprint Nextel Corp., v. Forsee*, No. 10-2445, 2010 U.S. Dist. LEXIS 131807, *30 (D. Kan. 2010)[59] [60]; *see also Newton v. Hornblower*, 224 Kan. 506, 511 (Kan. 1978) ("The courts are generally *lenient* in excusing the need for demand prior to bringing a stockholder derivative action when a petition or complaint recites circumstances that would make the demand futile or useless.")  Moreover, "[o]n a motion to dismiss the complaint for failure to make a prior demand, the usual standard is whether any set of facts can be shown that would prove futility is applicable." *Newton,* 224 Kan. at 511.[61]

Kansas courts also will look to the decisions of the Delaware courts for guidance in making a determination regarding demand futility.[62]  Under Delaware law, demand is excused when the allegations in the complaint create a "reasonable doubt" that demand would be futile. The relevant time period for making this determination is as of the time the complaint is *filed*:

> [A] court must determine *whether or not the particularized factual allegations* of a derivative stockholder complaint *create a reasonable doubt* that, *as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested*

---

[59] Defendants fail to even mention *Randolph* in their motion to dismiss regardless of the fact that it was (i) decided in Kansas, (ii) was brought under Kansas law, and (iii) found that a shareholder was excused to make demand against *Sprint*.  *See Randolph*, 2010 U.S. Dist. LEXIS 131807, at *30 (rejecting Sprint's argument that the plaintiff was required to make demand on its board).

[60] A compendium of unreported cases is attached hereto as Exhibit A.

[61] Conversely, Kansas applies a *higher* fiduciary duty standard on its directors than other jurisdictions.  *Newton*, 224 Kan. at 514 ("It is apparent from an examination of the Kansas decisions that the prevailing rule in Kansas sets a higher or stricter fiduciary duty standard required of directors and officers of corporations than in some other jurisdictions.").

[62] *Carson v. Lynch Multimedia Corp.*, 123 F. Supp. 2d 1254, 1260 (D. Kan. 2000) (noting that Kansas courts "look [ ] to the decisions of the Delaware courts involving corporation law.")

*business judgment in responding to a demand.*  If the derivative plaintiff satisfies this burden, then demand will be excused as futile.

*Rales*, 634 A.2d at 934 (holding that plaintiff adequately alleged demand futility); *see also In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 276 (S.D.N.Y. 2006) ("*Veeco*") ("[T]o survive a Rule 23.1 motion to dismiss, plaintiffs need not demonstrate a probability of success on the merits.   They need only establish a ***reasonable doubt*** that the board could have properly exercised its independent and disinterested business judgment in responding to a demand.") (citation omitted).  Here, the Complaint was filed April 30, 2012.

## B.      Tests for determining demand futility

The purpose of the demand futility doctrine is to excuse the plaintiff from making demand on a Company's Board of Directors where it would be pointless to do so.   This situation may arise where the Board has made clear that it will not take steps to remedy the alleged misconduct or where the request would amount to asking the Directors to take action against themselves to recover damages caused by their own misconduct.[63]

Plaintiff has alleged in detail that the Board has given a clear, unambiguous signal that it will not take action to remedy the alleged misconduct if it were asked to do so through the issuance of a formal demand.   These allegations and relevant case law are discussed in § B.1. *infra*.   In addition, Plaintiff has alleged facts that create "a reasonable apprehension of actionable director malfeasance that the sitting board cannot be expected to objectively pursue on the corporation's behalf," which also establishes that demand would be futile.[64]   These allegations and relevant case law are discussed in §§ B.2(a) and B.2(b), *infra*.

### 1.   Demand Would Be Patently Futile Where, As Here, The Board Has Already Announced Its Intentions To Continue Engaging in the Illegal Scheme.

---

[63] *In re Oxford Health Plans, Inc. Sec. Litig.*, 192 F.R.D. 111, 115-116 (S.D.N.Y. 2000) (*Oxford Health*) (court observed that "the totality of their actions to date suggest most strongly that they will not take action" and also that making a demand on the Board would "require them to investigate and bring clams [sic] against themselves for their own misconduct").
[64] *See Ryan v. Gifford*,  918 A.2d 341, 352 (Del. Ch. 2007) (internal quotations omitted).

