UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------  X

LOUISIANA MUNICIPAL POLICE
EMPLOYEES' RETIREMENT SYSTEM,
Derivatively on Behalf of Itself, and All Others
Similarly Situated,

                       Plaintiffs,

          -against-

DAN R. HESSE, JOSEPH J. EUTENEUR,
ROBERT H. BRUST, PAUL N. SALEH,
JAMES H. HANCE, JR., ROBERT R.
BENNETT, GORDON M. BETHUNE,
LARRY C. GLASSCOCK, V. JANET HILL,
FRANK IANNA, SVEN-CHRISTER NILSSON,
WILLIAM R. NUTI, and RODNEY O'NEAL,
                  Defendants,

          -and-

SPRINT NEXTEL CORP.,
                Nominal Defendant.
----------------------------------------  X

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

12 Civ. 4017 (ALC)(JCF)

**MEMORANDUM &
ORDER**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7-26-13

**ANDREW L. CARTER, JR., District Judge:**

**I.**    **Introduction**

      This case is a shareholder derivative action brought by Plaintiff Louisiana Municipal

Police Employees' Retirement System ("LAMPERS") seeking relief from alleged harm caused

by Dan Hesse, Joseph Euteneur, Robert Brust, Paul Saleh, James Hance, Jr., Robert Bennett,

Gordon Bethune, Larry Glasscock, Janet Hill, Frank Ianna, Sven-Christer Nilsson, William Nuti,

and Rodney O'Neal (collectively "Defendants" or "Directors"), as members of the Board of

Directors of Sprint Nextel Corporation ("Sprint").  Plaintiffs claim the Directors permitted Sprint

to adopt a tax policy clearly in violation of New York law, thereby breaching their fiduciary

duties and wasting corporate assets.  Defendants move to dismiss the Complaint for failure to

state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## II.    Background

Sprint provides telecommunications services and products throughout the country and is the third largest wireless communications provider in the United States.  Defendants are all members of Sprint's Board of Directors and either hold senior executive offices or are members of high-level committees, including the Audit Committee, Finance Committee, Executive Committee, Nominating & Corporate Governance Committee, and Compensation Committee. Defendant Hesse currently serves as Sprint's Chief Executive Officer, and Defendant Euteneur is the company's Chief Financial Officer.

As of 2005, Sprint has sold wireless plans for a designated number of minutes per month at a fixed periodic, or monthly, access charge. (Compl. ¶ 33.)  The fixed monthly access charge remains the same regardless of whether the customer makes interstate (between two or more states) or intrastate (within the same state) calls. (Id.)  At the end of each month, Sprint sends its customers invoices showing the fixed monthly access charge, any overages, and charges for sales tax.  The invoice does not break-out interstate and intrastate usage and does not indicate taxes are collected on less than the full fixed monthly access charge for voice services. (Id. ¶ 34.)

### A. *New York's Taxation of Wireless Services*

Wireless companies frequently bundle services – that is package different types of services together in a single plan, such as internet and wireless calling.  Various services are treated differently for tax purposes when sold individually.  As a result of bundling, non-taxable services are commonly sold with taxable services in a single plan.  For example, New York law does not impose a sales tax on interstate voice services sold on a per minute basis but does impose a sales tax on intrastate voice services. Compare N.Y. Tax Law § 1105(b)(1)(B)

2

(McKinney 2012) <u>with</u> § 1105(b)(3). Often, a wireless company will sell both interstate and intrastate calling services as part of the same plan for the single, fixed access rate.

As alleged in the Complaint, New York law unequivocally requires where a wireless provider bundles interstate calling, a non-taxable service on its own, with other taxable voice services, like intrastate calling, the entire amount of wireless voice services sold in New York is subject to state sales tax. (Pl.'s Mem. 6; Compl. ¶¶ 38-39.) In other words, interstate calls cannot be unbundled from other voice services that are part of the fixed monthly access charge for purposes of paying sales tax.[1] To clarify this requirement, the New York Tax Department provided wireless carriers with guidance in a 2002 Technical Services Bureau Memorandum, which also contained examples of its proper application. (Compl. ¶¶ 38-41.) Plaintiffs claim the tax provision at issue was clear to Sprint. (<u>Id.</u> ¶ 37.)

## B.  *Sprint's Alleged Tax Strategy*

Beginning in July of 2005, Plaintiffs allege Sprint initiated a strategic plan to avoid paying sales tax on an arbitrary portion of its monthly charges for voice services, which it characterized as "interstate" in nature. (<u>Id.</u> ¶ 46.) Under this plan, Sprint unbundled interstate usage from its fixed monthly access charge and did not collect or pay sales tax on that portion of the charge. (<u>Id.</u> ¶¶ 46, 51.) Because the fixed monthly charge was not divisible based on customer usage, Sprint was forced to manufacture an arbitrary method for determining what portion of the charge was interstate usage and what portion was not. (<u>Id.</u> ¶ 51.)

---

[1] Plaintiffs acknowledge New York law allows for the unbundling of certain services when calculating the amount of taxes owed. For instance, where a plan consists of wireless voice services and internet access, Sprint can legally unbundle the internet portion of the overall charge and not pay sales tax on that component because internet access, on its own, is not subject to state sales tax. (Compl. ¶¶ 42-45.) This method of unbundling specific services for tax purposes, referred to as component taxation, is not permitted when the component as issue is for voice services, according to Plaintiffs. (<u>Id.</u> ¶ 45.)