Prior to the filing of this lawsuit, the New York Attorney General filed suit against Sprint regarding the very practices that Plaintiff complains of here.  In response to the NY AG's suit (and before the filing of this Complaint), Sprint issued a press release expressly announcing that it was refusing to change its practices with respect to the illegal tax scheme.  In other words, ***Sprint has already made clear that it will not take steps to remedy the misconduct alleged in the Complaint***.  Under these circumstances demand is manifestly futile, both as a matter of fact and of law.

The Court addressed a similar situation in *Oxford Health* and determined that demand would indeed have been futile:

> Plaintiffs point out the ***continued failure of Oxford or its Board to take action since the claims sued upon have become known.***  This Court concludes that ***the Complaint has made a compelling case in support of the contention*** . . . ***that it would have been futile to require plaintiffs to issue a demand*** to the Director Defendants requesting them to take action against themselves and certain senior Oxford executives for their intentional or reckless conduct as alleged. … ***[T]he totality of their actions to date suggest most strongly that they will not take action***, and would not have done so as of [the filing date], which is the relevant date to gauge futility.

*Oxford Health*, 192 F.R.D. at 116 (denying motion to dismiss under Delaware law).  As in *Oxford Health,* the "totality of [the Board's] actions to date suggest most strongly that they will not take action" to remedy the illegal conduct and would not have done so as of the time this Complaint was filed.  Thus, demand should be excused as futile.

### 2.   The allegations set forth in the complaint create a "reasonable apprehension of actionable director malfeasance" and demand should therefore be excused.

As noted, demand will be excused where the complaint sets forth allegations that create a "reasonable apprehension of actionable director malfeasance."[65]  Although "there is no one test used to determine demand futility, since the issue is fact intensive and no two cases are alike,"[66] there are two primary lines of inquiry that courts look to for guidance in making this determination:  was the Board "disinterested [and] independent" and were "the challenged acts . . .

---

[65] *Ryan*, 918 A.2d at 352.
[66] *Oxford Health*, 192 F.R.D. at 116.

the product of the board's valid exercise of business judgment."[67]   If the allegations of the complaint create a reasonable doubt as to *either* of these two factors, demand is excused.

These two factors were articulated by the Supreme Court of Delaware in the seminal case *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984) ("*Aronson*").   A few years later, the Supreme Court of Delaware had occasion to revisit the framework it created in *Aronson*.   In that subsequent case, *Rales v. Blasband*, 634 A.2d 927, ("*Rales*"), the court confronted a different fact pattern, namely, the lack of any decision by the Board that could be judged – by the business judgment rule standard or otherwise.   As the court explained:

> The Board did not approve the transaction which is being challenged. … In fact, [the new directors of the merged company] have made no decision relating to the subject of this derivative suit.  Where there is no conscious decision by directors to act or refrain from acting, the business judgment rule has no application.[68]

This situation may arise, for example, where the Board has been replaced since the period of misconduct or where the Board cannot be said to have made a decision, because the matter was outside the Board's purview.[69]   Under those circumstances, courts look to the first *Aronson* factor only, *i.e.,* has the plaintiff alleged that the directors are not disinterested or lack independence. Although sometimes referred to as the "*Rales* test," this is just the first prong of the *Aronson* test.

Here, there is a dispute among the parties as to which test should apply.   Defendants maintain that the Court should *not* consider the "business judgment" factor and instead should focus solely on whether or not the Board was "disinterested and independent."   As discussed in detail below, the rationale of *Rales* does not apply here, and the Court therefore may consider either grounds as a basis for a finding of demand futility.   In any event, Plaintiff has satisfied the

---

[67] *Ryan*, 918 A.2d at 352 ("Failure to make demand may be excused if the plaintiff can raise a reason to doubt that: (1) a majority of the board is disinterested and independent or (2) the challenged acts were the product of the board's valid exercise of business judgment.")
[68] *Rales*, 634 A.2d at 933 (citation omitted).
[69] *See Id.* at 934, n. 9 ("For example, if a stockholder brings a derivative suit alleging that a third party breached a contract with the corporation, demand should not be excused simply because the subject matter of the suit -- the third party's breach of contract – does not implicate the business judgment rule.")

requirements for establishing demand futility, regardless of the test applied.