3

Sprint allegedly developed this plan to gain a competitive advantage by reducing the amount of tax collected from its customers and, in turn, offering lower cost monthly plans. (Id. ¶ 47.)  Plaintiffs claim Sprint executives attended conferences with competitors, at which they discussed tax requirements, and sought an agreement amongst the wireless carriers whereby only internet services would be unbundled for tax purposes. (Id. ¶ 50.)  Sprint then changed course and decided to abandon the approach it championed with its competitors, proceeding to unbundle interstate usage as well. (Id. ¶¶ 50-51.)  Unbundling only internet services led to an alleged savings of $623,000 per month in taxes. (Id. ¶ 50.)  Unbundling interstate voice services allowed Sprint to realize an additional savings of $4.6 million per month and a total of $100 million in savings since 2005. (Id. ¶¶ 51, 53.)

In choosing which tax strategy to adopt, Sprint was aware that its competitors opted to unbundle only internet services through competitive surveillance but abandoned this approach "because there wasn't enough bang for the buck." (Id. ¶ 50.)  The Complaint alleges in early 2005, Sprint's Assistant Vice President of State and Local Tax, Director of External Tax, and other employees recommended to senior executives that interstate voice services be unbundled from the fixed monthly access charge and treated as if they were interstate usage billable on a per-minute basis, which was not taxed. (Id. ¶ 52.)  This approach was purportedly authorized by Sprint's senior executives. (Id.)

**C.  *Sprint's Alleged Plan to Cover-Up the Tax Strategy***

To cover-up its tax strategy, Plaintiffs claim Sprint did not pursue $30 million in refunds for "overpayment" of taxes, so as not to bring attention to the company's tax practices. (Id. ¶ 56.) The overpayment occurred when Sprint discovered, in 2009, it had failed to unbundle interstate

voice services from its fixed monthly access charge and treat them as non-taxable. (Id. ¶ 55.) Thus, Sprint "discovered that it did not adhere completely to its own unbundling program and therefore accidentally collected and paid the correct amount of sales taxes on a number of its plans." (Id.)  Sprint employees unfamiliar with the company's tax strategy suggested Sprint seek a refund, however, Sprint's Director of Telecom Tax thought otherwise: "My 2 cents is that, based on what [another Sprint employee] has laid out here, I don't think we should [seek a refund] – i.e., we can't change our books and records after the fact to support a refund." (Id. ¶ 56.)  A Senior Tax Counsel allegedly commented, "Sprint is already taking some risk with unbundling.  Our risks are exponentially increased if we try to pursue refunds when we didn't jump through the hoops on unbundling." (Id.)

Additionally, Sprint purportedly did not disclose its tax strategy to customers due to its illegality.  In July of 2005, the State and Local Tax Group and Marketing Group contemplated whether to communicate the component taxation program with customers but ultimately decided not to do so. (Id. ¶ 57.)  Further, when an employee in the Customer Billing Services Department inquired internally as to whether unbundling was part of the Subscriber Agreement, shown in the invoices, or available information to Customer Care Representatives, a member of the State and Local Tax Group responded, "[Sprint has] not educated our customers on how we are de-bundling transactions for their tax relief." (Id.)

**D.  *Lawsuit Initiated by the New York Attorney General***

According to Plaintiffs, Sprint knew, or should have known, its tax strategy was illegal by 2009.  That year, a New York Tax Department field auditor informed Sprint that its approach to unbundling was problematic, and this was reiterated by a senior enforcement official in 2011.

(Id. ¶ 7.)  In March of 2011, a qui tam action was filed against Sprint in New York state court related to its tax practices. (Id. ¶ 30.)  After investigating the allegations raised in the qui tam action, the New York Attorney General also filed suit on April 19, 2012. (Id.)

In the case brought by the New York Attorney General, it is alleged Sprint deliberately and knowingly failed to collect and pay more than $100 million in state and local taxes on its flat rate access charges for wireless calling plans over the course of seven years. (Id. ¶ 3.)  Moreover, Sprint is "experiencing serious business issues, and the amount of funds at issue is very material . . . ." (Id. ¶ 72.)  As a result of the company's tax strategy, Sprint could incur substantial penalties and be liable for interest on unpaid taxes at a rate of 14.5%. (Id. ¶ 73.)  Even after multiple lawsuits have been filed seriously questioning the legality of Sprint's tax strategy, the company continues to unbundle in alleged violation of the state tax code. (Id. ¶ 7.)

## E.  *Role of the Individual Defendants in Perpetrating Sprint's Tax Strategy*

Plaintiffs contend at all relevant times, each member of Sprint's Board of Directors had the responsibility to "approv[e] policies of corporate conduct, including policies regarding (a) compliance with applicable laws and regulations, and (b) maintenance of accounting, financial and other controls . . . ." (Id. ¶ 70.)  As members of the Audit Committee, which met anywhere from seven to seventeen times per year from 2005 to 2011, Defendants Bennett, Hance, Ianna, and Glasscock had unfettered access to the company's records, employees, and outside advisors at the company's expense. (Id. ¶¶ 63-66.)  Notwithstanding this unlimited access, the Audit Committee Defendants knowingly or recklessly turned a blind eye to Sprint's tax strategy and failed to guarantee Sprint's compliance with legal and regulatory requirements, perform internal auditing, and properly oversee management. (Id. ¶¶ 66, 68.)