### (a) The Complaint Creates Reasonable Doubt As To Whether Defendants Are Disinterested and Independent

The scope and severity of the illegal scheme alleged, combined with Defendants' majority membership on key Board committees, demonstrates the likelihood that Defendants will be found liable for breach of their fiduciary duties of good faith and loyalty – breaches which are ***not*** subject to the Company's limitations on liability described in Sprint's Articles of Incorporation. Thus, there is a substantial likelihood that Defendants will be found personally liable.

### (i) Sprint's Articles Do Not Exculpate the Directors' Misconduct

In their motion to dismiss, Defendants argue that, due to the exculpatory language Sprint's charter "it is not enough for Plaintiff to allege that any of [the Defendants] was grossly negligent – or otherwise breached the duty of care – in failing to cause Sprint to take a different tax position."[70]  In so arguing, Defendants fail to address the remainder of the liability limitation provision set forth in the Company's charter, which provides:

> No Director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty by such Director as a Director; provided, however, that this ARTICLE NINTH ***shall not eliminate or limit the liability of a*** Director to the extent provided by applicable law (i) ***for any breach of the Director's duty of loyalty*** to the Corporation or its stockholders, (ii) for ***acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law*** ...[71]

Thus, the Company's charter expressly allows for personal liability for directors who breach the duty of loyalty, good faith or otherwise engage in intentional misconduct or a knowing violation of law.  As a result, and as discussed in detail below, there is a substantial likelihood that Defendants will be found personally liable for the misconduct alleged in this matter.

---

[70] Def. Mem. at 11.
[71] *See* Sprint's Amended and Restated Articles of Incorporation, as amended on August 11, 2005 at p. 48 and as amended on May 17, 2012 at p. 46-47, appended to Defendants' Motion to Dismiss as Exhibits 1 and 2.

### (ii)  Defendants' knowing and/or reckless misconduct constitutes an actionable breach of their fiduciary duties.[72]

To be clear, this is not a case involving mere allegations of corporate mismanagement.  As the New York Attorney General succinctly stated regarding the conduct alleged herein:  "Under New York law, *Sprint's approach was and is unequivocally illegal.*"[73]  The only issue, therefore, is whether Defendants knowingly or recklessly breached their fiduciary duties in failing to address the multi-year tax evasion scheme.

Where, as here, there is a corporate governance structure in place, and particularly where the misconduct alleged is of such a pervasive and serious nature, the knowledge and liability of the individual directors may be established through inference:

> Where there is a corporate governance structure in place, we must then assume the corporate governance procedures were followed and that the board knew of the problems and decided no action was required.  In such circumstances, nothing in either federal or Delaware law holds it insufficient for individual directors' knowledge and liability to be pleaded inferentially. ... To put it bluntly, the allegations of the Complaint evidence misconduct of such pervasiveness and magnitude, undertaken in the face of the board's own express formal undertakings to directly monitor and prevent such misconduct, that the inference of deliberate disregard by each and every member of the board is entirely reasonable.

*In re Pfizer Inc. S'holder Derivative Litig.*, 722 F. Supp. 2d 453, 461-462 (S.D.N.Y. 2010).