6

Defendants Bethune, Nilsson, Hill, and O'Neal serve on the Nominating & Corporate Governance Committee, which is charged with ensuring Sprint "has effective corporate governance policies and procedure and an effective Board and Board review process." (<u>Id.</u> ¶ 69.) Sprint was warned at least two times by New York taxing authorities that the company's tax strategy was illegal. (<u>Id.</u> ¶ 71.)  Since Sprint had established reporting channels, Plaintiffs allege the Board was informed of the tax strategy and chose not to act. (<u>Id.</u>)  In the alternative, if the Board did not know about the tax strategy, it utterly failed to supervise and monitor the adequacy of the company's internal controls. (<u>Id.</u> ¶ 78.)  Thus, the Directors breached their fiduciary duties by failing to: (i) ensure the company was not engaged in illegal conduct, (ii) maintain accounting, financial, and other controls, (iii) assess material risks to the business, and (iv) implement processes sufficient to maintain the integrity of company operations. (<u>Id.</u> ¶ 73.)  Even after public disclosure of the tax strategy, the Board has taken no corrective action and opted to engage in costly litigation to justify its tax practices. (<u>Id.</u> ¶¶ 7, 71.)

## III.   Discussion

Plaintiffs claim the Directors breached their fiduciary duties by allowing the company to take its allegedly illegal tax approach under New York law to unbundling certain voice services from the flat rate access charge for wireless calling plans.  Further, Plaintiffs argue making demand on the Board would have been futile because the Directors will be personally liable for the resulting harm to the company.  Additionally, Sprint has already stated it plans to defend the tax strategy in litigation.  For these reasons, demand should be excused.  Defendants move to dismiss the Complaint under Rule 12(b)(6), contending Plaintiffs have not pled adequate facts to show demand futility and have failed to state a claim for corporate waste and indemnity.

A. *Standard of Review*

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows for dismissal if a party fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When deciding a motion to dismiss, the court must accept as true all well-pled facts alleged in the complaint and must draw all reasonable inferences in plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). Claims should be dismissed when a plaintiff has not pled enough facts that "plausibly give rise to an entitlement for relief." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678. If the non-moving party has "not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

Along with the pleading standards set forth in Rule 12(b)(6), the Federal Rules of Civil Procedure impose additional requirements when "one or more shareholders . . . bring a derivative action to enforce a right that the corporation . . . may properly assert but has failed to enforce." Fed. R. Civ. P. 23.1(a). Rule 23.1 mandates the complaint "state with particularity any effort by the plaintiff to obtain the desired action from the directors . . . and the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b). "Rule 23.1 is a 'rule of pleading that creates a federal standard as to the specificity of facts alleged with regard to efforts made to urge a corporation's directors to bring the action in question.'" Halebian v. Berv, 590 F.3d 195, 204 (2d Cir. 2009) (quoting RCM Secs. Fund, Inc. v. Stanton, 928 F.2d 1318, 1330 (2d Cir. 1991)). It is not satisfied by "conclusory statements or mere notice pleading." Staehr v. Mack, No. 07 Civ. 10368 (DAB), 2011 WL 1330856, at *4 (S.D.N.Y. Mar. 31, 2011).

8

**B.** *Demand Futility in Derivative Actions*

The parties agree federal procedural law and Kansas substantive law govern this derivative action with respect to the demand requirement.[2] See Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 108-09 (1991) ("[A] court that is entertaining a derivative action . . . must apply the demand futility exception as it is defined by the law of the State of incorporation."); Scalisi v. Fund Asset Mgmt., L.P., 380 F.3d 133, 138 (2d Cir. 2004) ("The substantive law which determines whether demand is, in fact, futile is provided by the state of incorporation of the entity on whose behalf the plaintiff is seeking relief."). The parties also agree Kansas looks to Delaware law for guidance on issues of corporate governance. See Kan. Heart Hosp., L.L.C. v. Idbeis, 184 P.3d 866, 878 (Kan. 2008) ("Reliance on . . . Delaware decision[s] is consistent with our long history of looking to Delaware for guidance when applying the Kansas General Corporation Code, which was modeled on the Delaware Code.").

i. *The Demand Requirement*

"It is a long held principle of corporate law that directors manage the business of the corporation." Kernaghan v. Franklin, No. 06 Civ. 1533 (LTS), 2008 WL 4450268, at *3 (S.D.N.Y. Sept. 29, 2008) (applying Delaware law). Yet, "[b]y its very nature the derivative action impinges on the managerial freedom of directors." Aronson v. Lewis, 473 A.2d 805, 811 (Del. 1984), overruled by, Brehm v. Eisner, 746 A.2d 244 (Del. 2000). Thus, the demand requirement obligates "shareholders [to] attempt to obtain relief directly from the corporation before initiating a derivative lawsuit." Franklin Sav. Corp. v. United States, 970 F. Supp. 855, 862 (D. Kan. 1997); see also Newton v. Hornblower, Inc., 224 Kan. 506, 511 (Kan. 1978)

---

[2] Sprint is incorporated in Kansas. (Compl. ¶ 13.)