Moreover, Plaintiff has alleged that Defendants recklessly failed to oversee, monitor and manage the Company's internal controls and compliance with applicable laws.[74]  This Court addressed similar allegations in *Veeco.*  There, the plaintiffs alleged that the defendants engaged in "reckless stewardship" of the company, "particularly [in] their failure to institute appropriate controls and oversight of all areas of the Company's business," which exposed the company to significant fines and legal liability for violations of the U.S. export laws.[75]  Plaintiffs further argued that five of the named defendants were members of the audit committee and that those

---

[72] This is the first prong of the *Aronson* test, which is also referred to as the *Rales* test.
[73] ¶¶ 12, 46.
[74] ¶ 73.
[75] *Veeco*, 434 F. Supp. 2d at 274-275.

directors, along with the Company's CEO, faced a substantial likelihood of personal liability.[76]

 With respect to the audit committee defendants, the *Veeco* Court considered a number of factors, including: the committee's responsibility for reviewing the scope and result of audits, overseeing the company's Code of Ethics and insuring the implementation of adequate internal controls; the allegations that the committee recklessly ignored internal red flags; and the evidence that the committee abdicated the responsibility to monitor legal compliance and investigate claims relating to the company's allegedly flagrant, systematic and repeated violations of applicable laws.[77] The Court further explained that:

> This is not a case where the directors had "no grounds for suspicion" or "were blamelessly unaware of the conduct leading to the corporate liability." … If true, plaintiffs allegations that the Committee ***failed to exercise appropriate attention to potentially illegal corporate activities would constitute a breach of loyalty,*** subjecting Elftmann, Fridrich, Kingsley, Simone and Pfister to a substantial likelihood of liability. Thus, ***plaintiffs' allegations raise a reasonable doubt that these director-Committee members were disinterested and capable of objectively deciding whether or not to prosecute this litigation on the corporation's behalf.***[78]

 Here, the Defendant Audit Committee members – *i.e.,* Hance, Bennett, Glasscock and Ianna – similarly: had responsibility for reviewing the scope and result of audits (¶ 63), overseeing the Company's Code of Ethics (*id.*), insuring the implementation of adequate internal controls (*id.*); recklessly ignored internal red flags, which included at least two express warning from the New York Attorney General and the decision to forego $30 million so as to not call attention to the illicit scheme (¶¶ 7, 55-56, 71; New York Opposition at 4 )[79]; abdicated the

---

[76] *Id.* at 275-76.

[77] *Id.* at 276-278.

[78] *Id.* at 278.

[79]  Defendants rely heavily on *In re Johnson & Johnson Derivative Litig.*, No. 10-2033, 2011 U.S. Dist. LEXIS 112292, *37 (D. N.J. Sept. 29, 2011) ("*J&J*"), to argue that the "red flags" alleged in the Complaint fail to establish that Defendants knew that Sprint was engaging in misconduct. As a preliminary point, *J&J* concerns an application of the "disinterested and independent" test only and is inapplicable to a consideration of Plaintiff's arguments with respect to the business judgment rule. Moreover, on both the facts and the law, *J&J* is inapposite. In that case, the plaintiffs' allegations pertained to misconduct (such as the payment of kick-backs and off-label marketing) perpetrated by 7 of the company's 250 foreign and domestic subsidiaries, which the court described as "employ[ing] principles of decentralized management." *Id.* at *5-6. In addition, the court found that "viewing Plaintiffs' allegations as whole, ***Plaintiffs have not alleged a sustained, systemic failure of board oversight***." *Id.* at *71. In contrast, Sprint's

responsibility to monitor legal compliance and investigate claims relating to the Company's allegedly flagrant, systematic and repeated violations of applicable laws (¶¶ 65-68); and failed to stop the illicit activities even once the New York Attorney General filed suit.[80]

Sprint's Corporate Governance Committee, which included Defendants Bethune, Hill, Nilsson and O'Neil, was similarly charged with insuring effective "corporate governance policies and procedures" and an "effective Board review process" (¶ 69).   More generally, Sprint's Corporate Governance Guidelines mandated that **all Directors** had, at all relevant times, the responsibility to "approv[e] policies of corporate conduct, including policies regarding (a) **compliance with applicable laws** and regulations, and (b) **maintenance of accounting, financial and other controls** …"   Each of the Directors also had the express duty to "**assess[] Sprint Nextel's material risks** and business resiliency," "**ensur[e] processes are in place to maintain the ethics**, **integrity and good corporate citizenship of Sprint Nextel**," and "perform[] other responsibilities specifically prescribed by applicable laws and regulations and Sprint Nextel's Bylaws or Articles of Incorporation." ¶ 70.