(finding Kansas law parallels Rule 23.1 and requires shareholders to make demand on the Board

before instituting a shareholder derivative action).  This approach encourages "giving the

corporation the opportunity to pursue alternative remedies, thereby resolving grievances without

burdensome and expensive litigation." Franklin Sav., 970 F. Supp. at 862.  "Moreover, where

litigation is appropriate, the derivative corporation will often be in a better position to bring the

suit because of superior financial resources and knowledge of the challenged transaction."

Kaufman v. Kan. Gas & Elec. Co., 634 F. Supp. 1573, 1578 (D. Kan. 1986).

The demand requirement, while embodying important policy and practical advantages, is

not absolute:

> A shareholder may be allowed to assume control of litigation on the corporation's
> behalf without first affording the directors the opportunity to occupy their normal
> status by making demand, if the shareholder can show his case is exceptional or,
> in other words, that demand would be a futile, useless exercise. Thus, the
> shareholder must demonstrate a degree of antagonism between the directors and
> the corporate interest such that the directors would be incapable of doing their
> duty.

Id.  If a shareholder shows the "directors are under an influence which sterilizes their discretion,

they cannot be considered proper persons to conduct litigation on behalf of the corporation."

Aronson, 473 A.2d at 813.  In such situations, demand may be excused as futile.

ii. *Tests for Demand Futility*

Two tests have been established to determine demand futility.  The Aronson test applies

to conscious action by the directors, including affirmative decisions to refrain from acting. Id.

"Under Aronson, 'plaintiffs seeking to establish demand futility must plead particularized facts

that create a reasonable doubt that 1) the directors are disinterested and independent, or that 2)

the challenged transaction was a valid exercise of business judgment.'" In re Am. Int'l Group,

10

Inc. Derivative Litig., 700 F. Supp. 2d 419, 430 (S.D.N.Y. 2010) (quoting In re Morgan Stanley

Derivative Litig., 542 F. Supp. 2d 317, 321-22 (S.D.N.Y. 2008)).  Demand is excused if the

shareholder creates reasonable doubt as to either prong of the Aronson test for a majority of the

directors sitting at the time the Complaint is filed. Id. (citation omitted).

The Rales test is employed "[w]here there is no conscious decision by directors to act or

refrain from acting," and thus, "the business judgment rule has no application." Rales v.

Blasband, 634 A.2d 927, 933 (Del. 1993).  It focuses on whether "particularized factual

allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time

the complaint is filed, the board of directors could have properly exercised its independent and

disinterested business judgment in responding to a demand." Id. at 934.  As pointed out in Rales,

"The absence of board action . . . makes it impossible to perform the essential inquiry

contemplated by Aronson — whether the directors have acted in conformity with the business

judgment rule in approving the challenged transaction." Id. at 933.

The parties dispute which test should apply to the instant case.  Plaintiffs assert the

Aronson test is applicable because Defendants knowingly or recklessly failed to prohibit Sprint

from implementing the allegedly illegal tax strategy.  In turn, the Complaint can be construed to

allege conscious inaction.  Plaintiffs further claim they have "satisfied the requirements for

establishing demand futility, regardless of the test applied." (Pl.'s Mem. 15-16.)  Defendants

argue the Rales test is appropriate where, as here, none of the allegations in the Complaint

identify any decision or action by the Directors that relates to the tax strategy.

The Court agrees Rales applies to this case, as Plaintiffs offer no particularized facts

demonstrating conscious decisions by Defendants to act or not act with respect to Sprint's tax

strategy.  The primary allegations include Defendants' membership and corresponding duties as part of the Audit and Corporate Governance Committees, Defendants' failure to monitor processes ensuring compliance with all relevant regulations and laws, and Defendants' failure to respond to "red flags" regarding the alleged illegality of Sprint's tax strategy.  Yet, there are no allegations that Defendants were personally made aware of the tax strategy or the warnings from the New York Tax Department employees.  Additionally, there are no allegations Defendants' approved or reviewed the tax strategy or made specific decisions to conceal the company's tax practices.  In sum, Plaintiffs offer no facts, particularized or otherwise, to show one or more Defendants made any conscious decisions about Sprint's tax strategy, including when those decisions were made, what the contours of those decisions were, and what, if any, research and information were part of their deliberations. See In re INFOUSA, Inc. S'holders Litig., 953 A.2d 963, 986 (Del. Ch. 2007) ("The Court cannot address the business judgment of an action not taken and, therefore, should concern itself with . . . the Rales test . . . .").

iii.  *Analysis under the Rales Test*

Having concluded Rales guides the demand futility inquiry, it must be determined whether there is reasonable doubt a majority of the directors were disinterested and independent at the time the Complaint was filed.  Plaintiffs argue Defendants are individually liable for harm to the company resulting from Sprint's tax strategy and thus, were unable to objectively decide whether to prosecute this litigation on the company's behalf.  Notably, Sprint's Articles of Incorporation do not exculpate directors from personal liability for breaches of the duty of loyalty or acts or omissions not in good faith or involving intentional misconduct or knowing violations of law. (Donnelly Decl., Ex. 2 at 46-47, Dkt. No. 24-4.)  Plaintiffs contend Defendant's failure to prevent the company from taking the "unequivocally illegal" tax position

12

at issue subjects Defendants to the exceptions to coverage enumerated in the Articles of
Incorporation, and therefore, Defendants face personal liability.