Moreover, Defendant Hesse, as the Company's CEO, President and a member of the Board of Directors derives a substantial amount of his income (if not all of his income) from Sprint and therefore cannot be deemed disinterested.  *See Veeco*, 434 F. Supp. 2d at 275 ("There is no question that Veeco, as Braun's principal employer … is a substantial – if not the sole – source of

---

misconduct was (and continues to be) perpetrated by the Company itself, not a handful of widely dispersed subsidiaries.  In addition, the Complaint details a sustained, systemic failure of board oversight by the Board and a refusal to address the serious allegations of wrongdoing facing it.  Moreover, *J&J* rejects the rationale of *Abbott* (which has been embraced by this Court (*see, e.g., In re Pfizer*, 722 F.Supp. 2d at 459-460)) that a plaintiff may demonstrate demand futility by establishing a conscious decided not to act.  *See Id.* at *37 (only applying the *Abbott* standard in "those limited circumstances" involving "extreme indifference.")  More generally, the District of New Jersey opinion is discordant with Kansas law, which dictates that "a determination about whether demand is excused [is] a lenient standard."  *Randolph,* 2010 U.S. Dist. LEXIS 131807, at *30.  Thus, *J&J* is inapplicable.

Defendants' reliance on *LMPERS v. Pandit* is similarly unavailing.  Unlike the concrete allegations of illegal conduct by Sprint alleged herein, in *Pandit* the Court found that the "alleged 'red flags' … were nothing more than signs of a continued deterioration in the financial markets."  *LMPERS v. Pandit*, No. 08 Civ. 7389, 2009 U.S. Dist. LEXIS 82308, *29 (S.D.N.Y. Sept. 10, 2009).  Thus, the case is readily distinguishable from the case at hand.

[80] *Cf Veeco*, 434 F. Supp. 2d at 276-278.

Braun's income.  Accordingly, Plaintiffs' allegations … allow the Court to infer that [his] interest was of a sufficient material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform [his] fiduciary duties without being influenced by his overriding personal interest.")

Defendants' knowing or reckless failure to implement the appropriate controls necessary to prevent a multi-year tax evasion scheme creates a substantial likelihood that they will be found to have breached their duties of good faith and loyalty, thereby giving rise to personal liability, which is not exculpated under the Company's Articles of Incorporation.  *Veeco*, 434 F.Supp. 2d at 278 (holding that the failure to exercise "appropriate attention to potentially illegal corporate activities would constitute a breach of loyalty," thus creating substantial likelihood of personal liability); *see also In re Abbott Labs. Derivative S'holders Litig.*, 325 F.3d 795, 809 (7th Cir. 2001) (the "sustained and systematic failure of the board to exercise oversight" indicated that directors' decision was not made in good faith and was contrary to the best interests of the company.)

Thus, Plaintiff has adequately alleged a substantial likelihood that Defendants will face personal liability for their misconduct and thus cannot be deemed disinterested for the purposes of assessing the demand requirement.  *See Oxford Health*, 192 F.R.D. at 117 ("In numerous cases where liability is based upon a failure to supervise and monitor, and to keep adequate supervisory controls in place, demand futility is ordinarily found, especially where the failure involves a scheme of sufficient magnitude and duration which went undiscovered by the directors.")

**(b) The challenged transaction was not a valid exercise of business judgment.[81]**

Plaintiff "may prove demand futility by raising a reason to doubt whether the challenged transactions were a valid exercise of business judgment."[82]  Under Kansas law, which applies here, "[p]roper business judgment" includes a requirement that the Board exercise "procedural due

---

[81] This is the second prong of the *Aronson* test.
[82] *Ryan*, 918 A.2d. at 354.

20

care" in reaching "an informed decision." *Geer v. Cox,* 242 F. Supp. 2d 1009, 1019 (D. Kan. 2003) (denying defendants' motion to dismiss for failure to make pre-suit demand).[83]  Defendants unquestionably cannot satisfy the business judgment standard.