As an initial matter, assertions that demand is futile because Defendants would be forced
to sue themselves and each other have been routinely rejected under Delaware law. See e.g. La.
Mun. Police Employees Ret. Sys. v. Pandit, No. 08 Civ. 7389 (LTS) (RLE), 2009 WL 2902587,
at *8 (S.D.N.Y. Sept. 10, 2009) ("[T]his 'bootstrap' argument that demand is excused because
defendants would have to sue themselves 'thereby placing the conduct of the litigation in hostile
hands and preventing its effective prosecution' has long been made to and dismissed by courts."
(quoting Aronson, 473 A.2d at 818)); Ferre v. McGrath, No. 06 Civ.1684 (CM), 2007 WL
1180650, at *3 (S.D.N.Y. Feb. 16, 2007) ("The rote allegation that directors would have to sue
themselves has been consistently rejected as a basis for excusing demand."); Fink v. Komansky,
No. 03 Civ. 0388 (GBD), 2004 WL 2813166, at *4 (S.D.N.Y. Dec. 8, 2004) ("It is settled law
that demand is not excused because plaintiff pleads that directors would have to sue themselves .
. . .").  Similarly, the existence of an "insured vs. insured" exclusion to Defendants' liability
insurance policies, on its own, does not create reasonable doubt as to whether the Directors were
disinterested.[3] In re Am. Int'l Group, Inc. Derivative Litig., 700 F. Supp. 2d at 433; Pandit, 2009
WL 2902587, at *9; Kernaghan v. Franklin, 2008 WL 4450268, at *7.

In Seminaris v. Landa, the Delaware court elaborated on when a director is interested
under Rales:

> A director is interested if he will be materially affected, either to his benefit or
> detriment, by a decision of the board, in a manner not shared by the corporation
> and the stockholders.  The 'mere threat' of personal liability in the derivative

---

[3] An "insured vs. insured" exclusion to director and officer liability insurance is "a typical exclusion from coverage of claims brought by [the corporation] against its directors . . . ." Carauna v. Saligman, Civ. A. No. 11135, 1990 WL 212304, at *4 (Del. Ch. Dec. 21, 1990).

action does not render a director interested; however, a 'substantial likelihood' of
personal liability prevents a director from impartially considering a demand.

662 A.2d 1350, 1354 (Del. Ch. 1995) (internal citations omitted).  Moreover, a director's

"discretion must also be free from the influence of other interested persons.  A director is

independent if he can base his decision 'on the corporate merits of the subject before the board

rather than extraneous considerations or influences.'" Id. (quoting Aronson, 473 A.2d at 816).

On one hand, Plaintiffs argue Defendants unquestionably knew Sprint's tax strategy was

illegal after litigation surrounding the issue began.  To support this argument, Plaintiffs point to

the qui tam action filed against Sprint, the state lawsuit filed by the New York Attorney General,

an SEC investigation, and the steep drop in Sprint's stock prices caused by litigation. (Apr. 23,

2013 Tr. at 14-16, 41-42.)  Aside from the fact that some of these allegations are not in the

Complaint, there is no explanation as to how they demonstrate Defendants knew the company

was pursuing an "illegal" tax strategy, as opposed to a "risky" tax strategy.  Puzzlingly, Plaintiffs

completely overlook the fact that no court has determined Sprint's tax practices violate New

York law at this time.[4]  In fact, Plaintiffs acknowledged during oral arguments if the state court

upholds Sprint's tax strategy, "this case would likely be dismissed." (Id. at 24.)  To maintain

Defendants knowingly and intentionally violated the law and, in turn, face personal liability is

untenable where it is ambiguous if the law has even been broken.  Plaintiffs' unsupported

allegations about the illegality of the tax strategy and the Directors' knowledge thereof are

---

[4] Plaintiffs repeatedly reference the New York Attorney General's position that "Sprint's approach was and is
unequivocally illegal." (N.Y. Atty. Gen. Compl. ¶ 46.)  While the Attorney General is making that argument, the
Court emphasizes it has yet to be adjudicated whether Sprint's approach is, in fact, illegal.  On July 3, 2013,
Plaintiffs submitted the decision from the Supreme Court of the State of New York, County of New York granting
in-part and denying in-part Defendants' motion to dismiss in the state court action. (Pl.'s Notice of Supp. Auth., Dkt.
No. 35.)  That the New York Attorney General's claim contending Sprint violated state tax law with its tax strategy
survived dismissal is of no moment to this case.  As the state court decision clearly pointed out, the Attorney
General's complaint successfully pled a cause of action, but there has been no assessment as to whether the evidence
proves liability.  Plaintiffs' supplemental authority does not change the Court's observation that, at this time, no
court has adjudicated Sprint's tax strategy as illegal.

inadequate to establish demand futility. See Fink v. Komansky, 2004 WL 2813166, at *4
(finding where the "entire lawsuit is based upon the allegation that someone on [the] board of
directors or on the senior executive staff must have known or should have known of the
unlawfulness of the transactions the Company entered into[,]" these "conclusionary [sic]
allegations of fact or law not substantiated with specific facts are insufficient to support demand
futility"); Wood v. Baum, 953 A.2d 136, 142 (Del. 2008) (finding plaintiffs failed to show
demand futility where they did "not plead with particularity the specific conduct in which each
defendant 'knowingly' engaged, or that the defendants knew that such conduct was illegal").