      As a preliminary point, Defendants insinuate in their moving papers that they did *not* have knowledge of the illegal tax evasion scheme, establishing *a priori,* that they did not "exercise procedural due care" in reaching "an informed decision."[84]  Indeed, Defendants argue that "The Complaint does not remotely meet this standard.  It does not allege any fact that, if proved, would show that any Director was even aware that there was a New York tax issue, much less that he or she deliberately caused Sprint to take an illegal tax position."[85]  Defendants' argument supports two strong inferences:  first, the Sprint Board utterly failed in its oversight in insuring that the Company complied with applicable law; second, even after learning of the allegations, the Board chose to fight what are seemingly uncontroverted claims of tax evasion in the context in which Sprint itself agreed with its competitors that it would collect taxes one way, but secretly collected them another way.  Thus, having seemingly disavowed any knowledge of the New York tax issue, Defendants cannot now be heard to claim that it followed a sound procedure and reached an informed decision regarding that issue.  The allegations in the Complaint (and indeed, Defendants' own admissions) demonstrate that the challenged transaction was not the product of a valid exercise of the Board's business judgment, thus satisfying this test for demand futility.[86]

      Moreover, as discussed in detail *supra,* Defendants were long-standing members of the Board of Directors and members of the very Committees charged with oversight and responsibility

---

[83] *See also In re Maxim Integrated Prods., Inc., Derivative Litig.*, 574 F. Supp. 2d 1046, 1068 (N.D. Cal. 2008) (applying Delaware law and stating: "Under the business judgment rule, the plaintiff must show that the fiduciary act[ed] in a manner that cannot be attributed to a rational business purpose or reach[ed] [a] decision by a grossly negligent process that include[d] the failure to consider all material facts reasonably available.") (internal quotations omitted).

[84] *Geer*, 242 F. Supp. 2d at 1019; *see* Def. Mem. at 12.

[85] Def. Mem. at 12.

[86] Defendants have provided no argument to the contrary.  If Defendants provide a new argument in their Reply brief, Plaintiff may respectfully request leave to file a sur-reply.

for management of the Company's internal controls, audit review and compliance with applicable laws and regulations. Nonetheless, Defendants allowed the massive tax fraud scheme to persist for seven years, despite clear evidence that the conduct was illicit. Indeed, on two separate occasions, once in 2009 and once in 2011, the New York Tax Authority *expressly* warned the Company that its interpretation of the tax code was incorrect and unequivocally illegal. At conferences, the Company's representatives represented to its industry peers that it was pursuing a "conservative" approach to New York state tax laws while secretly pursuing a "risky" "unbundling" approach patently not supported by the law. Perhaps most damning, the Company decided to forego $30 million rather than seek a refund, solely to avoid the possibility that it would invite scrutiny of their fraudulent scheme by the New York Tax Authority. This knowing or reckless failure to institute, oversee and monitor the Company's internal controls and compliance with applicable laws and regulations cannot have been the exercise of valid business judgment. *See In re Pfizer,* 722 F. Supp. 2d at 460 (finding that plaintiff had satisfied the business judgment rule basis for demand futility where the complaint alleged that the defendants engaged in a knowing or reckless disregard for illegal activity of substantial magnitude and duration).

Finally, Defendants argue that the Court should not consider the business judgment basis for a finding of demand futility and instead should limit its inquiry to a consideration as to whether the Defendants were disinterested and independent.[87] On the contrary, this Court has held that where directors knowingly or recklessly disregard illegal activity of substantial magnitude and duration, turning a "blind eye" to the wrongdoing, the business judgment rule is implicated:

> Other cases involving similar allegations that the directors knowingly or recklessly disregarded illegal activity have likewise held demand to be futile, especially when the alleged wrongdoing is of substantial 'magnitude and duration'. ... While **the Court agrees with plaintiff** *that a fair reading of the particularized allegations of the Complaint is that the* **defendants, at a minimum, knew of a high probability** *that Pfizer was* **continuing to purposely [engage in the**

---

[87] Def. Mem. at 9 ("In this case *Rales*—not *Aronson*—governs the demand futility analysis.")