On the other hand, Plaintiffs claim even before the litigation, Defendants must have
known about the company's tax practices but decided not to prevent management from
implementing them.  Again, Plaintiffs make no allegations that any of the Directors had personal
knowledge of Sprint's tax strategy or its disputed legality but rather, argue Defendants'
knowledge can be inferred based on the scope of the policy and their membership on high-level
committees.  A review of the case law counsels against this approach. See e.g. In re ITT Corp.
Derivative Litig., 588 F. Supp. 2d 502, 514 (S.D.N.Y. 2008) ("But neither an awareness of facts
nor a conscious disregard of oversight duties can be inferred solely from a director's service on a
committee."); Ferre v. McGrath, 2007 WL 1180650, at *6 ("Allegations of knowledge explained
solely by the directors' service as directors, without more, are insufficient as a matter of law –
even where, as here, the plaintiff alleges that the matters in suit relate to the corporation's 'core'
business."); Wood v. Baum, 953 A.2d at 142 (finding it "is contrary to well-settled Delaware
law" to conclude membership on a committee is a sufficient basis to infer knowledge of various
wrongful acts or omissions); South v. Baker, 62 A.3d 1, 17 (Del. Ch. 2012) ("As numerous
Delaware decisions make clear, an allegation that the underlying cause of a corporate trauma

falls within the delegated authority of a board committee does not support an inference that the directors on that committee knew of and consciously disregarded the problem . . . .").

Citing to In re Pfizer Inc. Shareholder Derivative Litigation, 722 F. Supp. 2d 453 (S.D.N.Y. 2010), Plaintiffs invite the Court depart from the line of cases above and follow Pfizer in finding where there is a functioning corporate governance structure in place and serious misconduct is alleged, knowledge of the Board is established through inference. However, Pfizer does not stand for the blanket proposition Plaintiffs suggest. To the contrary, there were unique facts in Pfizer supporting the finding that despite the lack of particularized allegations, it could "reasonably be inferred that [the directors] all knew of Pfizer's continued misconduct and chose to disregard it." Id. at 460. In making this finding, Judge Rakoff focused on a series of corporate integrity agreements, "which were part of larger settlements approved by the Pfizer board [and] imposed affirmative obligations on Pfizer's board . . . ." Id. at 461. For example,

> [T]hese agreements obligated Pfizer's Chief Compliance Officer to report directly to the board the allegations of misconduct here at issue so that the board could deal with them directly, rather than relying on management. There is no reason to believe this reporting requirement was not fully complied with, thus guaranteeing that each member of the board was bombarded with allegations of continuing misconduct . . . .

Id. No such agreement exists in this case, and there are no facts resembling Pfizer on which this Court could base such an inference.

Even assuming Defendants knew or should have known about the company's approach to unbundling through committee membership, there are no claims Defendants agreed the company's tax strategy contravened the law but condoned its implementation anyway, constituting bad faith. Knowledge of the tax strategy alone, which only implies Sprint differed in its interpretation of the tax code from the New York authorities, does not lead to a reasonable

inference the Directors intentionally engaged in misconduct. See In re Citigroup Inc. S'holder

Derivative Litig., 964 A.2d 106, 134-35 (Del. Ch. 2009) (determining whether a director

knowingly engaged in misconduct or acted in bad faith "requires an analysis of the state of mind

of the individual director" which can only be undertaken when specific facts regarding that

director are alleged); see also Pandit, 2009 WL 2902587, at *8 ("[E]ven if Plaintiff had

adequately alleged 'red flags,' Plaintiff has failed to proffer specific factual allegations regarding

the individual directors' conduct in response to these alleged 'red flags.'").  Overall, Plaintiffs

are unable to identify particularized facts of Defendants' knowledge or conduct, actual or

constructive, evidencing a breach of fiduciary duties.  Accordingly, there is no reasonable basis

to conclude Defendants face a substantial likelihood of personal liability rendering them unable

to exercise disinterested and independent judgment.[5]

Plaintiffs also claim if Defendants did not know about the tax strategy, they recklessly

failed to oversee, monitor, and manage Sprint's internal controls to prevent illegal activity.  As

members of high-level oversight committees, Defendants were tasked with reviewing audits,

overseeing Sprint's Code of Ethics, ensuring effective corporate governance policies and

procedures, and instilling effective Board review processes.  Instead, Defendants ignored "red

flags," abdicated responsibility to monitor legal conformance, and failed to stop illicit activities.

According to Plaintiffs, this reckless failure of oversight creates a substantial likelihood that

Defendants breached their duties of good faith and loyalty, giving rise to personal liability.