*illegal activity] and deliberately decided to let it continue by blinding themselves to that*
*knowledge – thus implicating the Aronson test [i.e., the business judgment prong of the*
*demand futility test.]* – the Court also concludes that, in any event, the *Rales* test, let alone the
alternative prong of the *Aronson* test, is met here by the Complaint's particularized allegations
that a majority of the directors face a substantial threat of personal liability. ...[88]

In sum, the business judgment rule prong of the demand futility test applies to Defendants'
misconduct and provides an independent, sufficient basis for excusing demand under these facts.[89]

## C.     Plaintiffs Have Stated a Valid Claim for Corporate Waste

The standard for corporate waste and bad faith by a board of directors are similar.  *See*
*White v. ICN Pharm., Inc.*, 783 A.2d 543, 554 n. 36 (Del. 2001).[90]  To prevail on either claim, the
plaintiff must show that the board's decision was so egregious or irrational that it could not have
been based on a valid assessment of the corporation's best interest.  *See Id.*; *see also Walt Disney*
*Co. Derivative Litig.*, 906 A.2d 27, 74 (Del. 2006) (claims of waste arise where directors
irrationally squander corporate assets).  Moreover, determinations of corporate waste are often
factually intensive inquires, not lending itself to resolution on a motion to dismiss.  *See e.g.*,
*Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 901 (Del. Ch. 1999) (discussing difficulty of
resolving corporate waste claims without factual inquiry).

The Complaint's allegations of corporate waste clearly meet these standards and
demonstrate the egregious and bad faith nature of Defendants' multi-year sales tax scheme.
Indeed, Defendants engaged in a scheme to file fraudulent statements with New York in a series of
transactions designed to under-collect and underpay sales taxes for its monthly fixed rate wireless
access charges, despite repeated warnings that the practice was illegal.[91]  In doing so, Defendants
have exposed the Company to, among other things, over $300 million in liability (plus statutory

---

[88] *In re Pfizer*, 722 F. Supp. 2d at 460 (holding that demand was futile).
[89] *Id.*
[90] There is little Kansas authority on corporate waste claims under Kansas law.  However, Kansas, like many
jurisdictions finds Delaware law instructive on matters of corporate law.  *See Kansas Heart Hosp., LLC v. Idbeis*, 184
P. 3d 866, 878 (Kan. 2008).
[91] ¶¶ 3-7.

interest) – which, according to Sprint's SEC filings, equals the amount of cash Sprint generated in the last three months of fiscal 2011.  Moreover, the illegal underpayment of New York sales taxes are ongoing as of the date of this filing, leaving no doubt that Defendants were either aware of and authorized the practice or refuse to take any steps to stop them.[92]  Clearly, Defendants' actions in this regard were egregious, and the decision to engage in this fraud was not based upon a valid and good faith assessment of the Company's best interest.  In short the Complaint clearly satisfied the requirements for pleading corporate waste.

Defendants, however, argue Plaintiff's claims for corporate waste are not "ripe" because Sprint "has not [yet] expended, much less wasted any assets."[93]  Defendants simply ignore the Complaint's allegations of loss of goodwill (¶ 30) and the havoc Defendants' tax scheme has already wreaked upon Sprint.  Among other things, the tax scheme has exposed the Company to, *inter alia*:  (i) scrutiny by other regulatory agencies, with the SEC announcing a formal investigation into its tax collection policies; and (ii) a decrease in share price, with the Company's stock dropping 4.6% upon announcement of the lawsuit, causing a loss of more than $360 million in market capitalization).  In addition, Sprint will incur (and has already incurred) significant costs defending against the New York Action and other governmental investigations.  These cognizable and immediate damages are sufficient to support Plaintiff's claims on a motion to dismiss.[94]

## D.   Plaintiffs have Stated Valid Claims for Contribution and Indemnification

In their Motion to Dismiss, Defendants argue that there is no right of contribution on behalf of Sprint because Defendants are not "joint tort-feasors" or "judgment debtors" under Kan.