---

[5] In their opposition brief, Plaintiffs argue Defendant Hesse, as Sprint's CEO, derives substantial income from Sprint and thus cannot be deemed disinterested.  Plaintiffs cite to In re Veeco Instruments, Inc. Securities Litigation, 434 F. Supp. 2d 267, 275 (S.D.N.Y. 2006), to support this argument.  First, Plaintiffs do not raise any allegations in the Complaint related to Hesse's income.  See Wright v. Ernst & Young LLP, 152 F.3d 169, 178 (2d Cir. 1998) (acknowledging this Circuit's long-standing practice of rejecting a party's attempt to amend its complaint through statements made in briefs).  Next, even if this argument is accepted, Plaintiffs must show reasonable doubt that a majority of Sprint's ten directors were disinterested and independent.

Delaware courts have recognized director liability arising "from an *unconsidered failure of the board to act* in circumstances in which due attention would, arguably, have prevented the loss." In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959, 967 (Del. Ch. 1996) (emphasis in original).  Known as a Caremark claim, "only a sustained or systematic failure of the board to exercise oversight – such as an utter failure to attempt to assure a reasonable information and reporting system exists – will establish the lack of good faith that is a necessary condition to liability." Id. at 971.  To prevail on a Caremark claim, Plaintiffs must offer specific facts demonstrating: "(a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." Stone v. Ritter, 911 A.2d 362, 370 (Del. 2006) (emphasis in original). "[T]he Caremark theory of recovery 'is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.'" Sampson v. Robinson, No. 07 Civ. 6890 (PAC), 2008 WL 3884386, at *5 (S.D.N.Y. Aug. 20, 2008) (quoting Caremark, 698 A.2d at 967).  Since a Caremark claim implicates board inaction, demand futility is assessed under the Rales test. Ferre v. McGrath, 2007 WL 1180650, at *3.

The demand futility arguments advanced with respect to a Caremark claim are equally deficient.  Plaintiffs do not contend Sprint lacked reporting or information channels; to the contrary, they acknowledge there were corporate governance committees.  Rather, it is nakedly asserted that Defendants ignored reports coming through those channels and other "red flags," such as the 2009 and 2011 warnings from the New York Tax Department employees and the $30 million Sprint chose not to pursue in tax refunds.  Importantly, there are no allegations any committees to which the Directors belonged had notice of Sprint's tax position but elected to

18

disregard it.  Nor have Plaintiffs alleged particularized facts indicating the committees had notice

of the warnings from state officials, and Defendants believed the warnings were based on a

credible interpretation of the tax code but still discounted them.  This is fatal to Plaintiffs'

Caremark claim. See Desimone v. Barrows, 924 A.2d 908, 940 (Del. Ch. 2007) ("Delaware

courts routinely reject the conclusory allegation that because illegal behavior occurred, internal

controls must have been deficient, and the board must have known so.").

      Plaintiffs' reliance on In re Veeco Instruments, Inc. Securities Litigation, 434 F. Supp. 2d

267, 270 (S.D.N.Y. 2006), to buttress their contentions is unpersuasive.  In Veeco, an employee

internally reported the company's violation of export laws. Id. at 278.  Following the report, the

company conducted an audit, revealing at least nine other shipments violating export laws. Id.

Defendant-directors, five of which were members of the Audit Committee, presumably reviewed

the audit report containing evidence of these violations, which would subject the company to

substantial liability. Id.  Nevertheless, seven months later, the same employee reported more

export violations. Id.  The plaintiffs argued the directors permitted additional violations to occur,

either by completely disregarding the initial reports from the employee and the audit, or by

failing to establish procedures that would protect the company against this liability. Id.  The

court found the plaintiffs' allegations raised reasonable doubt that a majority of the directors

were disinterested and independent. Id.  Specifically, the court agreed the allegations showed the

directors "conscientiously permitted a known violation of law by the corporation to occur." Id.

(citation omitted).  In reaching that conclusion, Judge McMahon stated, "This is not a case where

the directors had 'no grounds for suspicion' or 'were blamelessly unaware of the conduct leading

to the corporate liability.'" Id. (quoting Caremark, 698 A.2d at 969).

19

The facts here are distinguishable from <u>Veeco</u> in several important respects.  First and foremost, in <u>Veeco</u> there was no question that the company's practices violated federal export laws, which would subject the company to substantial penalties.  Moreover, after the first report from the employee, the company performed an internal audit.  As members of the Audit Committee, the directors were on notice of the serious violations that were occurring as uncovered by the company's own audit.  The facts provided in this case, however, do not directly allege, or create a reasonable inference, the Directors were on notice of serious violations of law.  At best, the directors could have been, though it is not specifically alleged they were, on notice that Sprint's tax employees were pursuing a tax strategy that was contrary to state officials' interpretation of the tax code but had not been adjudicated as illegal.  Because of the murky legal concepts at issue and the lack of allegations regarding what Defendants knew or did, this case markedly departs from the "reckless stewardship" present in <u>Veeco</u>.