---

[92] ¶ 7.
[93] Def. Mem. at 23.
[94] *See McSparran v. Career Educ. Corp.*, No. 04 C 0041, 2006 U.S. Dist. LEXIS 3787, at *18 (N.D. Ill. Jan. 27, 2006) (diminished business reputation and legal fees are sufficient damages in a derivative action); *In re Rasterops Corp. Sec. Litig.*, No. 92-20115, 1993 U.S. Dist. LEXIS 21504, at *7-10 (N.D. Cal. Sept. 9, 1993) (damage to goodwill and legal expenses are an immediate harm not contingent upon the outcome of parallel legal proceedings).

Stat. Ann § 60-2413[95] (describing contribution rights between joint contract obligors and joint judgment debtors).   In doing so, Defendants ignore long-standing principles of equitable contribution recognized by Kansas courts.   These equitable principles focus on the relative burdens of the parties in relation to their fault – not legalistic labels.   Indeed, as the Kansas Supreme Court has held:  the "doctrine of *equitable contribution* has long been recognized by this court as a remedy available to one who is compelled to bear more than his fair share of a common burden or liability to recover from the others their ratable portion of the amount paid by him..." *Waltrip v. Sidwell Oil & Gas, Inc.*, 774 P.2d 948, 955 (Kan. 1989) (internal citation omitted) (applying principles of equitable contribution with regards to parties who were neither joint tort-feasors nor judgment debtors).[96]   In short, Plaintiff's claim for contribution is valid under Kansas law.

In addition, Defendants argue that Plaintiff's claim for indemnification is not ripe for adjudication because, absent the ultimate decision in the New York Action, there is no "actual loss" and the claim is premature.[97]   However, the Company has already incurred substantial damages to its business reputation, goodwill and financial loss in the form of extensive legal fees in defending the New York Action and the SEC investigation.   These are cognizable and immediate damages making the claim for indemnification ripe for adjudication.[98]

In sum, the Complaint has brought valid claims for contribution and indemnification which should be sustained, and Defendants arguments to the contrary are without merit.

---

[95] Defendants cite to *Kansas Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs.*, 927 P.2d 466, 481 (Kan. 1996) in support of their interpretation of this statute. There, the Kansas Supreme Court was interpreting an entirely different statute (Kan. Stat. Ann. § 74-4904a) and only addressed Kan. Stat. Ann § 60-2413 as an interpretive tool.
[96] *See also U.S. Fidelity & Guar. Co. v. Sulco*, 939 F. Supp. 820, 823 (D. Kan. 1996) (Kan. Stat. Ann § 60-2413 does not preclude tort-feasors from seeking contribution from other *potential* tort-feasors (*i.e.*, not a party to the related action) through doctrine of comparative implied indemnity (but dismissing contribution claim on statute of limitation grounds)).
[97] *See* Def. Mem. at 24.
[98] *See McSparran* 2006 U.S. Dist. LEXIS 3787, at *19; *In re Rasterops Corp. Sec. Litig.*, 1993 U.S. Dist. LEXIS 21504, at *7.

## CONCLUSION

For the foregoing reasons, the Defendants Motion to Dismiss the Verified Shareholder Derivative Complaint should be denied in its entirety.

Dated: October 26, 2012                    **BLOCK & LEVITON LLP**

                                           By ____/s/ Jeffrey C. Block_____
                                           Jeffrey C. Block (JB 0387)
                                           Jason M. Leviton (admitted *pro hac vice*)
                                           Whitney E. Street (WS 2403)
                                           Scott A. Mays (admitted *pro hac vice*)
                                           155 Federal Street, Suite 1303
                                           Boston, MA 02110
                                           Telephone: (617) 398-5600
                                           Facsimile:  (617) 507-6020
                                           Jeff@blockesq.com
                                           Jason@blockesq.com
                                           Whitney@blockesq.com
                                           Scott@blockesq.com

                                           *Attorneys for the Plaintiff Louisiana*
                                           *Municipal Police Employees' Retirement*
                                           *System*