In a final attempt to circumvent the demand requirement, Plaintiffs contend Defendants' refusal to change Sprint's tax practices even after several lawsuits have been filed evidences demand futility.[6]  Yet, it is unclear how the company's decision to challenge the New York Attorney General's interpretation of the tax code on an unsettled question of law illustrates the directors would not have been able to objectively and impartially consider Plaintiffs' demand.  <u>See</u> <u>Allison v. Gen. Motors Corp.</u>, 604 F. Supp. 1106, 1114 (D. Del. 1985) (noting the lack of particularized facts showing why the Board could not objectively consider a demand when the

---

[6] Plaintiffs point to a press release issued by Sprint on the same day the New York Attorney General filed suit, which states Sprint denies the Attorney General's allegations and intends to fight the case, as evidence of demand futility. (Pl.'s Mot. for Judicial Notice, Ex. B, Dkt. No. 29-2.)  The press release was not attached to the Complaint or incorporated therein by reference.  However, Plaintiffs moved the Court to take judicial notice of the press release for the purpose of establishing Sprint's resistance to the Attorney General's allegations.  Defendants do not contest this fact and instead, reaffirm it in their moving papers for the Motion to Dismiss. (Def.'s Opp. to Mot. for Judicial Notice, Dkt. No. 30.)  As such, the Court considers as true and draws all reasonable inferences from Plaintiffs' allegation that Sprint denies liability and intends to fight the Attorney General's position in the state court action.

company was defending itself in related litigation).  Nor do Plaintiffs allege it was the Directors'

decision to challenge the New York Attorney General's position in the state lawsuit.  As is true

with the particularized facts to support Plaintiffs' other arguments, they are only notable in so far

as they are completely absent from the Complaint.

Looking to In re Oxford Health Plans, Inc., 192 F.R.D. 111 (S.D.N.Y. 2000), Plaintiffs

argue demand is "manifestly futile" because "Sprint has already made clear that it will not take

steps to remedy the misconduct alleged in the Complaint." (Pl.'s Mem. 14.)  The Court does not

read Oxford Health so expansively as to embrace Plaintiffs' position that where a shareholder

reasonably expects the directors to refuse demand, it is excused as a matter of course. C.f. In re

INFOUSA, Inc. S'holders Litig., 953 A.2d at 986 ("It is not enough for a shareholder merely to

plead facts sufficient to raise an inference that the board of directors *would* refuse a demand.")

(emphasis in original).  In Oxford Health, the plaintiffs pled particularized facts showing the

directors engaged in insider trading, knowingly or recklessly disseminated or permitted the

dissemination of misleading information to shareholders, and knowingly permitted the company

to engage in improper billing practices. 192 F.R.D. at 114.  The court found,

> [I]t would have been futile to require plaintiffs to issue a demand to the Director
> Defendants requesting them to take action against themselves and certain senior
> Oxford executives for their intentional or reckless conduct as alleged. Not only
> would this require them to investigate and bring clams against themselves for
> their own misconduct, and the totality of their actions to date suggest most
> strongly that they will not take action, and would not have done so [at the time the
> Complaint was filed].

Id. at 116.  Unlike this case, Oxford Health contained allegations that the directors' "misconduct

was largely, if not entirely, a situation of intentional nonfeasance and acquiescence with

knowledge of management's 'repeated misrepresentations to the financial markets regarding the

extent and likely duration of [Oxford's] financial crisis.'" Id.  The allegations here are not as

"similar" as Plaintiffs suggest, lacking any reference to what Defendants knew or approved.

　　　Plaintiffs face an unusual obstacle in this case because the crux of their position is

Sprint's tax policy is illegal, though that has yet to be determined.  Unlike other cases involving

insider trading or fraudulent accounting, implementation of the tax strategy alone is not clear

evidence of misconduct.[7]  While pursuing this strategy may be risky, it could result in substantial

rewards for the company in lieu of substantial losses.  Furthermore, the heightened pleading

standard for shareholder derivative actions requires particularized allegations; that means

specific facts demonstrating futility where demand on the Board is not made.  Not only is the

Complaint lacking in particularized allegations, but it is completely void of any allegations

explaining what Defendants knew or did.  All reasonable inferences to which Plaintiffs are

entitled cannot bridge the sizeable gaps in their pleading.  These deficiencies require a finding

that Plaintiffs have failed to show reasonable doubt that a majority of the Directors would have

been unable to exercise disinterested and independent business judgment while conducting a

good faith investigation into the misconduct Plaintiffs allege.

## IV.　　Conclusion

　　　For the reasons discussed above, Defendants' Motion to Dismiss is **GRANTED.**  Since

Plaintiffs cannot establish demand futility, the Complaint is **DISMISSED** in its entirety.  See

Sampson v. Robinson, 2008 WL 3884386, at *7 (dismissing the entire complaint when plaintiffs

---

[7] When questioned about the uncertain legal status of the tax strategy as a distinguishing factor in this case at oral arguments, Plaintiffs' counsel claimed Defendants had "grossly interpret[ed the tax] statute incorrectly" and conceded "a reasonable interpretation [of the statute] that turns out to be wrong . . . [will not lead to] demand futility in that situation." (Apr. 23, 2013 Tr. at 33-34.)  Plaintiffs' theory of demand futility would require the Court to determine whether Sprint's tax strategy, as it interpreted the tax code, was reasonable.  Yet, that is not the inquiry properly before this Court.  Plaintiffs' theory highlights the problem with arguing conduct that is only conjecturally wrongful is the basis for substantial personal liability of Defendants.  This position is in stark contrast to the cases Plaintiffs' cite where the alleged conduct was indisputably illegal.

failed to show demand futility).  The Clerk of Court is respectfully directed to close this case and

to enter judgment consistent with this Order.

**SO ORDERED.**

Dated:        New York, New York
              July 26 , 2013

                                        ANDREW L. CARTER, JR.
                                        **United States District Judge**